# EXHIBITS

# AND

# APPENDICES

# VOLUME 1

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


RUSSELL ELLWOOD
*Petitioner*

VERSUS

BURL CAIN, Warden
*Respondent*

---

EXHIBITS & APPENDICES

---

| Appendix 11 | 9-4-09 | Louisiana Supreme Court denial of post conviction, docket # 2008-KH-2343 |
| Appendix 1 | 6-26-08 | Application for Supervisory Writs into Fifth Circuit |
| Appendix 2 | 7-31-08 | Denial of Writs from Fifth Circuit |
| Appendix 3 | 3-23-98 | Indictment |
| Appendix 4 | 8-17-99 | Commitment Papers |
| Appendix 5 | | Journal of Forensic Sciences, Volume 28, Number 2, April 1983, page 427 |
| Appendix 6 | | Journal of Forensic Sciences, Volume 35, Number 1, January 1990, page 109 |

The following are appendices and exhibits that are contained in previously filings and this list is provided for convenience purposes.


APPENDICES within Appendix 1:

| Appendix AA | 2-26-03 | Original Post Conviction Application - See Exhibit AA |
| Appendix BB | 8-27-07 | Order for State to give procedural objections |
| Appendix CC | 9-11-07 | Supplement and Amendment to Post Conviction Application |

| Appendix DD | 10-11-07 | Supplement and Memorandum to Remanded Application for Post Conviction Relief |
| --- | --- | --- |
| Appendix EE | 12-18-07 | State's (untimely) Motion for Extension of Time |
| Appendix FF | 4-18-08 | State's (untimely) Response to Application for Post Conviction Relief |
| Appendix GG | 4-25-08 | Motion to Strike and Request for Summary Disposition objecting to Any Untimely State Response to Application for Post Conviction Relief |
| Appendix HH | 5-27-08 | Denial of Post Conviction and Motion to Strike and Summary Disposition |
| Appendix II | 6-10-08 | Notice of Intent |
| Appendix JJ | 8-15-07 | Fifth Circuit Remand, # 07-KH-553 |

EXHIBITS and APPENDICES within Appendices CC and DD:

| Exhibit A | 1/93 | Calendar of February 1993 - police time line with alibi dates |
| --- | --- | --- |
| Exhibit B | for 2/93 | Tide Tables, weather data for time period in question from David Walters, U.S. Geological Survey for February 1993 |
| Exhibit C | 2-02-93 | Missing person report - Signal 22 |
| Exhibit D | 2-21-93 | St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Cheryl A. Lewis |
| Exhibit E | 2-22-93 | St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Delores Mack |
| Exhibit F | 2-22-93 | St.Charles Parish Sheriff's Dept., Crime Scene Investigation Daily Report of Cheryl Lewis by Dr. Susan Garcia |
| Exhibit G | 2-22-93 | Bank statement - purchase of Greyhound Bus ticket from Canton, Ohio |
| Exhibit H | 2-01-94 | Police time line p. 86 - Ellwood visited Ohio, Entry for 2-01-94 |
| Exhibit I | 5-01-96 | JPSO Special Investigations Division Vice Squad 187808, 187809 |
| Exhibit J | 5-02-96 | JPSO Narcotics Division - Report of Investigation 187810 |

## EXHIBITS & APPENDICES (continued)

| | | |
|---|---|---|
| Exhibit K | 6-25-96 | Interview of Annette Phoenix, one week before her sister's death, listed as Sunday, 2:00 A.M., (actually Monday, February 1, 1993 2:00 A.M.), Going to Circle K |
| Exhibit L | 7-12-96 | JPSO audio tape transcription of Milo Lewis (item # 04-3203-95) |
| Exhibit M | 2-10-99 | State of Louisiana Dept. of Justice Interview Report of Milo Lewis (file # 36-373) with Cheryl Lewis on Wednesday evening |
| Exhibit N | 12-15-97 | Audio tape transcription from Stark County Jail, pp. 1, 4, 12, 13 |
| Exhibit O | 3-02-98 | Warrant for Arrest of Russell Ellwood and Affidavit (1993 time period not consistent with pregnancy of Samantha) |
| Exhibit P | 4-09-98 | Application for Bill of Particulars and Motion for Discovery and Inspection |
| Exhibit Q | 5-26-98 | Motion to suppress the evidence and alleged "inculpatory" statements |
| Exhibit R | 1-11-99 | Answer to Application for Bill of Particulars and Motion for Discovery and Inspection and cover letter |
| Exhibit S | 1-26-99 | Report from William Bass (University of Tennessee, Knoxville) to JPSO Steve Buras (officer provided autopsy photos) |
| Exhibit T | 3-23-98 | Indictment |
| Exhibit U | 3-02-99 | Amended Indictment |
| Exhibit V | 4-19-99 | Motion To Dismiss Remaining Count of the Indictment & Motion To Adopt All Previous Motions Filed |
| Exhibit W | 5-20-99 | Motion for Discovery and Inspection, Motion to Disallow Other Crimes Evidence, and Motion to Suppress |
| Exhibit X | 6-04-99 | Motion in Limine |
| Exhibit Y | 7-02-99 | Affidavit of Shara Kohrs - two inmates that testified could not identify Ellwood, but were urged by police to testify |
| Exhibit Z | 6-21-00 | Anonymous letter to James A. McPherson (witness coaching of St. Gabriel inmates - deposition of Bruce Harrison requested) |
| Exhibit AA | 2-26-03 | Original Post Conviction Application and cover letter |

| | | |
|---|---|---|
| Exhibit BB | 2-27-03 | Indigent mail request, Clerk of Court - District Attorney - St. Charles withdrawal slip $2.58 |
| Exhibit CC | 4-08-05 | Letter from Steven Lintlop |
| Exhibit DD | 3-06-06 | Letter from Steven Lintlop |
| Exhibit EE | 9-26-05 | Letter to Ross T. Scaccia from C.David James - material in my possession has been sent to Mr. Scaccia |
| Exhibit FF | 1-17-06 | Letter from Maria Chaisson (RE: Ron Camden telephone conversation) |
| Exhibit GG | 3-30-06 | Letter to Clerk of Court, 29th Judicial District Court |
| Exhibit HH | 8-18-06 | Affidavit of Charles Unger |
| Exhibit II | 7-2000. . . | Correspondence to Ellwood from McPherson, dated 7-10-00, 3-11-03, 3-18-03, 3-26-03, 5-02-03, 4-05-05, 5-24-05, 6-10-05, 7-18-05 |
| Exhibit JJ | 2-2003. . . | Correspondence to Practice Assistance Council from Ellwood, dated 2-14-03, 2-17-05, 3-01-05, 4-13-05, 5-16-05, 5-16-05, 6-14-05, 6-15-05, 7-05-05, 7-12-05 |
| Exhibit KK | 3-2005 . . . | Correspondence to Practice Assistance Council from McPherson, dated 3-10-05, 4-06-05, 4-18-05, 6-30-05 |

## TRANSCRIPTS

| | |
|---|---|
| Exhibit LL 5-26-98 | Transcript of perpetuated testimony of Stan Hill |

| | |
|---|---|
| p.57 lines 25-32 | Ellwood allegedly dumped bodies in alleyways |
| p.58 lines 1-5 | Ellwood allegedly dumped bodies "behind dumpsters or aside the river" |
| P.60 lines 7-23 | victims were "tied up" and "strangled" |

| | |
|---|---|
| Exhibit MM 12-09-98 | Transcript of Testimony of Lt. Susan Rushing |

| | |
|---|---|
| p.34 lines 30-32 p.35 lines 1-6 | Bodies not in same vicinity at same time |
| p. 40 lines 30-31 | Date of Samantha's birth in 1994 altered |
| p.41 lines 12-17 | Birthdate of child is very important |

## EXHIBITS & APPENDICES (continued)

**Exhibit NN**
**1-15-99**

Transcript of Hearing on Motion to Suppress

| | |
|---|---|
| p.10 lines 8-9 | Changed dates on things |
| p.10 line 24 | Witness interviews altered (Annette Phoenix interview) |
| p.35 lines 6-31 | Discovery issue - open discovery |
| p.37 line 8 | Discovery to be complete by March 15, 1999 |
| p.40 lines 1-5 | Jefferson Parish Coroner is under sub-contract in St.Charles |

**Exhibit OO**
**3-02-99**

Transcript of Pre-trial Motion to Amend Bill of Information

| | |
|---|---|
| p.7 lines 1-12 | Maria Chaisson spoke with Ron Camden. Ellwood did not confess during interrogation. |

**Exhibit PP**
**3-05-99**

Transcript of Hearing on Pre-trial Motions

| | |
|---|---|
| p.91 lines 12-32 | \ |
| p.92 lines 1-32 | \__ No evidence of misdemeanor manslaughter |
| p.93 lines 1-8 | / |
| p.94 lines 18-24 | / |
| p.94 lines 18-24 | No confirmation of second testing method |
| p.124 lines 28-32 | Discovery issue |
| p.125 lines 6-29 | Freese promises to complete discovery by March 15, 1999 |
| p.126 lines 23-26 | Full open discovery ended on December 10, 1998 |
| p.128 lines 2-9 | Freese agrees to provide additional discovery material of Delores Mack |

**Exhibit QQ**
**5-10-99**

Transcript of Hearing on Motions

| | |
|---|---|
| p.19 lines 3-32 | Discussion related to actual grounds as basis of defective indictment |
| p.21 lines 7-16 | Freese continues to suppress bus tickets dated 2/22/93 and 2/23/93 |
| p.23 lines 19-22 | Motion to dismiss denied |
| p.23 lines 23-29 | Scaccia objects for the record |

**Exhibit RR**
**6-01-99**

Transcript of Hearing on Motions

| | |
|---|---|
| p.22 lines 26-32 | \__ Motion to suppress the evidence of other crimes |
| p.23 line 1 | / |

| | | |
|---|---|---|
| p.23 lines 2-15 | The court will give cautionary instructions to the jury regarding four incidents |
| p.23 lines 16-26 | Scaccia objects to ruling denial |
| p.23 lines 27-32 | \\_ Freese believes we have had evidentiary hearing |
| p.24 lines 1-13 | / |
| p.26 lines 19-32 | Discovery motion heard |
| p.28 lines 17-32 | Autopsy reports grossly incomplete; never received supplemental reports. |
| p.29 lines 1-8 | Freese states autopsy discovery is complete |
| p.30 lines 1-8 | Freese states there are no autopsy photographs |
| p.39 lines 24-32 | \\____Only names of expert witnesses provided |
| p.40 lines 1-20 | / |
| p.40 lines 21-28 | Freese states no need for *Daubert* hearings; Scaccia fails to object |
| p.41 lines 11-22 | Scaccia intends to subpoena Mary Manheim as expert witness |

**Exhibit SS**
**6-07-06**        Transcript of Trial - Day 1 - Motion in Limine Ruling

| | |
|---|---|
| p.6 lines 18-28 | Denied use of Stan Hill videos - no objection |
| p.7 line 1 | Maria Chaisson testimony to impeach Ron Camden |
| p.7 line 17 | Denied reconsideration of court's ruling on other crimes evidence |
| p.7 lines 18-24 | Denied Shara Kohr's testimony |
| p.7 lines 25-27 | Scaccia preserves objection |

**Exhibit TT**
**6-08-06**        Transcript of Trial - Day 2 (record erroneous marked Day 1)

| | | |
|---|---|---|
| p.80 lines 31-32 | Toxicological report was performed |
| p.81 lines 22-32 | \\____ Objection to "certain beyond a reasonable doubt" |
| p.82 lines 1-2 | / Trial court fails to charge jury on reasonable doubt during testimony of said witness |
| p.82 lines 26-32 | \\__ Unable to estimate the time of death |
| p.83 lines 8-13 | / |
| p.83 lines 14-17 | Alive but unconscious |

# EXHIBITS & APPENDICES (continued)

Exhibit UU
6-09-99
Transcript of Trial - Day 3

| | |
|---|---|
| p.5 lines 15-32 | Motion to protect record in reference to other crimes witnesses |
| p.6 lines 4-15 | Scaccia moves for mistrial based on denial of other crimes witnesses |
| p.7 lines 12-19 | Move for mistrial |
| p.7 lines 24-27 | Move for mistrial denied |
| p.25 lines 24-27 | Scaccia objects again and moves again for mistrial |
| p.25 lines 28-30 | Trial court notes objection |
| p.26 lines 26-30 | Third objection to other crimes witnesses and third motion to move for mistrial |
| p.27 lines 21-22 | Trial court denies motion |
| p.28 lines 25-32 | \\____ Denise Sanders testified Lewis and Ellwood seen |
| p.29 lines 1-8 | /      together in summer of 1993 |
| p.209 lines 17-29 | Ellwood feels comfortable with State's discovery |

Exhibit VV
6-10-99
Transcript of Trial - Day 4

Sharon Jones testimony

| | |
|---|---|
| p.102 lines 29-32 | \\____ Medical reports of birthdate of |
| p.103 lines 1-13 | /      Samantha as December 1, 1994 |

| | |
|---|---|
| p.125 lines 7-13 | Scaccia expresses desire to introduce original indictment into evidence |
| p.126 lines 13-32 | Discussion of original indictment as evidence |
| p.126 lines 27-32 | \\__ Freese objects |
| p.127 lines 1-5 | / |
| p.127 lines 6-8 | Trial court offers stipulation if agreeable to Scaccia |
| p.127 lines 9-17 | Scaccia refuses to agree to stipulation |
| p.127 lines 20-27 | State's objection is sustained trial court's stipulation enforced |
| p.144 lines 18-32 | \\____ Court entertains objection by McPherson |
| p.145 lines 1-31 | /      on disallowing other crimes testimony |
| p.146 lines 19-28 | Delete other crimes jury charge and testimony |
| p.146 lines 29-32 | Trial court denies fourth motion |
| p.190-200 | Jury Charges |

Exhibit WW    Petition to rule on pending Motion for Production of Documents with cover letter filed April 14, 2005, Clerk of Court, St. Charles Parish

Exhibit XX    Letter to Honorable Kirk R. Granier requesting to rule on motion for production of documents which was never ruled upon, with proof of mailing.

Exhibit AAA   7-02-99     Affidavit from Shara Kohrs #119059

Exhibit BBB   7-11-99     Letter from Shara Kohrs #119059
                                       (Backside notation of Ross T. Scaccia, attorney)

Exhibit CCC   8-10-99     Letter from Gayle Niedhardt #211283

Exhibit DDD   8-13-99     Letter from Sandra Cordero #396759

Exhibit EEE   3-12-01     Letter from James L. Piker

Exhibit FFF    12-27-06    Letter from April George #269654

Exhibit GGG   5-25-07     Affidavit from Russell Kirkland #417899

Exhibit HHH   6-06-07     Affidavit from Garnet Marshall #110335

Exhibit AAAA            Denial of access to the court's public records request

Exhibit BBBB 2-08-99     Lawrence Lewis interview, black male suspect responsible for the death of Cheryl Lewis

Exhibit CCCC 12-5-06     The Courier, Houmatoday.com, Ronald J. Dominique sometimes driving a small black pickup

Exhibit DDDD           Letter from Ellwood to Leon A. Cannizzaro, Jr., Orleans Parish District Attorney. Ronald J. Dominique driving a red/brown 4-door Toyota auto.

Exhibit EEEE           Affidavit of Joe Brown, Jr., information relevant to Mervin Spencer, black male suspect

Exhibit FFFF   9-18-08     Letter from Sandra Cordero relates conversation with Nawassa Richmond and willingness to provide statement to Ross T. Scaccia

Exhibit GGGG   9-22-07     Letter from Sandra Cordero, spoke with Gale Niedhardt and both are willing to give statements about coached witnessing

## EXHIBITS & APPENDICES (continued)

Exhibit HHHH   5-27-07   Notation of information inmates Daniel Dickerson and Jon Ballay provided relative to coached witnesses

Exhibit IIII   Addresses of coached witnesses provided to Petitioner by Jon Ballay

Exhibit JJJJ   8-1-2000   Denise "Cookie" Sanders lied during Petitioner's trial and could not identify Petitioner

## APPENDICES

Appendix A   Scientific Evidence (1986) - Pathology § 19-8(B) page 137, by P. Giannelli and E. Imwinkelried

Appendix B   Insect Succession and Decomposition of Pig Carcasses in Water, by Jerry A. Payne and Edwin King, Journal of Entomological Science, pp. 154-155

Appendix C   State v. Matthews, testimony of Dr. Patrick Besant-Matthews, cover page & pp. 123 &131

# The Supreme Court of the State of Louisiana

STATE EX REL. RUSSELL ELLWOOD

VS.

STATE OF LOUISIANA

NO. 2008-KH-2343

— — — — — —

IN RE: Ellwood, Russell; - Plaintiff; Applying For Supervisory and/or Remedial Writs, Parish of St. Charles, 29th Judicial District Court Div. D, No. 98-109; to the Court of Appeal, Fifth Circuit, No. 08-KH-541;

— — — — — —

**September 4, 2009**

Denied.

BJJ

CDK

JPV

JTK

JLW

GGG

BJ

Supreme Court of Louisiana
September 4, 2009

*Rachel Edelman*

Deputy   Clerk of Court
         For the Court

APPENDIX

II

Supreme Court
STATE OF LOUISIANA
400 ROYAL STREET
New Orleans
70130

70712-9800

Russell Ellwood, (Pro Se)
#413920, Cypress 3
Louisiana State Penitentiary
Angola, LA 70712

RECEIVED SEP 0 8 2009

MAILED FROM ZIP CODE 70130
$00.44
SEP 2009

US POSTAGE

HASLER

017H15517591

$0.420

07/31/2009

Mailed From 70053



**Court of Appeal**

FIFTH CIRCUIT

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

Russell Ellwood
D.O.C. No. 413920, Cypress 3
Louisiana State Penitentiary
Angola, LA 70712

RECEIVED AUG 0 4 2009

APPENDIX
2

# *Application For Writs*

## No. '08-KH-541

## COURT OF APPEAL, FIFTH CIRCUIT

## STATE OF LOUISIANA

JUL - 2 2008

*Mary S Legnon*

Deputy Clerk

**STATE OF LOUISIANA, EX REL., RUSSELL ELLWOOD**
**VERSUS**
**N. BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY; STATE OF LOUISIANA**

IN RE  RUSSELL ELLWOOD

**APPLYING FOR**  SUPERVISORY WRIT OF REVIEW FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT, PARISH OF ST CHARLES, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE KIRK R. GRANIER, DIVISION "D", NUMBER 98-109

**Attorneys for Relator:**

Russell Ellwood
D.O.C. No. 413920, Cypress 3
Louisiana State Penitentiary
Angola, LA 70712

**Attorneys for Respondent:**

Hon.  Harry J. Morel, Jr.
District Attorney
29th Judicial District Court
P. O. Box 680
Hahnville, LA 70057
(985) 783-6263

**WRIT DENIED**

(SEE ATTACHED)

Gretna, Louisiana, this 31st day of July, 2008.

STATE OF LOUISIANA, EX REL., RUSSELL
ELLWOOD

VERSUS

N. BURL CAIN, WARDEN, LOUISIANA
STATE PENITENTIARY; STATE OF
LOUISIANA

NO. 08-KH-541

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

## WRIT DENIED

Relator filed an application for post-conviction relief in the trial court on
February 26, 2003, making claims of insufficiency of evidence presented by the
State, improper introduction of other crimes evidence, and ineffective assistance of
counsel.

Due to a delay in the service of the original order to respond rendered in
August of 2007, the State was given an extension of time until April 2, 2008 to
respond to relator's claims. Relator filed a motion to strike the State's timely
response which was denied. On May 27, 2008, the trial court denied relator's
application on the merits.

In argument to this Court, relator asserts the trial court erred in denying his
motion to strike the State's response. We find no merit in this argument given the
extension of time granted by the trial court.

We have also considered the merits of relator's claims and find the trial
court's judgment to be correct. The issue of sufficiency of evidence was raised by
counsel and fully considered by this Court in relator's appeal.

The evidence of other crimes of which relator complains was the testimony
of seven prostitutes who established that relator had severally beaten and/or
sexually assaulted them. Relator admits he received written notice of the State's
intent to introduce the testimony, that his attorney objected, and that the matter was
fully considered by the trial court. Relator does not state why he was prejudiced in
not having a <u>Prieur</u> hearing. Rather, his argument is that the testimony of the

witnesses was factually dissimilar, since the woman he was charged with killing was drowned. La. C.E. Art. 1104 does not mandate a _Prieur_ hearing, and relator does not assert how the lack of a hearing prejudiced him. We find no merit in this claim.

Further, we find no error in the trial court's decision to deny the claim of ineffective assistance of counsel.

Gretna, Louisiana, this 31st day of July, 2008.

_____
**JUDGE MARION F. EDWARDS**

_____
**JUDGE CLARENCE E. MCMANUS**

_____
**JUDGE WALTER J. ROTHSCHILD**

A TRUE COPY
GRETNA

JUL 3 1 2008

Mary _____ DEPUTY CLERK
COURT OF APPEAL, FIFTH CIRCUIT

2



**INDICTMENT**

### STATE OF LOUISIANA

### 29TH JUDICIAL DISTRICT COURT

### FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

VERSUS

RUSSELL ELLWOOD

W/M DOB: 05/09/50

NO._____ DIV._____

*i True Bill*

> A TRUE BILL
> **SECOND DEGREE MURDER**
> **(TWO COUNTS)**
>
> BY: _____
> **FOREMAN**

*3-23-98*

On this the __23rd__ day of __MARCH__, 19__98__, the Grand Jury of the Parish of St. Charles,

State of Louisiana, charges that

*between January 31, 1993 and*

on or about~~ __February 9__ of 1993, at and in the Parish, District and State aforesaid. __RUSSELL ELLWOOD__

committed the offense of __SECOND DEGREE MURDER (TWO COUNTS)__ as defined by Louisiana Revised

Statute Title __14__; Section __30.1__ in that

    *COUNT 1:*    Russell Ellwood committed second degree murder of Delores Mack, and

    *COUNT 2:*    Russell Ellwood committed second degree murder of Cheryl Lewis,

contrary to the law of the State of Louisiana and against the peace and dignity of the same.

*Nolle Prosequi*
*as to Count 1 only*
*Doug W. Freese, AG*
*3/2/99*

RICHARD P. IEYOUB
**ATTORNEY GENERAL**

_____

BY: **DOUGLAS W. FREESE**
**Assistant Attorney General**
**State of Louisiana**

**APPENDIX**
**3**

*******************************************
SECTION

*******************************************
STATE OF LOUISIANA

versus

RUSSELL ELLWOOD

*******************************************
INDICTMENT FOR

SECOND DEGREE MURDER
(~~TWO~~ COUNT~~S~~)
ONE

*DIST. FILED*
*DON'T*
*AAG*
*7/7/98*

Filed _____ 19 _____

_____

_____ Deputy Clerk
*******************************************
Arraigned _April 9,_ 19 _98_

and Pleaded _Not guilty._

_Yati D. Trepagnier_ Minute Clerk
*******************************************

STATE OF LOUISIANA
PARISH OF ST. CHARLES
I HEREBY CERTIFY THAT THE WITHIN
AND FOREGOING IS A TRUE COPY OF THE
ORIGINAL ON FILE IN THIS OFFICE.
_Yati D. Trepagnier_
CLERK OF COURT
ST. CHARLES PARISH

# STATE OF LOUISIANA

## Twenty-Ninth Judicial District Court for the Parish of St. Charles

---

## THE STATE OF LOUISIANA.

TO THE SHERIFF OF THE PARISH OF ST. CHARLES—GREETING:

WHEREAS_____RUSSELL ELLWOOD_____

was by due form of law lately convicted before the Twenty-Ninth Judicial District Court for the Parish

of St. Charles of_____1 CT. SECOND DEGREE MURDER_____

_____

_____

_____

and was thereupon sentenced, on the_____17TH_____day of_____AUGUST,_____

nineteen hundred and_____99_____to imprisonment in the STATE PENITENTIARY at hard labor

for_____LIFE IMPRISONMENT WITHOUT BENEFIT OF PAROLE,_____~~XXXXXXXXXXXXXXXXXXXXXXXXX~~
       PROBATION OR SUSPENSION OF SENTENCE, CREDIT
       FOR TIME SERVED.


NOW, THEREFORE, You, the said Sheriff, are hereby commanded to carry in full and entire
execution every part of the aforesaid sentence. And for so doing this shall be your sufficient warrant
and authority.


WITNESS_____HONORABLE KIRK GRANIER_____

Judge, presiding in said Twenty-Ninth Judicial District Court, for the

Parish of St. Charles, at the Court of the Sittings of the same, in the

Parish of St. Charles, this_____17TH_____day of_____AUGUST,_____

in the year of our Lord one thousand nine hundred and_____99._____

_____Veli D. Trepagnier_____DY._____Clerk.

APPENDIX
4

No. 98-0109

# Twenty-Ninth Judicial District Court

PARISH OF ST. CHARLES

THE STATE OF LOUISIANA

VERSUS

RUSSELL ELLWOOD

Crime   1 CT. SECOND DEGREE MURDER

Date of Sentence   AUGUST 17, 1999

Amt. of Time   LIFE IMPRISONMENT WITH THE DEPT. OF CORRECTIONS,
WITHOUT BENEFIT OF PAROLE, PROBATION OR SUSPENSION
OF SENTENCE, CREDIT FOR TIME SERVED.

SENTENCE OF THE COURT

*William C. Rodriguez,* [1] *M.A. and William M. Bass,* [2] *Ph.D.*

# Insect Activity and its Relationship to Decay Rates of Human Cadavers in East Tennessee

**REFERENCE:** Rodriguez, W. C. and Bass, W. M., "Insect Activity and its Relationship to Decay Rates of Human Cadavers in East Tennessee," *Journal of Forensic Sciences*, JFSCA, Vol. 28, No. 2, April 1983, pp. 423-432.

**ABSTRACT:** This is the first report on an ongoing study conducted to collect data on the specific insects that are found in association with decaying human cadavers. Four nude unembalmed human cadavers were each placed, at various times of the year, within a decay research facility located in open wooded area. Data were collected daily throughout the entire decay cycle on the various insect populations that frequented each cadaver. Analysis of the data shows that there is a direct correlation between the rate of decay and the succession of insect families and species found in association with a decaying cadaver. Application of this entomological information can contribute to a more accurate estimation of "time since death" of an individual.

**KEYWORDS:** pathology and biology, decomposition, insects, postmortem changes, time of death

A decomposing corpse, which has been discovered lying in a wooded area, secluded lot, or in an open field, presents the forensic scientist with many questions to be answered. One of the most important questions is the "time interval since death." The answer to this question is, in many cases, crucial to establishing the identity of the individual. Forensic scientists faced with this question must rely on their experience of previously known cases. This results in a rough estimation of time since death, based on nonspecific criteria.

The purpose of this research was to provide a more reliable method for determining the time interval since death of a decaying corpse. This method is based on entomological and seasonal factors.

Decay rates of human cadavers have a direct relationship to the successional pattern of carrion frequenting insects. Application of this method can provide forensic scientists with a defined criterion for determining the time interval since death.

### Previous Studies on Decay Rates

Most research concerning decay rates has employed an entomological approach. In the anthropological literature Gilbert and Bass [1] proposed seasonal dating of prehistoric Amer-

Presented at the 34th Annual Meeting of the American Academy of Forensic Sciences, Orlando, FL, 8-11 Feb. 1982. Received for publication 29 May 1982; revised manuscript received 14 Sept. 1982; accepted for publication 15 Sept. 1982.

[1] Graduate student in physical anthropology, University of Tennessee, Knoxville, TN.

[2] Professor and head, Department of Anthropology, University of Tennessee, Knoxville, TN and Tennessee state forensic anthropologist.

**APPENDIX 5**

Copyright © 1983 by ASTM International

pattern of insect families frequenting each cadaver throughout the decay process. The successional patterns observed in this study are consistent with those described by Reed [3].

This successional pattern was marked by the presence of a particular insect family or families during each stage of decomposition. The succession of insect families observed in this study were found to be consistent with those described by Reed [3]. Also the various insect species observed in this study were found to be the same as those reported by Reed.

However, there are variations in the minimum time for particular insect species to begin frequenting the decaying subjects. These variations can most likely be attributed to the different decompositional rates of dog carcasses and human cadavers, which is to be expected considering the differences in body size and composition.

Insect and decompositional data collected in this study were also compared with that reported by Payne [6] and Payne and King [7,8]. Similarities were found to exist between the decompositional stages and insect families observed. Many of the particular insect species reported on by Payne and King were also observed in this study. Payne and King did not greatly elaborate on the specific insect successional and seasonality patterns observed, ruling out an accurate comparison of results.

During the fresh stage of decay, blow flies and muscid flies were the primary insect types observed. Their basic activities were feeding and reproduction on the cadavers. Egg laying by adult flies first occurred in the area of the face, eggs being deposited in the nasal openings, ears, mouth, and eyes. Toward the end of the fresh stage eggs were deposited in the area of the scrotum or vagina. Hatching of the eggs occurred shortly afterwards, with newly hatched fly larvae feeding on the flesh. Fly activity continued until the dry stage of decomposition.

At the onset of the bloated stage carrion beetles followed by rove and clown beetles were observed in association with the cadavers. These beetles were observed feeding on the young fly larvae, however the carrion beetles were also observed feeding on the decomposing flesh of the cadavers. In addition to the continued presence of blow and muscid flies, flesh flies were observed feeding and depositing eggs on the cadavers.



FIG. 1—Normal temperatures, normal precipitation, and deviations from normal for the period May 1981 to April 1982. 1 in. = 25.4 mm and $t°C = (t°F - 32)/1.8$.

*Robert W. Mann,*[1] *M.A.; William M. Bass,*[2] *Ph.D.; and*
*Lee Meadows,*[2] *B.A.*

# Time Since Death and Decomposition of the Human Body: Variables and Observations in Case and Experimental Field Studies

**REFERENCE:** Mann, R. W., Bass, W. M., and Meadows, L., **"Time Since Death and Decomposition of the Human Body: Variables and Observations in Case and Experimental Field Studies,"** *Journal of Forensic Sciences,* JFSCA, Vol. 35, No. 1, Jan. 1990, pp. 103–111.

**ABSTRACT:** Much of the difficulty in determining the time since death stems from the lack of systematic observation and research on the decomposition rate of the human body. Continuing studies conducted at the University of Tennessee, Knoxville, provide useful information on the impact of carrion insect activity, ambient temperature, rainfall, clothing, burial and depth, carnivores, bodily trauma, body weight, and the surface with which the body is in contact. This paper reports findings and observations accumulated during eight years of research and case studies that may clarify some of the questions concerning bodily decay.

**KEYWORDS:** physical anthropology, musculoskeletal system, postmortem interval, human skeleton, decay studies, time since death, human decomposition

There are few studies on the decomposition rate of the human body [1–4].[3,4] However, nonhuman studies have been conducted on such varied topics as the decay and putre-faction rates of frozen, thawed, and mechanically injured rats [5]; carrion insect activity of pigs [6–8]; and scattering and destruction of mammalian and human remains by carnivores [9–13]. Difficulty in obtaining bodies, lack of suitable areas for placement and study of the bodies, and negative public opinion all contribute to deter most human decay studies. However, it is crucial that forensic scientists have adequate knowledge to estimate accurately how long a person has been dead if they are to contribute to the resolution of the legal issues involved when a human body is recovered. The most common way to obtain such information is to conduct controlled studies on deceased individuals of known age, race, sex, weight, and cause/manner of death in natural, rather than laboratory, settings. In the natural setting, it is imperative that the exact time of death,

Received for publication 19 Dec. 1988; revised manuscript received 24 Jan. 1989; accepted for publication 7 March 1989.

[1] Museum specialist, Department of Anthropology, National Museum of Natural History, Smithsonian Institution, Washington, DC.

[2] Professor and department head and graduate assistant, respectively, Department of Anthropology, University of Tennessee, Knoxville, TN.

[3] W. C. Rodriguez, "Insect Activity and Its Relationship to Decay Rates of Human Cadavers in East Tennessee," unpublished Master's thesis, Department of Anthropology, University of Tennessee, Knoxville, 1982.

[4] M. S. Micozzi, "Taphonomy of Human and Animal Remains: Theory, Methodology, Principles and Applications," in *Fundamentals of Archaeology*, unpublished manuscript, Department of Anthropology, University of Pennsylvania, Fall 1981.

Copyright © 1990 by ASTM International

APPENDIX
6

body had mummified. However, her head hair and other indicators of gender such as the breasts were gone or distorted. Although her breasts were not easily recognizable, it was the low placement of the areola and large nipples that allowed a quick determination of sex at the scene. She subsequently was positively identified and reinterred.

*3.   The quickest rate of decay documented in our studies was a young, white female who was strangled.*

After autopsy (organs were not returned to the body) she was placed at the research facility in a disaster bag that was left unzipped down to the level of her mid-thoracic region. She was completely skeletonized in seven days during hot weather and in the shade.

*4.   Bodies floating in water will exhibit the typical indicators of decay including bloating, discoloration, loss of hair, and maggot infestation.*

*Example*—During the fall, three prisoners escaped from a penitentiary and tried, unsuccessfully, to swim across a wide river. Four days later they were found floating and were taken to the morgue for positive identification. The bodies were bloated and heavily infested with maggots (within all the major body cavities).

*5.   In warm to hot weather it literally takes only a few seconds for the first flies (blow flies) to land on a dead body placed outside in a wooded area.*

This has been noted on many occasions when placing bodies for study.

*6.   After only a few days in warm to hot weather, head hair will slough off and usually remain intact as a hair mass.*

When a skeleton has been scattered by carnivores, search the area for a mass of hair which will indicate where the body initially lay and decomposed. If the skeleton has been scattered on a mountainside or hill, search further up the hill because many of the bones, especially the round skull, will roll downhill when the soft tissues holding the bones together decay. In very cold weather both head and pubic hair may remain attached to the skin as a result of the lack of dehydration and to expansion of the hair follicles.

*Example*—A Jane Doe was held in a morgue cooler (approximately 40°F [4°C]) for a period of nearly five years pending police and forensic investigations. When the woman's identity could not be established, she was taken to the ARF for holding. After four months her head and pubic hair were still firmly held and could not be removed except with force.

*7.   If a body part has been exposed to certain chemicals, insects will avoid it.*

*Example*—At the ARF, a badly damaged human hand was removed for fingerprinting at the police laboratory and placed in a jar of formalin. When the hand was put back

Russell Ellwood
#413920, Cypress 3
Louisiana State Penitentiary
Angola, LA 70712

June 26, 2008

Peter J. Fitzgerald, Jr.
Clerk of Court
Fifth Circuit Court of Appeal
P.O. Box 489
Gretna, LA 70054-0489

Re:     Application for Supervisory Writ of Review
        and Memorandum in Support

Dear Honorable Clerk,

Please find enclosed applicant's Application for Supervisory Writ of Review

and Memorandum in Support to be filed with your court.

Thank you for your time in this matter.

Respectfully submitted,

*Russell Ellwood* 06/26/08
Russell Ellwood
#413920, Cypress 3
Louisiana State Penitentiary
Angola, LA 70712

cc: file

**APPENDIX
1**

IN THE

FIFTH CIRCUIT COURT OF APPEAL

STATE OF LOUISIANA

State of Louisiana
Ex rel., RUSSELL ELLWOOD,
*Relator / Applicant*

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

APPLICATION FOR SUPERVISORY WRIT OF REVIEW

From the Denial of Application for Post
Conviction Relief in the 29th Judicial
District Court, Parish of St. Charles, Louisiana,
Criminal Docket No. 98-109, Division "D",
Honorable Kirk R. Granier, Judge Presiding.

Respectfully submitted, *pro se*, this 26th day of June, 2008.

*Russell Ellwood* 06/26/08
Russell Ellwood (Applicant)
D.O.C. No. 413920, Cypress 3
Louisiana State Penitentiary
Angola, Louisiana 70712

Criminal Post Conviction Proceeding

# TABLE OF CONTENTS

APPLICATION FOR SUPERVISORY WRIT OF REVIEW . . . . . . . . . . . . . . . . . v

MEMORANDUM IN SUPPORT OF POST-CONVICTION RELIEF . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

ASSIGNMENT / SPECIFICATION OF
    ERROR AND PROCEDURAL CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

CLAIMS / ISSUES
        CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

**CONSTITUTION**

Louisiana Constitution, Article 5, § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

United States Constitution, Amendment 6 . . . . . . . . . . . . . . . . . . . . . . . . . . xi

United States Constitution, Amendment 14 . . . . . . . . . . . . . . . . . . . . . . . . . xi

**CODE**

La. C.Cr.P., Art. 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

La. C.Cr.P., Art. 924, et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

La. C.Cr.P., Art. 927 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

La. C.Cr.P., Art. 929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi, 16

La. C.Cr.P., Art. 930.3(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 16

La. C.Cr.P., Article 930.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

La. C.Cr.P., Title 31A, Arts. 926-930.8 . . . . . . . . . . . . . . . . . . . . . . . . . . viii

La. C.E., Art. 705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**FEDERAL CASES**

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) . . . . . . . . xii

Estelle v. Williams, 425 U.S. 501, 48 L.Ed.2d 126, 96 S.Ct. 1691 (1976) . . . . . . 10

Eubank v. Crawford, No. 89-3151, 1989 WL 123260 (6th Cir. Oct. 18, 1989) . . . . . vii

Hamilton v. Lyons, 74 F.3d 99 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . xii

Henry v. Mississippi, 379 U.S. 443, 13 L.Ed.2d 408, 85 S.Ct. 564 (1965) . . . . . . . 10

Hills v. Henderson, 529 F.2d 397 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . ix

Houston v. Lack, 487 U.S. 266 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) . . . . . . . . . . . 6

Latiolais v. Whitley, 93 F.3d 205 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 15

Rector v. Johnson, 120 F.3d 551 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 5

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Christoph, 904 F.2d 1036 (6th Cir. 1990) . . . . . . . . . . . . . . . . . vii

United States v. Robles-Vertiz, 155 F.3d 725 (5th Cir. 1998) . . . . . . . . . . . . . . . 7

United States v. Salvatore, 110 F.3d 1131 (5th Cir. 1997) . . . . . . . . . . . . . . . . . 6

United States v. Slovacek, 867 F.2d 842 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . 6

Wainwright v. Sykes, 433 U.S. 72, 53 L.Ed.2d 594, 97 S.Ct. 2497 (1977) . . . . . . . 10

STATE CASES

Bradford v. State, 278 So.2d 624 (La. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

State ex rel. Ferrand v. Blackburn, 414 So.2d 1207 (La. 1983) . . . . . . . . . . . . . . . 3

State ex rel. Tassin v. Whitley, 602 So.2d 721 (La. 1992) . . . . . . . . . . . . . . . xi, 16

State ex rel. Womack v. Blackburn, 393 So.2d 1216 (La. 1981) . . . . . . . . . . . . . . . 3

State v. Code, 627 So.2d 1373 (La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

State v. Cruz, 455 So.2d 1351 (La. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

State v. Ellwood, 00-1232 (La. App. 5th Cir. 2/28/01), 783 So.2d 423. . . . . . . . . vi

State v. Hicks, 554 So.2d 1298 (La. App. 1 Cir. 1989) writs denied, 559 So.2d
1374 (La. 1990) and 604 So.2d 1297 (La. 1992) . . . . . . . . . . . . . . . . . . . . . . 16

State v. LaBorde, 11 So.2d 404 (La. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

State v. Lacaze, 824 So.2d 1063 (La. 2002), citing State v. Strickland, 683 So.2d
218 (La. 1996) and citing State v. Sullivan, 559 So.2d 1356 (La. 1990) . . . . . . . . ix

State v. Lee, 778 So.2d 656, 2000-2429 (La.App. 4 Cir. 01/04/01) . . . . . . . . . . . 5

State v. Marshall, 660 So.2d 819 (La. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . xii

State v. Mussall, 523 So.2d 1305 (La. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . xi

State v. Peoples, 383 So.2d 1006 (La. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State v. Raymo, 419 So.2d 858 (La. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wilson v. State, 220 So.2d 426 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Womack v. Blackburn, 393 So.2d 1216 (La. 1981) . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE
FIFTH CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA

State of Louisiana
Ex rel., RUSSELL ELLWOOD,
*Relator / Applicant*

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

APPLICATION FOR SUPERVISORY WRIT OF REVIEW

From the Denial of Application for Post
Conviction Relief in the 29th Judicial
District Court, Parish of St. Charles, Louisiana,
Criminal Docket No. 98-109, Division "D",
Honorable Kirk R. Granier, Judge Presiding.

MEMORANDUM IN SUPPORT OF POST-CONVICTION RELIEF

MAY IT PLEASE THE COURT:

Now comes Russell Ellwood, pro se, Applicant herein, who respectfully

submits the instant Application for Supervisory Writ of Review from the denial of

Post Conviction Relief in the 29th Judicial District Court, Parish of St. Charles,

Louisiana. In support, Applicant presents the following:

STATEMENT OF JURISDICTION

The Fifth Circuit Court of Appeal has jurisdiction to entertain the instant

Application for Superviosry Writ of Review pursuant to **Article 5 § 10** of the

**Louisiana Constitution of 1974**, which provides supervisory powers to the circuit court over all district courts within its circuit. Further, **Article 930.6** of the Louisiana Code of Criminal Procedure provides the avenue for review of a denial of an Application for Post Conviction Relief by a District Court.

## STATEMENT OF THE CASE

Applicant was charged by Bill of Indictment on March 23, 1998 with two counts of second degree murder in violation of **LSA-R.S. 14:30.1**. Count one charged Applicant with the Second Degree Murder of Delores Mack and count two charged Applicant with the Second Degree Murder of Cheryl Lewis "on or about February 1993."

On April 9, 1998, Applicant was arraigned and entered a plea of not guilty to both counts in the Bill of Indictment. On March 2, 1999, approximately one year later, the State entered a nolle prosequi as to count one of the indictment regarding Delores Mack. The indictment was also amended to allege that Cheryl Lewis was murdered "on or between January 31, 1993 and February 9, 1993." Applicant was re-arraigned on the amended indictment on June 9, 1999. At that time, Applicant pled not guilty to the charge of second degree murder of Cheryl Lewis.

Because of extensive pre-trial publicity, the trial court granted Applicant's Motion for a Change of Venue from St. Charles Parish to Lafayette Parish. Trial began on June 8, 1999, and on June 10, 1999, a 12 person jury found the Applicant guilty as charged.

On August 17, 1999, Applicant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Applicant filed a timely appeal in accordance with **La.C.Cr.P. article 914** and Applicant's conviction and sentence were affirmed by the Fifth Circuit Court of Appeal. See *State v. Ellwood*, 00-1232 (La. App. 5th Cir. 2/28/01), 783 So.2d 423.

Applicant did not seek certiorari in the Louisiana Supreme Court.

Applicant's original Application for Post-Conviction was timely placed into the prison mailing system on February 27, 2003. ***Houston v. Lack***, 487 U.S. 266, 270-271 (1988); ***U.S. v. Christoph***, 904 F.2d 1036 (6th Cir. 1990) (following ***Houston***); ***Eubank v. Crawford***, 887 F.2d 1086 (6th Cir. 1989) (89-3151) (prisoner's complaint deemed filed when mailed).

On May 27, 2008, the Honorable Kirk R. Granier, Judge, 29th Judicial District Court, denied Applicant's Application for Post-Conviction Relief and Motion to Strike. (See Exhibit HH).

Applicant filed his Notice of Intent to Seek Writs with the District Court on June 10, 2008. (Exhibit II).

This timely filed Application for Supervisory Writs follows.

Applicant avers that he is an inmate at the Louisiana State Penitentiary, at Angola, Louisiana, Burl Cain, Warden.

ASSIGNMENT / SPECIFICATION OF
ERROR AND PROCEDURAL CLAIMS

Applicant avers due diligence in all claims, amendments and supplementation. Furthermore, Applicant wishes this Court to note that the District Court erroneously allowed the State far too much time to file its answer to Applicant's P.C.R. Even so, the State ran past its allotted time and filed its answer late. The District Court, nonetheless, allowed the State's answer, and denied Applicant's Motion to Strike the State's Answer.

The ruling of the District Court constitutes an abuse of discretion on the part of the District Court judge, as well as the erroneous interpretation and unreasonable application of established federal and state laws.

First, the State cited **La. C.Cr.P., Art. 841**, lack of contemporaneous objection, as grounds to deny Applicant's claims: "To preserve for appeal the type of errors

defendant is suggesting the law requires a contemporaneous objection in the trial court. LSA - C.Cr.P., Art. 841." The District Court states: "The answer filed by the Attorney General's Office is persuasive."

This Applicant is on Habeas Corpus Post Conviction Relief, not direct appeal, and the law applicable to P.C.R. is contained specifically in La. C.Cr.P., Title 31A, Arts. 926-930.8. In point of fact, for the very reason that Applicant's counsel failed to make a contemporaneous objection at trial shows his lack of performance and his ineffective assistance of counsel.

Secondly, the State asserts that Applicant's first two claims are related to the issue of sufficiency of the evidence on direct appeal and are repetitive. Again, this view is adopted by the District Court, which states: "Additionally, the Court is persuaded that the Defendant's 'ineffective assistance of counsel' claim is also without merit."

Even a cursory examination of Applicant's Application for Post Conviction Relief shows that all of his claims are based on ineffective assistance of counsel. This is true of Applicant's Supplemental and Amendment, as well, and are specifically recapped in a "Summary of Ineffective Assistance of Counsel Claims." An issue under **La. C.Cr.P., Art. 930.3(A)**, claiming a wrongful conviction based on a constitutional violation, if proven, would warrant post conviction relief. An Applicant must then be given the opportunity to prove such claim. The law and proper procedure dictate that Applicant, who now has the burden of proof, be the one given the chance to "persuade" the court.

Further, one specific claim under insufficiency of evidence does not preclude additional, separate claims under the general heading of insufficiency of evidence. Especially in the context of ineffective assistance of counsel on collateral attack of a conviction that may be due to his errors and omissions concerning such issue.

Counsel's performance, or lack thereof, is the focal point on review.

This P.C.R. contains ineffective assistance of counsel claims which contend that trial and appellate counsel in this case failed to raise certain issues, and / or failed to properly and fully argue and brief others. Some of these issues contain facts that have never been considered by any court.

Indeed, the issue of ineffective assistance of counsel is deemed not properly raised until P.C.R. by the Louisiana Supreme Court, because this is the best forum for an evidentiary hearing. *State v. Lacaze*, 824 So.2d 1063 (La. 2002), citing *State v. Strickland*, 683 So.2d 218 (La. 1996) (remand for hearing to determine if counsel's actions were strategy or dereliction), and citing *State v. Sullivan*, 559 So.2d 1356 (La. 1990) (remand for hearing to determine if Brady material was suppressed and if counsel was ineffective). And see *Hills v. Henderson*, 529 F.2d 397, 401, n.6 (5th Cir. 1976); "A claim that an evidentiary ruling deprived a state court defendant of fundamental fairness is cognizable on habeas corpus." (Citations omitted).

This Court has already remanded this case to the District Court to properly adjudicate Applicant's P.C.R. (Appendix JJ). Apparently, the District Court held Applicant's P.C.R. so long, that when it finally came to the court's attention, it was summarily dismissed as a second or subsequent P.C.R. This Court had to bring to the District Court's attention that this was Applicant's original P.C.R. and stated viable ineffective assistance of counsel claims.

Further, Applicant's custodian and the State were each served with a copy of this original P.C.R. five years ago by the Clerk of Court, in compliance with the Uniform Application for Post Conviction Relief. In addition to the District Court's absent-mindedness, the State failed to file an answer in all that time.

Since Applicant's Supplement and Amendment was an extension of his original

three claims, a windfall was already conceded to the State by not asking that the State's answer be limited to the Supplement and Amendment.

**La. C.Cr.P., Art. 927** states, in pertinent part:

A.    If an application alleges a claim which, if established, would entitle the petitioner to relief, the court shall order the custodian, through the district attorney in the parish in which the defendant was convicted, to file any procedural objections he may have, or an answer on the merits if there are no procedural objections, within a specified period not in excess of thirty days. . . .

(emphasis added).

La. C.Cr.P., Art. 927, Official Revision Comment, in pertinent part:
The thirty day period gives the district attorney ample time to prepare his answer.  See ABA Standards, Post Conviction Procedure, § 4.3

The District Court erroneously and prejudicially allowed the State 90 (ninety) days in which to file an answer.  When the State received this ruling 12 days later, the State had no procedural grounds to ask for an additional 90 days in which to file an answer.  Nor did the District Court have any legitimate basis to grant this request.

Nonetheless, the court granted the State's request, for a total of 180 days (six times the legal limit of the statute), yet the State still filed its answer late.

An answer by the State should have been procedurally barred, and Applicant's Motion to Strike the State's Answer should have been granted.  The District Court should have, (as this Court should), considered the Applicant's P.C.R. as being unchallenged by the State, and either grant relief on the merits, or at least order an evidentiary hearing to more fully develop the facts of the case.  Especially in light of an already oppressive five year delay in any proceedings of the case.

Clearly, an evidentiary hearing was called for in this instance to, at the very least, question Applicant's counsel(s) regarding their actions and inactions in order to gauge the prejudicial impact of their lapses.  Further, to expand the record concerning the exculpatory evidence an agent of the State destroyed, as well as to scrutinize this agent's further actions in this case.  Also, to discover suppressed material and bring

forth additional witnesses to prove Applicant's claims.

However, the District Court failed to order an evidentiary hearing even though the facts contained in Applicant's P.C.R., and the District Court's ruling — adopting the State's untimely answer — show sharply contested facts which require a full evidentiary hearing. **La. C.Cr.P., Art. 929**; *State ex rel. Tassin v. Whitley*, 602 So.2d 721 (La. 1992).

Applicant should not have been denied due process and access to the courts just because he could not afford an attorney to prepare, and actively pursue timely proceedings on his P.C.R. Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585 (1956).

> *Pate v. Holman*, 341 F.2d 764, 768 (5th Cir. 1965),

> "*Lane v. Brown*, 1963, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892, *Burns v. State of Ohio*, 1957, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209, and *Smith v. Bennett*, 1961, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 make clear that the *Griffin* principle is not to be limited to direct appeals from criminal convictions, but extended alike to state post conviction proceedings * * * even though the State has already provided one review on the merits. *Lane v. Brown*, 372 U.S. at 484, 83 S.Ct. at 773."

Indeed this Court should consider the prejudicial delays in this case, as well as the procedural defaults, and determine whether due process demands that this case be dismissed with prejudice.

Additionally, the District Court erroneously considered just the evidence favorable to the state. A reviewing court should consider all evidence in a light most favorable to the state, not only evidence favorable to the state. *State v. Mussall*, 523 So.2d 1305 (La. 1988).

The point is that in these instances the claims raised are of **Sixth** and **Fourteenth** Amendment ineffective assistance of counsel issues. Although unadjudicated claims and facts have been ignored by the District Court and should be reviewed by this Court, it is not necessary for this Court to rehash an adjudicated issue

to rule on an ineffective assistance of counsel claim.

Simply put, if Applicant raised a claim on direct appeal that was denied, this fact does not exonerate counsel from errors and omissions. This Court need only find that had trial or appellate counsel properly raised, professionally argued or briefed this issue, that this may have possibly changed the outcome. This would be substandard performance, and ineffective assistance of counsel.

Applicant contends that this conviction, as shown by the record evidence cannot stand: *Hamilton v. Lyons*, 74 F.3d 99 (5th Cir. 1996); "Convictions tainted by the suppression, destruction, or alteration of material evidence violate a defendant's Fourteenth Amendment right to due process. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963)." See also, *State v. Marshall*, 660 So.2d 819 (La. 1995). (Argued infra).

## STATEMENT OF THE FACTS

On February 21, 1993, the body of a black female was found off of Highway La. 3160 in Hahnville, Louisiana. She was nude, except for a pair of pink socks, and was wedged in a drainage canal off the road. Fingerprints identified the body as that of Cheryl Lewis.

An autopsy report and a toxicological examination could not conclude if the victim had drowned. It was impossible to determine if the victim was alive but unconscious, when the body hit the water. The manner of death is officially unclassified. Toxicology reports revealed the presence of cocaine in her system, although only purge fluid was tested. Toxicological tests do not exist for decompositional fluids such as purge fluid. Consequently, the exact amount of cocaine present in the victim is unknown. Police reports indicate the body had been in the area less than twenty-four hours prior to discovery.

On February 22, 1993 at approximately 2:00 pm, the body of a second black female (transsexual) was found off of Highway La. 3160 in Hahnville, Louisiana. She was also nude and found in a drainage canal. Fingerprints identified the body as

that of Delores Mack.

An autopsy report concluded asphyxia by suffocation and strangulation as the cause of death with cocaine and amphetamines present in the system. The manner of death was classified as "homicide by strangulation." Police reports indicate the body had been in the area less than twenty-four hours and was within ½ mile of the location where Cheryl Lewis was found.

On February 23, 1993, SCSO Major Sam Zinna issued a report of his findings stating that although the bodies of Lewis and Mack were discovered in the same area on two consecutive days, both bodies were not in the same area at the same time.

On February 26, 1993, Matt Scallan, Times-Picayune reporter quoted SCSO Major Sam Zinna; "Our investigators went through the area looking for evidence on Sunday, and the second body was not there at that time." He said that the body discovered Monday was apparently dumped after investigators left the scene of Sunday's discovery.

Again, on March 9, 1993, Matt Scallan, Times-Picayune reporter wrote, "Deputies believe her body was dumped in the canal after Lewis' body was discovered."

Approximately one year after the victims had been discovered, Applicant was observed in his taxi, by two off-duty St. Charles Parish Deputies, on the same stretch of road approximately one mile from where the victims' bodies were discovered. Applicant said he was there to change the oil in his taxi and was nervous because he planned to dump the used oil in the swamp, an Environmental Protection Agency violation. The deputies, however, refused to admit to finding motor oil, oil changing supplies, or oil filters in Applicant's vehicle. SCSO Deputy Boyd Frickey ordered Applicant, "do not open your tool box." Applicant's taxicab's "cruising light" contained the type of artificial lighting necessary to change oil in an unlit area at night.

Subsequently, a serial crime task force was originated to investigate the murders of several prostitutes in the New Orleans area. In May of 1995, while investigating the murder locations of several victims for the task force, Detective Phil Ramon of the

Jefferson Parish Sheriff's Office was informed by a St. Charles Parish Deputy that a "suspicious person," identified as Applicant, had been stopped in the area of two of the murder sites. Based upon the information provided to the task force by the St. Charles Parish Sheriff's Office, Applicant became a suspect in the investigation.

On July 23, 1997, Colonel Walter T. Gorman of the Jefferson Parish Sheriff's Office traveled to Sebring, Florida, with other members of the Serial Crime Task Force for the purpose of conducting interviews with the Applicant. Applicant had previously moved to Sebring to develop a relationship with his father. After being advised of his rights, Applicant gave several statements to the police over a period of three days. These statements were recorded and later transcribed.

On August 4, 1997, a few days after the interviews had been concluded, Highlands County Sheriff's undercover officers, for the convenience of Jefferson Parish investigators, entrapped Applicant for purchase of cocaine in Sebring, Florida, in order to hold Applicant for the ongoing Louisiana investigation. As a result, Applicant was incarcerated for 85 days.

During his incarceration, Applicant made a number of statements to fellow inmates that JPSO Lieutenant Susan D. Rushing accused him of committing crimes. One of these inmates was Stan Hill. Applicant admitted to police in a taped statement that he indeed made a statement about accusations by Lt. Susan Rushing that he committed crimes.

During August, 1997, as Applicant remained incarcerated in Sebring, Florida, Task Force members in Louisiana conducted an interview with Mary O'Neal and Ernest Macklin, two friends of Applicant. Both witnesses revealed to JPSO Lt. Susan Rushing and SCSO Sgt. Olga Fourroux that Applicant left Louisiana in February, 1993, to visit his brother in Canton, Ohio.

Applicant parked his taxicab at the home of Ms. O'Neal and Mr. Macklin and gave the ignition keys of the taxicab to Mr. Macklin with permission to move the taxicab if necessary. Ms. O'Neal then drove Applicant to Interstate 59 North, where he began to hitchhike to Canton, Ohio.

After conducting this interview, a rift ensued between Lt. Rushing and Sgt. Fourroux over Lt. Rushing's intent to alter a proposed time line in order to continue prosecution of Applicant. Indeed, Lt. Rushing did so. See Police Time Line, page 86, entry for February 1, 1994. (Exhibit H).

Immediately thereafter SCSO Sgt. Fourroux began sifting through thousands of gas receipts and tax records taken from underneath a house in uptown New Orleans where Applicant resided, in order to begin constructing the time line of Applicant. Sgt. Fourroux discovered among the onion-skin gas receipts a computer printed Greyhound Bus ticket dated February 22, 1993 and onion-skin Greyhound Bus ticket dated February 23, 1993. Sgt. Fourroux approached Lt. Rushing with this exculpatory evidence. Lt. Rushing ordered Sgt. Fourroux to destroy the bus tickets. However, Sgt. Fourroux did not do so.

In September, 1997, while constructing the time line, secretary Mary Dunn re-discovered the onion-skin Greyhound Bus ticket. Detective Phil Ramon was seated approximately 10 feet away; assuming the onion-skin Greyhound Bus ticket was an onion-skin gas receipt, watched in amazement as Lt. Susan Rushing destroyed it. Ramon watched as Rushing snatched the receipt from the secretary who was organizing evidence. Ramon stated, "Lt. Rushing said, 'Give me that. I got a special place for that,' and she walked to the trash can, smiled and tore it up into tiny pieces."

At the time of the incident, Lt. Rushing and the Task Force members were not aware that Applicant's brother used a bank card to purchase Applicant's Greyhound Bus ticket. Ramon eventually took his allegations of evidence tampering and witness coaching to the F.B.I. who launched an investigation. (Exhibit G).

The Applicant was ultimately placed on probation for the Florida cocaine charge and moved to Canton, Ohio to work for his brother. The Ohio Adult Parole and Probation Authority, for the convenience of JPSO investigators, again incarcerated Applicant. The Task Force conducted a second round of interviews with Applicant in Ohio. Ron Camden, a 27 year veteran of the Cincinnati Police Department Homicide Squad, and someone whom Applicant referred to as an "associate advisor

of mine," was also present. Camden agreed to be present, not as a police officer, but as Applicant's friend. On the first day of the interview, November 25, 1997, Camden confronted Applicant with a transcribed statement of Stan Hill, an inmate previously incarcerated with the Applicant.

Applicant denied having ever made a statement to Hill. Lt. Susan Rushing then read a portion of Stan Hill's transcribed statement to Applicant. As Lt. Rushing read what Stan Hill alleged, that Applicant told him stating, "He put a body in water," Applicant exclaimed in question and inquiry, "I put a body in water?" (Exhibit Q). Applicant avers that he never made such statements, but that he was merely repeating what one of the law enforcement officers was saying, as this officer read from a transcript of a tape made by a prison inmate.

An audio tape of Stan Hill's statement was never played for the Applicant. Applicant agreed to give a taped statement at 0950 hours stating, "I discussed my case, my cases in New Orleans with Stan Hill, yes, while we were incarcerated at Highlands County Detention Facility. . . . yes, I want you to work with me. I have complete faith in you that you will find the killers or people that are guilty of these crimes and that I may be of assistance to you in this investigation."

There was a dispute between Lt. Susan Rushing and the Applicant over whether the Applicant could use the telephone to call his attorney. During the course of the interview, Applicant continuously requested use of the telephone to obtain legal counsel. In response to one request Lt. Susan Rushing informed Applicant that it was after 10:00 p.m. in New Orleans and Applicant should consider not disturbing his legal counsel who may be asleep.

Mr. Camden and Lt. Susan Rushing conspired to invent a confession alleging the Applicant made the following statement:

> "Okay, okay, I'm willing to give you this. I took a black
> female. I put her in my car. I took her down the road, and
> I put her in water. That's what I'm going to give you."

The first interview lasted approximately 14 hours, from 1:00 in the afternoon until three o'clock the next morning. Later in the day, throughout the second

interview, Applicant continued repeatedly asking for use of the telephone to call Ross Scaccia, his attorney. As the second interview concluded, Ron Camden finally handed Applicant a piece of paper written by Lt. Susan Rushing with the name, address, and telephone number of A & P Bonding on S. White Street in New Orleans where Ross Scaccia could be contacted. Ron Camden instructed Applicant to destroy the note and discard it.

During December, 1997, as Applicant still remained incarcerated in Canton, Ohio under the pretense of a probation violation, but actually for the convenience of Jefferson Parish Sheriff Harry Lee, Task Force members in Louisiana located two subjects, April George and Sharon Jones, who admit knowing Applicant. On December 12, 1997, Lt. Susan Rushing assisted JPSO Detective Phil Ramon with a coached interview of Sharon Jones. In the interview, Sharon Jones was coached to state that she was driven by Applicant down Airline Highway to Prescott Road. "That girl that got burned up, he tricked us into doing more drugs and then he threw that, that stuff up on us. Russell killed that girl. I know he killed her. That girl was dead. Lighter Fluid."

On December 24, 1997, Lt. Susan Rushing assisted JPSO Detective Robert H. Rotherham, Jr. with a coached identical interview of April George. In the interview, April George was coached to say that she was driven by Applicant down Airline Highway across a long bridge that ran over water. He then turned onto a dirt road and drove a short distance into the woods. Applicant then removed the girl from the trunk and bound her hands and feet with rope. At that point, he took this other girl a short distance from the cab and retrieved a metal gas can from his trunk. Before dousing her with the fuel, Applicant had removed a long gold chain with a small teddy bear pendant from around the victim's neck placing this object in his shirt pocket. Applicant then set fire to the victim while April George watched.

Authorities are not aware of any homicide case in Montz, Louisiana, any medical reports, or coroner reports involving a victim that was burned. Because April George is considered to have a learning disability, Sharon Jones was chosen to be developed as the State's main lay witness.

On Saturday, December 13, 1997, Lt. Susan Rushing received a tape-recorded telephone call from Applicant at the Stark County Correctional Center. Applicant said, "you found out very differently that I do have an attorney." Applicant complains to Lt. Susan Rushing that she violated his constitutional rights during the interrogation on November 25 and 26, 1997. Applicant complains to Lt. Susan Rushing that she took all of his telephone numbers and prohibited him from counsel, legal counsel. Applicant stated, "What, about 21 hours?"

On Monday, December 15, 1997, Lt. Susan Rushing received another tape-recorded telephone call from Applicant at the Stark County Correctional Center. A portion of the taped conversation twenty days after the alleged confession contains: Exhibit N. Page 4 of 16 (emphasis added):

> Rushing: Okay, on the 22nd, do you intend _ever_, okay, coming back here, talking to your attorney, and _confessing_ to _anything_?
>
> Ellwood: No.
>
> Rushing: Then why should I come pick you up?
>
> Ellwood: I cannot confess, I'm innocent. I cannot confess, to ah, ah guilt.

Exhibit N. Page 13 of 16:

> Ellwood: Well, you came on like a, you know, a cannon, you know, and I'm an innocent person, you know.
> Rushing: Well, you keep saying that, but then you, then you keep saying also that what is the charge for, for IV'ing somebody.

A false probation violation was ultimately dismissed.

On Friday, January 16, 1998, Applicant voluntarily returned to Louisiana from

Ohio. Applicant was accompanied by St. Charles Parish Sheriff Greg Champagne. Stephanie Grace, Times-Picayune reporter, noted: Champagne said, officers will seek a confession from Applicant regarding the slayings, although a confession may not be necessary to gain a conviction.

> "The evidence keeps building up. . . . But this case could be made without a confession.", Champagne said.

Also on January 16, 1998, subsequent to following remarks by Ms. Jones, she was granted full use and derivative use immunity, pursuant to Article 439.1 of the Louisiana Code of Criminal Procedure. On February 16, 1998, Ms. Jones was interviewed in the presence of her attorney. Ms. Jones stated that Applicant had shown her two dead bodies. The time period for this observation is not consistent with the time period Cheryl Lewis and Delores Mack had been found. Applicant pointed to a body that was practically submerged in a canal that runs parallel to 3160 on this side. (This body is consistent with the case of Delores Mack). Applicant then pointed out a second body that was practically submerged in the canal area. (This body is consistent with the case of Cheryl Lewis). JPSO Lieutenant Susan Rushing and SCSO Sergeant Olga Fourroux (primarily armed with the coached statement of Stan Hill, the coached statements of Sharon Jones, and the altered date of birth of Samantha, Ms. Jones daughter) constructed a sworn affidavit and warrant of arrest for Applicant, which was presented to Emile St. Pierre, Judge of the 29th Judicial District Court on March 2, 1999. (Exhibit O).

A portion of Ms. Jones testimony during Applicant's trial contains prosecutor known perjured testimony regarding the age of her child:

Q.    I believe I have various medical records regarding you, Ms. Jones. Did you have a baby in 1994?

A.    Yes.

Q.    And the little baby's name is what?

A.    It's Samantha.

Q. And while you were going with Russell Ellwood, weren't you pregnant with her?

A. Yeah.

Q. And you were like three or four months pregnant then; is that correct?

A. Yeah.

Q. Your baby was born in what month?

A. December the first.

Q. Of 1994?

A. Yeah.

(Exhibit VV, pp. 102, 103)

The first warrant cited a coroner's report that said Cheryl Lewis had been dead for no longer than 24 hours when her body was found. The second warrant said the woman's body had been in the area longer than a day. Both warrants were signed by Lieutenant Susan Rushing.

Judge St. Pierre, convinced of the "facts and circumstances" in support of the affidavit, affixed his signature authorizing the arrest of Applicant for LSA-R.S. 14:30.1, homicide in the second degree (two counts).

Subsequently, Applicant was arraigned on two counts of second degree murder in violation of LSA-R.S. 14:30.1, Delores Mack and Cheryl Lewis.

In response to defense counsel's objection, a grand jury convened. On March 23, 1998, Applicant was charged by indictment with two counts of second degree murder in violation of LSA-R.S. 14:30.1, Delores Mack and Cheryl Lewis.

On April 9, 1998, Applicant was again arraigned on the same two counts, the indictment was read, and the Applicant entered a plea of not guilty. Sometime between February and March, 1998, Maria Chaisson, Applicant's indigent defense counsel, initiated a telephone conversation with Ron R. Camden. In the interview, Mr. Camden is noted as stating:

> "Ellwood didn't really confess. He said anything in an attempt to return to New Orleans and Ross Scaccia, his attorney."

Subsequently, beginning with Phil Ramon and the F.B.I. investigation which culminated with the termination of both JPSO Phil Ramon and JPSO Susan Rushing, Attorney General Richard P. Ieyoub issued a statement on February 22, 1999.

### State of Louisiana v. Russell Ellwood

> "As a result of subsequent investigation initiated by members of the Task Force along with the Louisiana Department of Justice, as best as it can be determined, it appears that it was physically impossible for Russell Ellwood to have murdered Delores Mack. The State will delete one count of the indictment on March 1."
>
> "The State will continue its murder prosecution against Ellwood for the death of Cheryl Lewis."

On March 2, 1999, the State entered a nolle prosequi as to count one of the indictment, Delores Mack. The indictment was also amended to allege that Cheryl Lewis was murdered "on or between January 31, 1993 and February 9, 1993," effectively removing Applicant out of his alibi. With his attorney present, Applicant was arraigned on the amended indictment, not charged by the grand jury on June 7, 1999. At that time, Applicant pled not guilty to the charge of second degree murder of Cheryl Lewis.

## CLAIM I

THE ADMISSION OF PREJUDICIAL TESTIMONY ABSENT PRE-TRIAL *PRIEUR* HEARINGS WAS IN VIOLATION OF LA.C.CR.P. ART. 404(B) AND DEPRIVED APPLICANT OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.

Applicant contends that the jury verdict was prejudicially based on erroneously introduced "other crimes" evidence. The defense moved, prior to trial, for a *Prieur* hearing on the proposed other crimes evidence, but was denied one. The trial court allowed only a written notice of what the other crimes evidence would show, and an argument about same, but did not require the other crimes witnesses to appear in court, prior to trial for a required *Prieur* hearing.

The prosecutor was erroneously permitted to introduce "other crimes" evidence of several incarcerated women, who testified that they had each been attacked or abused by the Applicant. Their testimony was allowed over the repeated objections of the defense, prior to and during trial. At least two of these coached witnesses that testified could not identify the Applicant.

There is <u>no</u> physical evidence that the victim was killed in any manner, including second degree murder. She could have overdosed on drugs, wandering along Highway 3160, then simply drowned in the adjoining water. It is obvious that the jury found the Applicant guilty, not because there is any valid evidence to that effect, but because of the "other crimes" evidence erroneous admitted. *State v. Kennedy*, 803 So.2d 916 (La. 2001).

In *State v. Code*, 627 So.2d 1373 at 1381 (La. 1993), the court held: La. Code of Evid. Art. 1103 provides that the notice requirements and evidence standards of *Prieur* and its progeny have <u>not</u> been overruled by the new Code of Evidence. Under *Prieur*, the state is required to give a Applicant notice that evidence of other crimes will be offered and which exception to the general exclusionary rule the state is relying upon. *Prieur*, 277 So.2d at 130. <u>In addition</u>, the state must prove by clear and

convincing evidence that the defendant committed the other crimes. *Prieur*, 277 So.2d at 129.

In *State v. Henry*, 436 So.2d 510 (La. 1983); *State v. Talbert*, 416 So.2d 97 (La. 1982); and *State v. Hatcher*, 372 So.2d 1024 (La. 1979), the Louisiana Supreme Court set forth the factors which must be met for other crimes evidence to be admissible:

> (1) there must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith; (2) the modus operandi employed by the defendant in both the charged and uncharged offenses must be so peculiarly distinctive that one must logically say they are the work of the same person; (3) the other crimes evidence must be substantially relevant for some other purpose than to show a probability that the defendant committed the crime on trial because he is a man of criminal character; (4) the other crimes evidence must tend to prove a material fact genuinely at issue; and (5) the probative value of the extraneous crimes evidence must outweigh its prejudicial effect.

In the instant case, other crimes evidence introduced failed to meet any of these criteria. Seven prostitutes testified that the Applicant beat them or sexually assaulted them or awoke in a "pool of blood." Their testimony was allowed not only to show system, pattern, motive, and intent, but propensity.

Further, there is no evidence in the instant case that the victim died in that manner. The manner of her death is officially unclassified, therefore, accident cannot be ruled out. There were no signs of assault (trauma). Her cause of death was ultimately deemed "asphyxia due to drowning."

1) the cases are factually dissimilar; 2) the prior alleged crimes were not relevant and served no legitimate purpose at trial, and only prejudiced Applicant, the State's sole purpose for introducing it; and 3) the prejudicial effect outweighed any probative value.

Trial counsel repeatedly moved for *Prieur* hearings during pre-trial and trial. (Exhibits W, RR, UU, & VV). Mistrial was denied four times. (Exhibits UU & VV).

Applicant was prejudiced by the erroneous admission of this evidence because it served no other purpose than to paint Applicant as a "bad character." Clearly, there were contemporaneous objections here, but appellate counsel failed to raise these issues.

## CLAIM II

EVIDENCE WAS INSUFFICIENT TO OBTAIN A CONVICTION, TO THE PREJUDICE OF APPLICANT, IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.

Since a conviction based upon insufficient evidence is a violation of constitutionally guaranteed due process, such an assignment may be raised in a post-conviction proceeding. LSA-C.Cr.P. Art. 930.3(1); *State ex rel. Womack v. Blackburn*, 393 So.2d 1216 (La. 1981); *State ex rel. Ferrand v. Blackburn*, 414 So.2d 1207 (La. 1983).

Further, the insufficiency of evidence claim raised on direct appeal was specific to the lack of evidence that the instant Applicant had killed the victim, which Applicant does not abandon, but does not argue here.

However, Applicant does argue that it was ineffective assistance of counsel not to require the State's expert to show the basis of her opinion that the victim had, in fact, drowned. This is an essential element of the crime, and directly addresses intent.

The State suppressed the fact from defense that the required tests to conclusively prove or disprove death by drowning were never performed on the victim in this case.[1]

The contention of the State is that the victim in the instant case is a drowning victim. The official <u>cause</u> of death is "asphyxia due to drowning" but no medical

---

[1]Specifically, lung tissue examination to detect the presence of diatoms (micro-organisms naturally present in water, but not in lungs), and dilated alveoli. Edema fluid present in the alveolar would cause disproportionate autolytic changes in the respiratory epithelium (lung tissue with ditch water micro-organisms would decay more rapidly).

records exist in support of this official "opinion." No medical records or test results were presented during trial to support asphyxia due to drowning.

The State has failed to show beyond a reasonable doubt that the victim died by drowning.

This is an insufficiency of evidence claim not premised on lack of evidence to prove Applicant killed the victim, but on lack of evidence to prove the victim drowned. This implicates the manner of death as being unproven, not who did it.

The sufficiency of evidence fails at the *causation* and *mens rea* long before it ever gets to the *actus reus*.

Simply put, it is impossible to get to the point of proving beyond a reasonable doubt that Appliant drowned a person when it has not been proven that said person died by drowning. Likewise, even the intent to drown someone.

The State's expert, Dr. Susan Garcia, performed an autopsy on the victim in this case. Even an expert must state the basis of their opinion. **La. C.E., Art. 705.** Without proper scientific methods to guide her, Dr. Garcia speculated that the victim had drowned. With nothing in the record to back up this opinion, a ***Daubert***[2] hearing should have been requested by Applicant's trial counsel. Speculation or best guesses cannot be methods generally accepted in the relevant scientific community.

Further, the court denied Applicant an expert to rebut the State's experts, which was asked for after the court denied use of the original indictment (argued infra) for impeachment and rebuttal.

Dr. Garcia, in her report, notes hemorrhage or blue discoloration of the petrous ridges of the skull. There is no doubt that the decedent did asphyxiate.

Hemorrhage of the petrous region of the temporal bones is quite common in each type of asphyxia. ***State v. Cruz***, 455 So.2d 1351, 1354 (La. 1984).

---

[2]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)

Dr. Garcia only notes the weight of each lung, atelectatic property, and decompositional changes present but fails to note dilated alveoli or edema fluid in the alveolar. No glass slides of the lung tissue exist. No x-rays of the lung tissue exist to show presence of water in the lungs. Water in the lungs is essential, combined with hemorrhage of the petrous ridges of the skull in order to rule "asphyxia due to drowning." See *Rector v. Johnson*, 120 F.3d 551, 555-556 (5th Cir. 1997). Without the presence of water in the lungs and only hemorrhage of the petrous ridges of the skull, the decedent could not have asphyxiated due to drowning and in all probability, did asphyxiate elsewhere, and the dead body was placed in the water. See Autopsy report of Cheryl Lewis (The circumstances of this death considering the location where the body was found . . . make the manner of death highly suspicious for homicide. Accident cannot be completely ruled out, therefore manner is best left unclassified at this time).

Clearly, the cause of death was not officially determined to be either accidental, or intentional. Dr. Garcia simply concluded "asphyxia due to drowning" because the body was discovered in water, but no water was found in Cheryl Lewis. Dr. Garcia notes, "There is no remaining evidence of fracture or injury" because "soft tissue of the face is not present." Therefore, Dr. Garcia is unable to indicate any "intent to inflict great bodily harm," an essential element of the charged crime.

Additionally, defense counsel failed to request a "Certificate of Analysis" prior to or during trial. *State v. Lee*, 778 So.2d 656, 666 (La.App. 4 Cir. 2001). Although the body location might suggest foul play, there is no evidence supporting such suggestion. Obviously, an expert for the defense would have easily spotlighted the errors in the State's theory, and shattered the erroneous presumptions.

*State v. LaBorde*, 11 So.2d 404 at 404, 405 (La. 1942). "This Court has held that where the evidence of the prosecution is accepted as true and it does not prove the

crime charged, we can consider the legal issue presented, even though no bill of exception was taken, because it is an error patent on the face of the record."

*State v. Raymo*, 419 So.2d 858 at 861 (La. 1982). Because the State's case was devoid of evidence of an essential element of the charged offense, . . . defendant's conviction and sentence must be set aside, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970; *State v. Peoples*, 383 So.2d 1006 (La. 1980), regardless of how the error is brought to the attention of the reviewing court. State ex rel. *Womack v. Blackburn*, 393 So.2d 1216 (La. 1981).

## CLAIM III

DEFENSE COUNSEL FAILED TO MOVE FOR MISTRIAL, CAUSING APPLICANT TO STAND TRIAL ON A DEFECTIVE INDICTMENT, AND WITHOUT EXPERT TESTIMONY.

Defense counsel failed to move for a mistrial during an attempt made by defense counsel to introduce into evidence the original indictment for comparison to the amended indictment as rebuttal to prosecution expert witness testimony. (See Exhibits T & U).

Defense was denied defense funds by the trial court. Defense was without expert witness testimony to rebut the post-mortem interval of the decedent. Defense counsel's attempt to introduce the original indictment into evidence after denial of defense expert witness testimony relating to the post-mortem interval of the decedent was denied.

The judge only permitted a reading of the prosecution's amended indictment. Only the grand jury can broaden an indictment through amendment. *United States v. Salvatore*, 110 F.3d 1131, 1145 (5th Cir. 1997). A constructive amendment occurs when the government is allowed to prove "an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment." *Id.* (quoting *United States v. Slovachek*, 867 F.2d 842, 847 (5th Cir. 1989)). [ ] . . .

illustrate that the government may not obtain an indictment alleging certain material elements or facts of the crime, then seek a conviction on the basis of a different set of elements or facts. *U.S. v. Robles-Vertiz*, 155 F.3d 725 at 727-728 (5th Cir. 1998) emphasis added.

In the instant case, the grand jury found an indictment alleging that the same man killed two separate victims. When this same man produced a solid alibi, a State's agent tried to destroy the exculpatory evidence. This same agent then falsely claims Applicant made a confession that was 1) not recorded or written and signed; 2) alleged to have occurred at a time prior to when the agent is on record still asking for a confession; 3) and prior to when a police spokesperson suggests to the media that the lack of a confession in this case would not hamper a prosecution; and 4) was subsequently denied as having occurred by Mr. Camden, one of the persons present at the time of the alleged confession.

Further, the State then illegally amended the indictment, shuffling the dates in order to continue this malicious prosecution. In effect, the State is going against the grand jury's finding and saying that the same man did not kill both of these women, but this Applicant killed one of them.

However, the facts of the cases are so similar that a rational person could not be persuaded to believe two different people committed these crimes. Therefore, these facts were kept from the jury.

Ironically, the State then failed to secure the proper tests to prove the victim drowned, much less killed by drowning. It may be that the victim did not drown at all. Exactly like the other victim.

Additionally, there are no tests to determine if someone was conscious or not at the time of death. There are no tests to interpret the effect of cocaine on a deceased person.

Direct examination of Dr. Susan Garcia (Exhibit TT, pp. 80-83):

By Douglas Freese:

Q.   And you indicated that a toxicological report was performed; is that correct?

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

A.   Yes. That's a standard procedure in any forensic examination.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Cross by James McPherson:

Q.   Are you able to estimate the date of her death?

A.   Not precisely.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Q.   And I believe you said that you think she was alive at the time of her death but may not be conscious?

A.   I think I testified that I think she was alive at the time she hit the water and was not conscious.

Exercising due diligence, the Applicant has corresponded with Steven P. Lintlop, MSc., Head of Research and Development at the Centre of Forensic Sciences in an effort to obtain expert opinion and information on this matter. In an April 8, 2005 letter (Exhibit CC), he states:

> **There is no test or method available to a toxicologist to allow them to determine whether any individual is conscious or unconscious at the time of death.**

Further, in a March 6, 2006 letter (Exhibit DD), he states:

> **The prosecutor, Mr. Freese, asked Dr. Garcia whether the death could have been due to a cocaine overdose. Dr. Garcia replied "No". This response is not supported by the information available to me. As I have stated in previous letters, given that "purge fluid" and not blood was analyzed it is not possible to interpret the effect of cocaine on the deceased.**

**Federal Rule 104(E)** provides that a judge's ruling on admissibility does not limit the "right of a party to introduce before the jury evidence to weight or credibility." *Crane v. Kentucky*, 476 U.S. 683 (1986). Whether rooted directly in the

due process clause, or in the compulsory process or confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.

Further, since Applicant had an alibi, the date is clearly essential to the offense, and any changes to this element must be done by the grand jury. The amended indictment is substantially defective. A "defect of substance," under **LSA - C.Cr.P. Art. 487**, when amended after trial begins, is a defect which will work to the prejudice of the party accused. *City of Baton Rouge v. Norman*, 290 So.2d 865 (La. 1974).

The trial court denied expert witness fees, thus depriving Applicant of "the essential tools of an adequate defense." *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087 (1985). Defense counsel's attempt to secure relevant witnesses was erroneously denied by the trial court, thereby preventing Applicant from presenting a defense. *State v. Harris*, 478 So.2d 229 at 229 and 231 (La. App. 3 Cir. 1985).

The Applicant had a "police alibi" for the dates in the original indictment. The defense was prohibited from showing the jury that the prosecution manipulated the dates to fit its new theory after Applicant's alibi destroyed their case. The time of death of the victim, Cheryl Lewis, was crucial to the defense. Evidence that she died, or was killed, when the Applicant was out of town was vital. The original indictment is critical evidence to the defense that was suppressed erroneously by the court.

Trial counsel should have called for a mistrial. Further, these issues should have been raised by Appellate counsel on appeal.

## CLAIM IV

CUMULATIVE EFFECT OF ERRORS AND OMISSIONS BY TRIAL AND APPELLATE COUNSEL DENIED APPLICANT A FAIR TRIAL AND ADEQUATE REVIEW.

The question of ineffective assistance of counsel is a cumulative one. It is not proper to divide each issue up on an effort to "conquer" it; rather, this court must

review the totality of the circumstances and the cumulative effect of counsel's lapses. See *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (when reviewing counsel's effectiveness, court must look to "all the circumstances" of the trial). Therefore, the claims submitted below must be viewed in their cumulative context, rather than in isolation.

The cumulative effect of defense counsel's failures prevented Applicant the right to present a defense and the right to a fair trial. *Bradford v. State*, 278 So.2d 624, 625 (La. 1973); *Wilson v. State*, 220 So.2d 426, 427 (1969).

When counsel for petitioner fails to comply with the contemporaneous objection rule, it is not the petitioner who caused the error, but trial counsel who caused prejudice to petitioner by his failure to raise the complaint timely and properly before the trial court. Therefore, it is not procedural default counted against Applicant, but ineffective assistance of counsel, which is not the result of trial strategy. *Henry v. Mississippi*, 379 U.S. 443, 13 L.Ed.2d 408, 85 S.Ct. 564 (1965); *Estelle v. Williams*, 425 U.S. 501, 48 L.Ed.2d 126, 96 S.Ct. 1691 (1976); *Wainwright v. Sykes*, 433 U.S. 72, 53 L.Ed.2d 594, 97 S.Ct. 2497 (1977).

The defense was denied the use of two video tapes of the state witness, Stan Hill, as part of its cross-examination and as part of its impeachment of this witness. These video tapes had been taken prior to trial, at the request of state, to "preserve" Stan Hill's testimony, for it was alleged by the state that the witness was ill and may not be available for trial. (Exhibits X, LL, & SS, p.6).

A prison inmate witness for the defense was not permitted to give testimony that:

A) she knew the Applicant;
B) she knew the Applicant, and was "good friends with" one of the victims who died, and for which the Applicant was a suspect;
C) that her friend's jewelry, a ring, was seen by her in the possession of several people she knew as "drug dealers," after her death;
D) she gave the names of these "drug dealers" to the police;
E) she knew the people were drug dealers because she had purchased drugs from them;

F) she knew other women who made their living as prostitutes, who knew the Applicant;

G) other prostitutes shared information with her regarding their safety, as they "worked;" and

H) there was never any concern by her or her fellow workers that Applicant was any danger to any of them.

After considering the above information provided by this potential witness, the trial court refused to allow her to testify, because the court felt her testimony was irrelevant. A proffer was then made by the defense, which included the above statements. This witness was present in court, and gave this testimony to the judge, out of the presence of the jury. The court again denied her testimony as being "irrelevant," but did say that the court would allow the witness to say only the following: "I know Russell Ellwood and he has a reputation for non-violence."

This limited ruling by the trial court so restricted defense that they elected not to use her, reasoning that to use her as a witness in this manner would be worse than not using her at all. This was so prejudicial to an adequate defense, appellate counsel should have argued this issue on appeal.

Because the defense alleged that the main investigatory officer was guilty of police misconduct, the defense attempted to show that the officer coaxed witnesses against the Applicant, deserted evidence in his favor, and portrayed him as a "serial killer." This defense was thwarted by the trial court. The officer had "made" the Applicant "a suspect in 15 to 26 murders." The victim in one of those murders was the same person for which the Applicant was a suspect.

The defense contended that the over-zealous and fame seeking police officer portrayed the Applicant as a "serial killer" and that this was an exaggeration on her part. The death of one of those victims "attributed" to Applicant by that officer was relevant to the entire case. Testimony that this witness had seen the victim's jewelry, a ring, in the possession of other people she personally knew as "drug dealers," after this victim's death would be relevant, at least to show that other persons could have

committed the offenses. The court did not allow the defense witness' testimony on the grounds of relevancy.

Integral to the facts of this issue, the arrest on December 5, 2006 of Ronald J. Dominique, the "Bayou Serial Killer" and his numerous confessions serves as the base of the foundation in firm support of Applicant's claim of actual innocence.

According to police records, Mr. Dominique was active before and during 1993, the time period consistent with the deaths of Cheryl Lewis and Delores Mack. Mr. Dominique was arrested on August 25, 1985 on an obscenity charge in Lafouche Parish. Dominique's first recorded brush with a rape accusation involved a Houma man his same age who said Dominique picked him up, took him back to Thibodaux and bound and raped him at gunpoint. This first alleged victim said he met Dominique in 1993. The second incident occurred three years later. The victim said he met Dominique and allegedly agreed to help him buy drugs. The two men rode to Dominique's house and went inside, where Dominique grabbed a gun and tied him up, police reports say. Dominique brutally raped him with a knife to the victim's throat. Dominique was jailed on August 15, 1996. After three months, the charges were dropped. He was released November 7, 1996.

Applicant contends that the aforementioned time line is inaccurate. An accurate time line includes Cheryl Lewis, February 21, 1993, discovered 70 yards from Delores Mack, February 22, 1993, discovered in the pumping station canal; the rape of a Houma man at Dominique's house in Thibodaux in 1993, month unknown,; John Wooters, June 18, 1993, discovered on Hwy. 3127 very near the discovery site of Lewis, Mack, Mitchell, and Ranson. John Wooters was a florist in New Orleans. Ronald J. Dominique worked for a florist in Houma as a delivery man.

Vincent Symanski, discovered in a drainage canal on Hwy. 61 in Sorrento, Louisiana on February 17, 1994; David Mitchell, discovered in the same pumping

station canal in July 1997 where Delores Mack was discovered; and Larry Ranson, discovered in the same pumping station canal on Hwy. 3160 where Mack and Mitchell were discovered which is 70 yards from the discovery site of Cheryl Lewis. Three victims were discovered literally on top of one another, 70 yards from a fourth victim; all four in the very near [close proximity] to the discovery site of John Wooters.

The state contends that all of Dominique's victims are male and generally homosexual. Delores Mack was legally a woman. Mr. Dominique is an admitted homosexual and drug user. However, several recently discovered facts dispute the state's contention. A trail of evidence links the death of Cheryl Lewis with the deaths of three drug dealers of Boutte; Angel Mejia (June 20, 1997), Joseph Brown (October 20, 1997), and Gary Pierre (December 14, 1997). Pierre knew both Brown and Mejia, lived one block from Mejia and was arrested with him on drug-distribution charges in 1997. Joseph Brown was also a drug dealer and the illegitimate son of Cheryl Lewis. Mervin Spencer knew Joseph Brown, Cheryl Lewis, Brown's mother, and Annette Phoenix, sister of Cheryl Lewis. Mervin Spencer, it is alleged, was intimate with both sisters. Cheryl Lewis was last seen getting into a vehicle with a black man identified as Mervin Spencer. Mr. Spencer was frequently seen driving a black Toyota pickup truck as was Ronald J. Dominique.

Milo Lewis, boyfriend of Cheryl Lewis, stated to JPSO Bruce Harrison that he and Cheryl Lewis were together until late evening on a Wednesday in February, 1993. Lewis never saw Cheryl Lewis again.

The unaltered statement of Annette Phoenix indicates the actual post-mortem interval of Cheryl Lewis (Exhibit K) and corroborates the statement of Marie Dupre (Exhibit C). These two statements combined with the statements of Milo Lewis (Exhibits L and M) fully support Applicant's claim of actual innocence.

Unaltered statement of Annette Phoenix by Lieutenant Rushing (Exhibit K):

"Annette reported that, one week before her sister's death, she was on the street in the West Bank Traffic Circle on a Sunday at 2:00 am

13

[actually Monday morning], she was using crack cocaine and was engaged in prostitution. She was on foot, intending to go to the Circle K in the traffic circle, . . ."

Missing person report concerning statement of Marie Dupre (Exhibit C):

"Ms. Dupre went on to state that Cheryl came to her residence at about 2:00 am on Monday, the 1st of February to get a few dollars to go to the Circle K food store. . ."

Based upon these three statements and based upon Applicant's police initiated alibi, Wednesday, February 3, 1993 is inaccurate. The PMI is well within Applicant's alibi. On Wednesday evening, February 10, 1993, Applicant was asleep at the Salvation Army Men's Lodge in Hattiesburg, Mississippi. On Wednesday evening, February 17, 1993, Applicant was in Canton, Ohio.

Through coached and fabricated evidence; altered, destroyed, and suppressed exculpatory evidence, Applicant was falsely convicted of a crime in which he is actually innocent. The incontrovertible fact remains; when Applicant was in Ohio, Cheryl Lewis died in Louisiana.

In July of 2005, Paul Petta explained to Applicant a connection between inmate Jon Ballay, D.O.C.# 126099, attorney Jim Williams, and himself, in the development of Diane Gilliam as an "other crimes evidence" witness. This conversation brings to light the fabrication and probable coaching of Diane Gilliam as a witness. Request is hereby made for subpoena of Paul Petta, D.O.C. # 87208, regarding this claim.

On July 22, 2006, Charles Unger (D.O.C. # 87945) spoke with Applicant expressing his desire to testify in the defense of Applicant. (Exhibit HH).

Garnet Marshall, D.O.C.# 110335, has provided information to Applicant that his coached statement was obtained through the effort of Lt. Susan Rushing during visits to Angola. During each visit she was accompanied by two different male detectives and SCSO Sgt. Olga Fourroux. During one of Lt. Rushing's visits, she purchased a carton of Camel cigarettes for Mr. Marshall and promised to assist with

his early release in exchange for his coached statement against Applicant. Additionally, Mr. Marshall provided information in reference to Mervin Spencer, Cheryl Lewis, Joe Brown, and the crucial link to Ronald J. Dominique. Request is hereby made for subpoena of Garnet Marshall, D.O.C. # 110335. (Exhibit HHH).

On May 27, 2007, Applicant spoke with inmate Daniel Dickerson, # 87172. He worked as a paralegal for Jim Williams, attorney, and prepared documents in reference to Jon Ballay as intermediary for Diane Gilliam and Nawassa Richmond in preparation of their false testimony against me.

On June 4, 2007 3:00 pm, Jon Ballay revealed to Applicant that, "of course Diane Gilliam made a deal with the prosecutor, but didn't get it."

On June 13, 2007, Applicant spoke with Daniel Dickerson, #87172, during lunch. He said that he came to prison in February of 1999. He worked for Jim Williams up to that time. All documents he prepared pertaining to Diane Gilliam, Nawassa Richmond, and Jon Ballay would be before that date. (Exhibit EEE).

There are many examples of Applicant's due diligence to develop facts and evidence to prove his case. Applicant should have been afforded, and still should be, an evidentiary hearing with appointment of counsel and expert assistance to further develop facts of the case.

Newly developed facts, and affidavits of recantations show that the conviction in this case is sharply contested by facts and record evidence which requires reversal of the instant conviction and sentence, or, at least an evidentiary hearing to further develop this case.

Further, Applicant asks that the conviction and sentence in this case be subject to an accumulation of errors as the basis for a new trial. *Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996).

## CONCLUSION

Persuasive argument, the stock-in-trade of effective counsel, has been denied this Applicant throughout his case. When what should have been requested or argued is omitted by counsel, or half-heartedly attacked, then that attorney's client has received ineffective assistance of counsel.

The fact that Applicant's counsels have failed to raise claims, issues, or further argue objections in the record, does not invalidate them. In fact, if Applicant can show the slightest merit to an omitted claim, then Applicant shows ineffective assistance of counsel which, essentially, may only be raised on P.C.R. *State v. Hicks*, 554 So.2d 1298, 1306 (La. App. 1 Cir. 1989) writs denied, 559 So.2d 1374 (La. 1990) and 604 So.2d 1297 (La. 1992). Therefore, this Honorable Court should review Applicant's timely and valid claims.

Applicant maintains that he has stated claims, and has pointed to record facts and evidence that entitles him to Post Conviction Relief, pursuant to C.Cr.P., **Art. 924**, *et seq.* Additionally, that the State has failed to, and / or has chosen not to, sufficiently challenge or properly address Applicant's claims on P.C.R. That through the State's own untimeliness, a procedural default should preclude this Court from consideration of any answer by the State, and consideration of Applicant's claims as being unchallenged.

Wherefore, Applicant asserts that he should be granted the Post Conviction Relief requested in his Application for Post Conviction Relief and his Supplement and Amendment.

Alternately, Applicant requests that this Honorable Court call for an evidentiary hearing in this matter, pursuant to C.Cr.P., **Art. 930**, requiring an evidentiary hearing when there are factual issues contested that cannot be resolved on the record alone. Applicant further cites C.Cr.P., **Art. 929**, Official Revision Comment, quoted in *State*

*ex rel. Tassin v. Whitley*, 602 So.2d 721 (La. 1992) (in pertinent part): "If a factual issue of significance to the outcome is sharply contested, the trial court will not be able to resolve the factual dispute without a full evidentiary hearing."

Respectfully submitted, *pro se*, this 26th day of June, 2008, at Angola, Louisiana.

*Russell Ellwood* 06/26/08
Russell Ellwood
D.O.C.# 413920, Cypress 3
Louisiana State Penitentiary
Angola, Louisiana 70712

IN THE
FIFTH CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA


State of Louisiana
Ex rel., RUSSELL ELLWOOD,
*Relator / Applicant*

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

---

EXHIBITS & APPENDICES

---

| Appendix AA | 2-26-03 | Original Post Conviction Application - See <u>Exhibit</u> AA |
|---|---|---|
| Appendix BB | 8-27-07 | Order for State to give procedural objections |
| Appendix CC | 9-11-07 | Supplement and Amendment to Post Conviction Application |
| Appendix DD | 10-11-07 | Supplement and Memorandum to Remanded Application for Post Conviction Relief |
| Appendix EE | 12-18-07 | State's (untimely) Motion for Extension of Time |
| Appendix FF | 4-18-08 | State's (untimely) Response to Application for Post Conviction Relief |
| Appendix GG | 4-25-08 | Motion to Strike and Request for Summary Disposition objecting to Any Untimely State Response to Application for Post Conviction Relief |
| Appendix HH | 5-27-08 | Denial of Post Conviction and Motion to Strike and Summary Disposition |
| Appendix II | 6-10-08 | Notice of Intent |
| Appendix JJ | 8-15-07 | Fifth Circuit Remand, # 07-KH-553 |

<u>EXHIBITS and APPENDICES within Appendices CC and DD</u>:

| Exhibit A | 1/93 | Calendar of February 1993 - police time line with alibi dates |
|---|---|---|
| Exhibit B | for 2/93 | Tide Tables, weather data for time period in question from David Walters, U.S. Geological Survey for February 1993 |
| Exhibit C | 2-02-93 | Missing person report - Signal 22 |

# EXHIBITS & APPENDICES (continued)

Exhibit D    2-21-93    St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Cheryl A. Lewis

Exhibit E    2-22-93    St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Delores Mack

Exhibit F    2-22-93    St.Charles Parish Sheriff's Dept., Crime Scene Investigation Daily Report of Cheryl Lewis by Dr. Susan Garcia

Exhibit G    2-22-93    Bank statement - purchase of Greyhound Bus ticket from Canton, Ohio

Exhibit H    2-01-94    *ALTERED* Police time line p. 86 - Ellwood visited Ohio, Entry for 2-01-94

Exhibit I    5-01-96    JPSO Special Investigations Division Vice Squad 187808, 187809

Exhibit J    5-02-96    JPSO Narcotics Division - Report of Investigation 187810

Exhibit K    6-25-96    Interview of Annette Phoenix, one week before her sister's death, listed as Sunday, 2:00 A.M., (actually Monday, February 1, 1993 2:00 A.M.), Going to Circle K

Exhibit L    7-12-96    JPSO audio tape transcription of Milo Lewis (item # 04-3203-95)

Exhibit M    2-10-99    State of Louisiana Dept. of Justice Interview Report of Milo Lewis (file # 36-373) with Cheryl Lewis on Wednesday evening

Exhibit N    12-15-97    Audio tape transcription from Stark County Jail, pp. 1, 4, 12, 13

Exhibit O    3-02-98    Warrant for Arrest of Russell Ellwood and Affidavit (1993 time period not consistent with pregnancy of Samantha)

Exhibit P    4-09-98    Application for Bill of Particulars and Motion for Discovery and Inspection

Exhibit Q    5-26-98    Motion to suppress the evidence and alleged "inculpatory" statements

Exhibit R    1-11-99    Answer to Application for Bill of Particulars and Motion for Discovery and Inspection and cover letter

Exhibit S    1-26-99    Report from William Bass (University of Tennessee, Knoxville) to JPSO Steve Buras (officer provided autopsy photos)

Exhibit T    3-23-98    Indictment

Exhibit U    3-02-99    Amended Indictment

Exhibit V    4-19-99    Motion To Dismiss Remaining Count of the Indictment & Motion To Adopt All Previous Motions Filed

Exhibit W    5-20-99    Motion for Discovery and Inspection, Motion to Disallow Other Crimes Evidence, and Motion to Suppress

Exhibit X    6-04-99    Motion in Limine

Exhibit Y    7-02-99    Affidavit of Shara Kohrs - two inmates that testified could not identify Ellwood, but were urged by police to testify

| | | |
|---|---|---|
| Exhibit Z | 6-21-00 | Anonymous letter to James A. McPherson (witness coaching of St. Gabriel inmates - deposition of Bruce Harrison requested) |
| Exhibit AA | 2-26-03 | Original Post Conviction Application and cover letter |
| Exhibit BB | 2-27-03 | Indigent mail request, Clerk of Court - District Attorney - St. Charles withdrawal slip $2.58 |
| Exhibit CC | 4-08-05 | Letter from Steven Lintlop |
| Exhibit DD | 3-06-06 | Letter from Steven Lintlop |
| Exhibit EE | 9-26-05 | Letter to Ross T. Scaccia from C.David James - material in my possession has been sent to Mr. Scaccia |
| Exhibit FF | 1-17-06 | Letter from Maria Chaisson (RE: Ron Camden telephone conversation) |
| Exhibit GG | 3-30-06 | Letter to Clerk of Court, 29th Judicial District Court |
| Exhibit HH | 8-18-06 | Affidavit of Charles Unger |
| Exhibit II | 7-2000... | Correspondence to Ellwood from McPherson, dated 7-10-00, 3-11-03, 3-18-03, 3-26-03, 5-02-03, 4-05-05, 5-24-05, 6-10-05, 7-18-05 |
| Exhibit JJ | 2-2003... | Correspondence to Practice Assistance Council from Ellwood, dated 2-14-03, 2-17-05, 3-01-05, 4-13-05, 5-16-05, 5-16-05, 6-14-05, 6-15-05, 7-05-05, 7-12-05 |
| Exhibit KK | 3-2005 ... | Correspondence to Practice Assistance Council from McPherson, dated 3-10-05, 4-06-05, 4-18-05, 6-30-05 |

## TRANSCRIPTS

**Exhibit LL**    Transcript of perpetuated testimony of Stan Hill
**5-26-98**

| | |
|---|---|
| p.57 lines 25-32 | Ellwood allegedly dumped bodies in alleyways |
| p.58 lines 1-5 | Ellwood allegedly dumped bodies "behind dumpsters or aside the river" |
| P.60 lines 7-23 | victims were "tied up" and "strangled" |

**Exhibit MM**    Transcript of Testimony of Lt. Susan Rushing
**12-09-98**

| | |
|---|---|
| p.34 lines 30-32 | Bodies not in same vicinity at same time |
| p.35 lines 1-6 | |
| p. 40 lines 30-31 | Date of Samantha's birth in 1994 altered |
| p.41 lines 12-17 | Birthdate of child is very important |

**Exhibit NN**    Transcript of Hearing on Motion to Suppress
**1-15-99**

| | |
|---|---|
| p.10 lines 8-9 | Changed dates on things |
| p.10 line 24 | Witness interviews altered (Annette Phoenix interview) |
| p.35 lines 6-31 | Discovery issue - open discovery |
| p.37 line 8 | Discovery to be complete by March 15, 1999 |
| p.40 lines 1-5 | Jefferson Parish Coroner is under sub-contract in St.Charles |

**Exhibit OO**
3-02-99

Transcript of Pre-trial Motion to Amend Bill of Information

| | |
|---|---|
| p.7 lines 1-12 | Maria Chaisson spoke with Ron Camden. Ellwood did not confess during interrogation. |

**Exhibit PP**
3-05-99

Transcript of Hearing on Pre-trial Motions

| | |
|---|---|
| p.91 lines 12-32 | \ |
| p.92 lines 1-32 | \\__ No evidence of misdemeanor manslaughter |
| p.93 lines 1-8 | / |
| p.94 lines 18-24 | / |
| p.94 lines 18-24 | No confirmation of second testing method |
| p.124 lines 28-32 | Discovery issue |
| p.125 lines 6-29 | Freese promises to complete discovery by March 15, 1999 |
| p.126 lines 23-26 | Full open discovery ended on December 10, 1998 |
| p.128 lines 2-9 | Freese agrees to provide additional discovery material of Delores Mack |

**Exhibit QQ**
5-10-99

Transcript of Hearing on Motions

| | |
|---|---|
| p.19 lines 3-32 | Discussion related to actual grounds as basis of defective indictment |
| p.21 lines 7-16 | Freese continues to suppress bus tickets dated 2/22/93 and 2/23/93 |
| p.23 lines 19-22 | Motion to dismiss denied |
| p.23 lines 23-29 | Scaccia objects for the record |

**Exhibit RR**
6-01-99

Transcript of Hearing on Motions

| | |
|---|---|
| p.22 lines 26-32 | \\__ Motion to suppress the evidence of other crimes |
| p.23 line 1 | / |
| p.23 lines 2-15 | The court will give cautionary instructions to the jury regarding four incidents |
| p.23 lines 16-26 | Scaccia objects to ruling denial |
| p.23 lines 27-32 | \\__ Freese believes we have had evidentiary hearing |
| p.24 lines 1-13 | / |
| p.26 lines 19-32 | Discovery motion heard |
| p.28 lines 17-32 | Autopsy reports grossly incomplete; never received supplemental reports. |
| p.29 lines 1-8 | Freese states autopsy discovery is complete |
| p.30 lines 1-8 | Freese states there are no autopsy photographs |
| p.39 lines 24-32 | \\____ Only names of expert witnesses provided |
| p.40 lines 1-20 | / |
| p.40 lines 21-28 | Freese states no need for *Daubert* hearings; Scaccia fails to object |
| p.41 lines 11-22 | Scaccia intends to subpoena Mary Manheim as expert witness |

**Exhibit SS**
6-07-06

Transcript of Trial - Day 1 - Motion in Limine Ruling

| | |
|---|---|
| p.6 lines 18-28 | Denied use of Stan Hill videos - no objection |
| p.7 line 1 | Maria Chaisson testimony to impeach Ron Camden |
| p.7 line 17 | Denied reconsideration of court's ruling on other crimes evidence |
| p.7 lines 18-24 | Denied Shara Kohr's testimony |
| p.7 lines 25-27 | Scaccia preserves objection |

**Exhibit TT**
6-08-06

Transcript of Trial - Day 2 (record erroneous marked Day 1)

| | |
|---|---|
| p.80 lines 31-32 | Toxicological report was performed |
| p.81 lines 22-32 | \\___ Objection to "certain beyond a reasonable doubt" |
| p.82 lines 1-2 | /    Trial court fails to charge jury on reasonable doubt during testimony of said witness |
| p.82 lines 26-32 | \\__ Unable to estimate the time of death |
| p.83 lines 8-13 | / |
| p.83 lines 14-17 | Alive but unconscious |

**Exhibit UU**
6-09-99

Transcript of Trial - Day 3

| | |
|---|---|
| p.5 lines 15-32 | Motion to protect record in reference to other crimes witnesses |
| p.6 lines 4-15 | Scaccia moves for mistrial based on denial of other crimes witnesses |
| p.7 lines 12-19 | Move for mistrial |
| p.7 lines 24-27 | Move for mistrial denied |
| p.25 lines 24-27 | Scaccia objects again and moves again for mistrial |
| p.25 lines 28-30 | Trial court notes objection |
| p.26 lines 26-30 | Third objection to other crimes witnesses and third motion to move for mistrial |
| p.27 lines 21-22 | Trial court denies motion |
| p.28 lines 25-32 | \\___ Denise Sanders testified Lewis and Ellwood seen |
| p.29 lines 1-8 | /    together in summer of 1993 |
| p.209 lines 17-29 | Ellwood feels comfortable with State's discovery |

**Exhibit VV**
6-10-99

Transcript of Trial - Day 4

Sharon Jones testimony

| | |
|---|---|
| p.102 lines 29-32 | \\___ Medical reports of birthdate of |
| p.103 lines 1-13 | /    Samantha as December 1, 1994 |
| p.125 lines 7-13 | Scaccia expresses desire to introduce original indictment into evidence |
| p.126 lines 13-32 | Discussion of original indictment as evidence |
| p.126 lines 27-32 | \\__ Freese objects |
| p.127 lines 1-5 | / |
| p.127 lines 6-8 | Trial court offers stipulation if agreeable to Scaccia |
| p.127 lines 9-17 | Scaccia refuses to agree to stipulation |
| p.127 lines 20-27 | State's objection is sustained trial court's stipulation enforced |
| p.144 lines 18-32 | \\___ Court entertains objection by McPherson |
| p.145 lines 1-31 | /    on disallowing other crimes testimony |
| p.146 lines 19-28 | Delete other crimes jury charge and testimony |
| p.146 lines 29-32 | Trial court denies fourth motion |
| p.190-200 | Jury Charges |

**Exhibit WW**  Petition to rule on pending Motion for Production of Documents with cover letter filed April 14, 2005, Clerk of Court, St. Charles Parish

**Exhibit XX**  Letter to Honorable Kirk R. Granier requesting to rule on motion for production of documents which was never ruled upon, with proof of mailing.

**Exhibit AAA**  7-02-99    Affidavit from Shara Kohrs #119059

| Exhibit BBB | 7-11-99 | Letter from Shara Kohrs #119059 |
| | | (Backside notation of Ross T. Scaccia, attorney) |
| Exhibit CCC | 8-10-99 | Letter from Gayle Niedhardt #211283 |
| Exhibit DDD | 8-13-99 | Letter from Sandra Cordero #396759 |
| Exhibit EEE | 3-12-01 | Letter from James L. Piker |
| Exhibit FFF | 12-27-06 | Letter from April George #269654 |
| Exhibit GGG | 5-25-07 | Affidavit from Russell Kirkland #417899 |
| Exhibit HHH | 6-06-07 | Affidavit from Garnet Marshall #110335 |

## APPENDICES

| Appendix A | Scientific Evidence (1986) - Pathology § 19-8(B) page 137, by P. Giannelli and E. Imwinkelried |
| Appendix B | Insect Succession and Decomposition of Pig Carcasses in Water, by Jerry A. Payne and Edwin King, Journal of Entomological Science, pp. 154-155 |
| Appendix C | State v. Matthews, testimony of Dr. Patrick Besant-Matthews, cover page & pp. 123 & 131 |

State of Louisiana
Ex rel., RUSSELL ELLWOOD,
*Relator / Applicant*

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

---

## EXHIBITS & APPENDICES

---

| | | |
|---|---|---|
| Appendix AA | 2-26-03 | Original Post Conviction Application - See <u>Exhibit</u> AA |
| Appendix BB | 8-27-07 | Order for State to give procedural objections |
| Appendix CC | 9-11-07 | Supplement and Amendment to Post Conviction Application |
| Appendix DD | 10-11-07 | Supplement and Memorandum to Remanded Application for Post Conviction Relief |
| Appendix EE | 12-18-07 | State's (untimely) Motion for Extension of Time |
| Appendix FF | 4-18-08 | State's (untimely) Response to Application for Post Conviction Relief |
| Appendix GG | 4-25-08 | Motion to Strike and Request for Summary Disposition objecting to Any Untimely State Response to Application for Post Conviction Relief |
| Appendix HH | 5-27-08 | Denial of Post Conviction and Motion to Strike and Summary Disposition |
| Appendix II | 6-10-08 | Notice of Intent |
| Appendix JJ | 8-15-07 | Fifth Circuit Remand, # 07-KH-553 |

<u>EXHIBITS and APPENDICES within Appendices CC and DD</u>:

| | | |
|---|---|---|
| Exhibit A | 1/93 | Calendar of February 1993 - police time line with alibi dates |
| Exhibit B | for 2/93 | Tide Tables, weather data for time period in question from David Walters, U.S. Geological Survey for February 1993 |
| Exhibit C | 2-02-93 | Missing person report - Signal 22 |

| Exhibit D | 2-21-93 | St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Cheryl A. Lewis |
|---|---|---|
| Exhibit E | 2-22-93 | St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Delores Mack |
| Exhibit F | 2-22-93 | St.Charles Parish Sheriff's Dept., Crime Scene Investigation Daily Report of Cheryl Lewis by Dr. Susan Garcia |
| Exhibit G | 2-22-93 | Bank statement - purchase of Greyhound Bus ticket from Canton, Ohio |
| Exhibit H | 2-01-94 | Police time line p. 86 - Ellwood visited Ohio, Entry for 2-01-94 |
| Exhibit I | 5-01-96 | JPSO Special Investigations Division Vice Squad 187808, 187809 |
| Exhibit J | 5-02-96 | JPSO Narcotics Division - Report of Investigation 187810 |
| Exhibit K | 6-25-96 | Interview of Annette Phoenix, one week before her sister's death, listed as Sunday, 2:00 A.M., (actually Monday, February 1, 1993 2:00 A.M.), Going to Circle K |
| Exhibit L | 7-12-96 | JPSO audio tape transcription of Milo Lewis (item # 04-3203-95) |
| Exhibit M | 2-10-99 | State of Louisiana Dept. of Justice Interview Report of Milo Lewis (file # 36-373) with Cheryl Lewis on Wednesday evening |
| Exhibit N | 12-15-97 | Audio tape transcription from Stark County Jail, pp. 1, 4, 12, 13 |
| Exhibit O | 3-02-98 | Warrant for Arrest of Russell Ellwood and Affidavit (1993 time period not consistent with pregnancy of Samantha) |
| Exhibit P | 4-09-98 | Application for Bill of Particulars and Motion for Discovery and Inspection |
| Exhibit Q | 5-26-98 | Motion to suppress the evidence and alleged "inculpatory" statements |
| Exhibit R | 1-11-99 | Answer to Application for Bill of Particulars and Motion for Discovery and Inspection and cover letter |
| Exhibit S | 1-26-99 | Report from William Bass (University of Tennessee, Knoxville) to JPSO Steve Buras (officer provided autopsy photos) |
| Exhibit T | 3-23-98 | Indictment |
| Exhibit U | 3-02-99 | Amended Indictment |
| Exhibit V | 4-19-99 | Motion To Dismiss Remaining Count of the Indictment & Motion To Adopt All Previous Motions Filed |
| Exhibit W | 5-20-99 | Motion for Discovery and Inspection, Motion to Disallow Other Crimes Evidence, and Motion to Suppress |
| Exhibit X | 6-04-99 | Motion in Limine |
| Exhibit Y | 7-02-99 | Affidavit of Shara Kohrs - two inmates that testified could not identify Ellwood, but were urged by police to testify |

EXHIBITS & APPENDICES (continued)

Exhibit Z 6-21-00 Anonymous letter to James A. McPherson (witness coaching of St. Gabriel inmates - deposition of Bruce Harrison requested)

Exhibit AA 2-26-03 Original Post Conviction Application and cover letter

Exhibit BB 2-27-03 Indigent mail request, Clerk of Court - District Attorney - St. Charles withdrawal slip $2.58

Exhibit CC 4-08-05 Letter from Steven Lintlop

Exhibit DD 3-06-06 Letter from Steven Lintlop

Exhibit EE 9-26-05 Letter to Ross T. Scaccia from C.David James - material in my possession has been sent to Mr. Scaccia

Exhibit FF 1-17-06 Letter from Maria Chaisson (RE: Ron Camden telephone conversation)

Exhibit GG 3-30-06 Letter to Clerk of Court, 29th Judicial District Court

Exhibit HH 8-18-06 Affidavit of Charles Unger

Exhibit II 7-2000... Correspondence to Ellwood from McPherson, dated 7-10-00, 3-11-03, 3-18-03, 3-26-03, 5-02-03, 4-05-05, 5-24-05, 6-10-05, 7-18-05

Exhibit JJ 2-2003... Correspondence to Practice Assistance Council from Ellwood, dated 2-14-03, 2-17-05, 3-01-05, 4-13-05, 5-16-05, 5-16-05, 6-14-05, 6-15-05, 7-05-05, 7-12-05

Exhibit KK 3-2005... Correspondence to Practice Assistance Council from McPherson, dated 3-10-05, 4-06-05, 4-18-05, 6-30-05


TRANSCRIPTS

Exhibit LL Transcript of perpetuated testimony of Stan Hill
5-26-98

p.57 lines 25-32 Ellwood allegedly dumped bodies in alleyways
p.58 lines 1-5 Ellwood allegedly dumped bodies "behind dumpsters or aside the river"
P.60 lines 7-23 victims were "tied up" and "strangled"


Exhibit MM Transcript of Testimony of Lt. Susan Rushing
12-09-98

p.34 lines 30-32 Bodies not in same vicinity at same time
p.35 lines 1-6
p. 40 lines 30-31 Date of Samantha's birth in 1994 altered
p.41 lines 12-17 Birthdate of child is very important


Exhibit NN Transcript of Hearing on Motion to Suppress
1-15-99

p.10 lines 8-9 Changed dates on things
p.10 line 24 Witness interviews altered (Annette Phoenix interview)
p.35 lines 6-31 Discovery issue - open discovery
p.37 line 8 Discovery to be complete by March 15, 1999
p.40 lines 1-5 Jefferson Parish Coroner is under sub-contract in St.Charles

**Exhibit OO**
3-02-99

Transcript of Pre-trial Motion to Amend Bill of Information

| | |
|---|---|
| p.7 lines 1-12 | Maria Chaisson spoke with Ron Camden. Ellwood did not confess during interrogation. |

**Exhibit PP**
3-05-99

Transcript of Hearing on Pre-trial Motions

| | |
|---|---|
| p.91 lines 12-32 | \ |
| p.92 lines 1-32 | \__ No evidence of misdemeanor manslaughter |
| p.93 lines 1-8 | / |
| p.94 lines 18-24 | / |
| p.94 lines 18-24 | No confirmation of second testing method |
| p.124 lines 28-32 | Discovery issue |
| p.125 lines 6-29 | Freese promises to complete discovery by March 15, 1999 |
| p.126 lines 23-26 | Full open discovery ended on December 10, 1998 |
| p.128 lines 2-9 | Freese agrees to provide additional discovery material of Delores Mack |

**Exhibit QQ**
5-10-99

Transcript of Hearing on Motions

| | |
|---|---|
| p.19 lines 3-32 | Discussion related to actual grounds as basis of defective indictment |
| p.21 lines 7-16 | Freese continues to suppress bus tickets dated 2/22/93 and 2/23/93 |
| p.23 lines 19-22 | Motion to dismiss denied |
| p.23 lines 23-29 | Scaccia objects for the record |

**Exhibit RR**
6-01-99

Transcript of Hearing on Motions

| | |
|---|---|
| p.22 lines 26-32 | \__ Motion to suppress the evidence of other crimes |
| p.23 line 1 | / |
| p.23 lines 2-15 | The court will give cautionary instructions to the jury regarding four incidents |
| p.23 lines 16-26 | Scaccia objects to ruling denial |
| p.23 lines 27-32 | \__ Freese believes we have had evidentiary hearing |
| p.24 lines 1-13 | / |
| p.26 lines 19-32 | Discovery motion heard |
| p.28 lines 17-32 | Autopsy reports grossly incomplete; never received supplemental reports. |
| p.29 lines 1-8 | Freese states autopsy discovery is complete |
| p.30 lines 1-8 | Freese states there are no autopsy photographs |
| p.39 lines 24-32 | \____Only names of expert witnesses provided |
| p.40 lines 1-20 | / |
| p.40 lines 21-28 | Freese states no need for *Daubert* hearings; Scaccia fails to object |
| p.41 lines 11-22 | Scaccia intends to subpoena Mary Manheim as expert witness |

**Exhibit SS**
6-07-06

Transcript of Trial - Day 1 - Motion in Limine Ruling

| | |
|---|---|
| p.6 lines 18-28 | Denied use of Stan Hill videos - no objection |
| p.7 line 1 | Maria Chaisson testimony to impeach Ron Camden |
| p.7 line 17 | Denied reconsideration of court's ruling on other crimes evidence |
| p.7 lines 18-24 | Denied Shara Kohr's testimony |
| p.7 lines 25-27 | Scaccia preserves objection |

| | | |
|---|---|---|
| Exhibit TT<br>6-08-06 | Transcript of Trial - Day 2 (record erroneous marked Day 1) | |
| | p.80 lines 31-32 | Toxicological report was performed |
| | p.81 lines 22-32 | \\___ Objection to "certain beyond a reasonable doubt" |
| | p.82 lines 1-2 | /￼ Trial court fails to charge jury on reasonable doubt<br>during testimony of said witness |
| | p.82 lines 26-32 | \\__ Unable to estimate the time of death |
| | p.83 lines 8-13 | / |
| | p.83 lines 14-17 | Alive but unconscious |

| | | |
|---|---|---|
| Exhibit UU<br>6-09-99 | Transcript of Trial - Day 3 | |
| | p.5 lines 15-32 | Motion to protect record in reference to other crimes witnesses |
| | p.6 lines 4-15 | Scaccia moves for mistrial based on denial of other crimes witnesses |
| | p.7 lines 12-19 | Move for mistrial |
| | p.7 lines 24-27 | Move for mistrial denied |
| | p.25 lines 24-27 | Scaccia objects again and moves again for mistrial |
| | p.25 lines 28-30 | Trial court notes objection |
| | p.26 lines 26-30 | Third objection to other crimes witnesses and third motion to move for mistrial |
| | p.27 lines 21-22 | Trial court denies motion |
| | p.28 lines 25-32 | \\___ Denise Sanders testified Lewis and Ellwood seen |
| | p.29 lines 1-8 | /     together in summer of 1993 |
| | p.209 lines 17-29 | Ellwood feels comfortable with State's discovery |

| | | |
|---|---|---|
| Exhibit VV<br>6-10-99 | Transcript of Trial - Day 4 | |
| | Sharon Jones testimony | |
| | p.102 lines 29-32 | \\___ Medical reports of birthdate of |
| | p.103 lines 1-13 | /    Samantha as December 1, 1994 |
| | p.125 lines 7-13 | Scaccia expresses desire to introduce original indictment into evidence |
| | p.126 lines 13-32 | Discussion of original indictment as evidence |
| | p.126 lines 27-32 | \\__ Freese objects |
| | p.127 lines 1-5 | / |
| | p.127 lines 6-8 | Trial court offers stipulation if agreeable to Scaccia |
| | p.127 lines 9-17 | Scaccia refuses to agree to stipulation |
| | p.127 lines 20-27 | State's objection is sustained trial court's stipulation enforced |
| | p.144 lines 18-32 | \\___ Court entertains objection by McPherson |
| | p.145 lines 1-31 | /    on disallowing other crimes testimony |
| | p.146 lines 19-28 | Delete other crimes jury charge and testimony |
| | p.146 lines 29-32 | Trial court denies fourth motion |
| | p.190-200 | Jury Charges |

| | |
|---|---|
| Exhibit WW | Petition to rule on pending Motion for Production of Documents with cover letter filed April 14, 2005, Clerk of Court, St. Charles Parish |
| Exhibit XX | Letter to Honorable Kirk R. Granier requesting to rule on motion for production of documents which was never ruled upon, with proof of mailing. |
| Exhibit AAA 7-02-99 | Affidavit from Shara Kohrs #119059 |

| | | |
|---|---|---|
| Exhibit BBB | 7-11-99 | Letter from Shara Kohrs #119059 |
| | | (Backside notation of Ross T. Scaccia, attorney) |
| Exhibit CCC | 8-10-99 | Letter from Gayle Niedhardt #211283 |
| Exhibit DDD | 8-13-99 | Letter from Sandra Cordero #396759 |
| Exhibit EEE | 3-12-01 | Letter from James L. Piker |
| Exhibit FFF | 12-27-06 | Letter from April George #269654 |
| Exhibit GGG | 5-25-07 | Affidavit from Russell Kirkland #417899 |
| Exhibit HHH | 6-06-07 | Affidavit from Garnet Marshall #110335 |

## APPENDICES

| | |
|---|---|
| Appendix A | Scientific Evidence (1986) - Pathology § 19-8(B) page 137, by P. Giannelli and E. Imwinkelried |
| Appendix B | Insect Succession and Decomposition of Pig Carcasses in Water, by Jerry A. Payne and Edwin King, Journal of Entomological Science, pp. 154-155 |
| Appendix C | State v. Matthews, testimony of Dr. Patrick Besant-Matthews, cover page & pp. 123 &131 |

**RECEIVED**

DEC 1 1 2007

WEST FELICIANA PARISH
~~PUBLIC DEFENDER~~ OFFICE

STATE OF LOUISIANA

VERSUS

RUSSELL ELLWOOD

NUMBER: 98-0109

29TH JUDICIAL DISTRICT COURT

PARISH OF ST. CHARLES

STATE OF LOUISIANA

DIVISION: D

### ORDER

Considering petitioner's application for post conviction relief, and motion for evidentiary hearing,

IT IS HEREBY ORDERED that the attorney general shall file any procedural objections he may have, and an answer on the merits if there are no procedural objections, to Claims I – XI raised, within 90 days of this order.

Hahnville, Louisiana, this ___ day of August, 2007.

AUG 27 2007

_____
KIRK R. GRANIER, DISTRICT JUDGE

Please serve:

Russell Ellwood
#413920
Camp C Wolf 4
Louisiana State Penitentiary
Angola, LA 70712

Attorney General
State of Louisiana

**R E C E I V E D**

DEC 1 1 2007

Legal Programs Department

2007 DEC -5 PM 3: 03

RECEIVED
ST. CHARLES PARISH
SHERIFF'S OFFICE

**APPENDIX
BB**