IN THE

TWENTY-NINTH JUDICIAL DISTRICT COURT

PARISH OF ST. CHARLES

STATE OF LOUISIANA


RUSSELL ELLWOOD,
                    *Petitioner*,

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
                    *Respondent*

---

SUPPLEMENT TO THE APPLICATION FOR
POST-CONVICTION RELIEF AMENDED AND
MEMORANDUM IN SUPPORT
Case No. 98-109 Division "D"

---

MEMORANDUM ON BEHALF OF:

RUSSELL ELLWOOD, Petitioner, Pro Se


Respectfully submitted,


Russell Ellwood (Petitioner)
D.O.C. No. 413920, ~~Spruce 1~~ Cypress-3
Louisiana State Penitentiary
Angola, Louisiana 70712


Criminal Proceeding

APPENDIX
CC

IN THE

TWENTY-NINTH JUDICIAL DISTRICT COURT

PARISH OF ST. CHARLES

STATE OF LOUISIANA

RUSSELL ELLWOOD,
*Petitioner*,

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

CASE NUMBER: 98-109                              DIVISION: "D"

FILED: _____        _____
                                        DEPUTY CLERK OF COURT

## MEMORANDUM IN SUPPORT OF POST-CONVICTION RELIEF

MAY IT PLEASE THE COURT:

The Supplemental Post-Conviction Application Amended of Russell Ellwood, Petitioner, appearing herein personally and in forma pauperis, moves with the full reservation of his rights and respectfully applies to this Honorable Court pursuant to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I §§ 1, 2, 3, 13, 16, 17, 19, 20 and 22 of the Louisiana Constitution, and other law set forth below.

The Court should grant post-conviction relief in this case on the ground, it obtained the conviction by violating the constitution of the United States or the state of Louisiana. La. C.Cr.P. Art. 930.3(1). The Petitioner suggests this Court set a date for an evidentiary hearing on his claims — to ensure the maintenance of his rights under Louisiana Code of Criminal Procedure Article 924, *et seq.* — and protect his guarantees to due process and equal protection.

The Petitioner further requests the Court to allow supplements and/or

amendments to this application by himself, an attorney or both, in the interest of justice. The Petitioner proffers the following facts and law in support of his claims:

## STATEMENT OF JURISDICTION

Jurisdiction is properly vested in this Court under the provisions of LSA-Const. Art. I., § 22, Art. V., § 16(a), 1974 and La. C.Cr.P. Art. 924, *et seq.*

## STATEMENT OF THE CASE

Petitioner, Russell Ellwood, was charged by indictment on March 23, 1998 with two counts of second degree murder in violation of **LSA-R.S. 14:30.1**. Count one charged Ellwood with the murder of Delores Mack and count two charged Ellwood with the murder of Cheryl Lewis "on or about February 1993." On April 9, 1998, Petitioner was arraigned and entered a plea of not guilty on both counts. Almost one year later to date, on March 2, 1999, the State entered a nolle prosequi as to count one of the indictment regarding Delores Mack. The indictment was also amended to allege that Cheryl Lewis was murdered "on or between January 31, 1993 and February 9, 1993." Petitioner was re-arraigned on the amended indictment on June 9, 1999. At that time, Petitioner pled not guilty to the charge of second degree murder of Cheryl Lewis. Because of extensive pre-trial publicity, the trial court granted Petitioner's Motion for a Change of Venue from St. Charles Parish to Lafayette Parish. A three day trial began on June 8, 1999, which concluded in a jury finding that the Petitioner was guilty as charged. On August 17, 1999, Petitioner was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Petitioner filed a timely appeal in accordance with **La.C.Cr.P. article 914** and Petitioner's conviction and sentenced were affirmed by the Fifth Circuit Court of Appeal. See *State v. Ellwood*, 00-1232 (La. App. 5th Cir. 2/28/01), 783 So.2d 423.

Petitioner asserts that his original Application for Post-Conviction was timely placed into the prison mailing system on February 27, 2003. Inmate's request for

legal/indigent mail (signed by Peggy Leslie. dated 2-27-03); Inmate Withdrawal Request (Indigent Mail Request, 2-28-03). The burden of having his application for post-conviction relief was on the Petitioner, and once the application was presented to Classification Officer Peggy Leslie on February 27, 2003, Petitioner's burden was satisfied. *Houston v. Lack*, 487 U.S. 266, 270-271 (1988); *U.S. v. Christoph*, 904 F.2d 1036 (6th Cir. 1990) (following *Houston*); *Eubank v. Crawford*, No. 89-3151, 1989 WL 123260 (6th Cir. Oct. 18, 1989) (prisoner's complaint deemed filed when mailed).

> Under "mailbox rule" established by United States Supreme Court In *Houston*, prisoner's pro se compliant . . . would be deemed "filed" as of date he deposited it in the prison mailing system, not as of date it was received by district court clerk. *Cooper v. Brookshire*, 70 F.3d 377 (5th Cir. 1995).

Petitioner contends due diligence in all claims, amendments (claims 1-3) and supplementation (claims 4-11). (Exhibits II, JJ, KK, WW, XX, PP page 125 lines 6-29, and UU page 209, lines 17-29).

Furthermore Petitioner wishes the court to note, in support of claims 4-11, which allege, and Petitioner has proof, that the facts upon which the claims are predicated were not known to the Petitioner. Failure to consider these claims is a miscarriage of justice.

*Jones v. Estelle*, 722 F.2d 159, 173 (5th Cir. 1983); but there is no statute of limitations on the serious constitutional claims of prisoners. The majority of the courts creates one in this case without the countervailing justification of requiring that such issues be known and understood to be present or readily discoverable at the time of the earlier petition.

*Dean v. United States*, 788 F.Supp. 306, 312; even if the cause and prejudice standard applied in *McClesky* were applicable here, review of applicant's claims would be appropriate under the "fundamental miscarriage of justice" exception. *McClesky*, 111 S.Ct. at 1470. Under this exception, an applicant is entitled to review of a new claim, despite the failure to demonstrate cause for failing to raise it in the first

application, if the "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496; *McClesky*, 111 S.Ct. at 1470.

Petitioner continues to argue that he is not guilty of any crimes.

*Borrego v. U.S.*, 975 F.Supp. 520 at 523, 524, 525:

At 524:

Thus, it follows that the court overcame the barrier extending the "actual innocence" standard of reveiw to non-capital sentences when it extended the exception to capital sentences because capital and non-capital cases are treated alike on federal habeas review. See *United States v. Maybeck*, 23 F.3d 888, 893 (4th Cir. 1994).

At 525:

The application of the "actual innocence" exception to a non-capital sentence also appears to be in accord with at least three courts of appeal. See *id*. ("We see little difference between holding that a defendant can be innocent of the acts required to enhance a sentence in a death case and applying a parallel rationale in non-capical cases."); *Mills v. Jordan*, 979 F.2d 1273, 1277 (7th Cir. 1992)
. . .

See also *State v. Orman*, 925 So.2d 761 at 762 (2d Cir. App. 2006) citing The Louisiana Supreme Court, in *Carlin v. Cain*, 706 So.2d 968 (La. 1998).

## STATEMENT OF THE FACTS

On February 21, 1993 at 0807 hours, the body of an African-American woman was found off Highway La. 3160 in Hahnville, Louisiana. The victim was nude except for a pair of pink socks and was wedged stationary in a drainage canal off the side of the road. Fingerprints identified the body as that of Cheryl Lewis. An autopsy report and a toxicological examination could not conclude that the victim drowned. No medical reports or records of any testing exist to support "asphyxia due to drowning." It is impossible to determine if the victim was alive but unconscious, when the body hit the water. (Appendix C). Manner of death was unclassified. Toxicology reports revealed the presence of cocaine in the system, although only purge fluid was tested. Toxicological interpretations do not exist for decompositional fluids such as purge fluid. Consequently, the amount of cocaine present in the victim is unknown. (Exhibits CC & DD). SCSO reports indicate the body had not been in the area more

than twenty-four hours prior to discovery. (Exhibit D).

On February 22, 1993 at 1400 hours, the body of a second African-American woman (transsexual) was found off of Highway La. 3160 in Hahnville, Louisiana. The victim was nude found in a drainage canal.  Fingerprints identified the body as that of Delores Mack.

An autopsy report concluded asphyxia by suffocation and strangulation as the cause of death with cocaine and amphetamines present in the system.  Manner of death was classified as "homicide by strangulation."   SCSO reports indicate the body had not been in the area more than twenty-four hours and .5 tenths of a mile from the location where Cheryl Lewis was found.  (Exhibit E).

On February 23, 1993, SCSO Major Sam Zinna issued a report of his findings stating that although the bodies of Lewis and Mack were discovered in the same area on two consecutive days, both bodies were not in the same area at the same time.

On February 26, 1993, Matt Scallan, Times-Picayune reporter quoted SCSO Major Sam Zinna; the body discovered Monday was apparently dumped after investigators left the scene of Sunday's discovery, Zinna said.

"Our investigators went through the area looking for evidence on Sunday, and the second body was not there at that time," he said.

Again, on March 9, 1993, Matt Scallan, Times-Picayune reporter wrote, "Deputies believe her body was dumped in the canal after Lewis' body was discovered."    Almost exactly one year after the victims had been discovered. Defendant was observed in his taxi by two off-duty St. Charles Parish Deputies, on the same desolate stretch of road approximately one mile from where the victims' bodies were discovered.  The taxi was dark, but apparently occupied by a driver.  The deputies decided to investigate.   After several minutes the driver, who was fully dressed, exited the vehicle.  The driver produced a valid Louisiana driver's license that

identified him as "Russell Ellwood." Ellwood said he was there to change the oil in his taxi and was nervous because he planned to dump the used oil in the swamp, an Environmental Protection Agency violation. The deputies, however, refused to admit to finding motor oil, oil changing supplies, or oil filters in Ellwood's vehicle. SCSO Deputy Boyd Frickey ordered Ellwood, "do not open your tool box." Ellwood's taxicab "cruising light" contained the type of artificial lighting that would have been necessary to make the type of mechanical repair in an unlit area at night.

Subsequently, a serial crime task force was originated to investigate the murders of several prostitutes in the New Orleans area. In May of 1995, while investigating the murder locations of several victims for the task force, Detective Phil Ramon of the Jefferson Parish Sheriff's Office was informed by a St. Charles Parish Deputy that a "suspicious person," identified as Russell Ellwood, had been stopped in the area of two of the murder sites. Based upon the information provided to the task force by the St. Charles Parish Sheriff's Office, Defendant became a suspect in the investigation.

On July 23, 1997, Colonel Walter T. Gorman of the Jefferson Parish Sheriff's Office traveled to Sebring, Florida, with other members of the Serial Crime Task Force for the purpose of conducting interviews with the Defendant. Defendant had previously moved to Sebring to "develop a relationship with his father." After being advised of his rights, Defendant gave several statements to the police over a period of three days. These statements were recorded and later transcribed. On August 4, 1997, a few days after the interviews had been concluded, Highlands County Sheriff's undercover officers, for the convenience of Jefferson Parish investigators, entrapped Defendant for purchase of cocaine in Sebring, Florida, successfully holding Defendant for the ongoing Louisiana investigation. As a result, Defendant was incarcerated for 85 days. During his incarceration, Defendant made a number of statements to fellow inmates that JPSO Lieutenant Susan D. Rushing accused him of committing crimes.

One of these inmates was Stan Hill. Defendant admitted to police in a taped statement that he indeed made a statement about accusations by Lt. Susan Rushing that he committed crimes.

During August, 1997, as Defendant remained incarcerated in Sebring, Florida, Task Force members in Louisiana conducted an interview with Mary O'Neal and Ernest Macklin, two friends of Defendant. Both witnesses revealed to JPSO Lt. Susan Rushing and SCSO Sgt. Olga Fourroux that Defendant left Louisiana in February, 1993, to visit his brother in Canton, Ohio.

Ellwood parked his taxicab at the home of Ms. O'Neal and Mr. Macklin and gave the ignition keys of the taxicab to Mr. Macklin with permission to move the taxicab if necessary. Ms. O'Neal then drove Defendant to Interstate 59 North, where he began to hitchhike to Canton, Ohio. (Exhibit A).

After conducting this interview, a rift ensued between Lt. Rushing and Sgt. Fourroux over Lt. Rushing's intent to alter a proposed time line in order to continue prosecution of Defendant. Indeed, Lt. Rushing did so. See Police Time Line, page 86, entry for February 1, 1994. (Exhibit H).

Immediately thereafter SCSO Sgt. Fourroux began sifting through thousands of gas receipts and tax records taken from underneath a house in uptown New Orleans where Ellwood resided, in order to begin constructing the time line of Defendant. Sgt. Olga Fourroux discovered among the onion-skin gas receipts a computer printed Greyhound Bus ticket dated February 22, 1993 and onion-skin Greyhound Bus ticket dated February 23, 1993. Sgt. Fourroux approached Lt. Rushing with this exculpatory evidence. Lt. Rushing ordered Sgt. Fourroux to destroy the bus tickets. However, Sgt. Fourroux did not do so. In September, 1997, while constructing the time line, secretary Mary Dunn re-discovered the onion-skin Greyhound Bus ticket. Detective Phil Ramon was seated approximately 10 feet away; assuming the onion-

skin Greyhound Bus ticket was an onion-skin gas receipt, watched in amazement as Lt. Susan Rushing destroyed it. Ramon watched as Rushing snatched the receipt from the secretary who was organizing evidence. Ramon stated, "Lt. Rushing said, 'Give me that. I got a special place for that,' and she walked to the trash can, smiled and tore it up into tiny pieces."

At the time of the incident, Task Force members were not aware that Ellwood's brother used a bank card to purchase Defendant's Greyhound Bus ticket. Ramon eventually took his allegations of evidence tampering and witness coaching to the F.B.I. who launched an investigation. (Exhibit G).

The Defendant was ultimately placed on probation for the Florida cocaine charge and moved to Canton, Ohio to work for his brother. The Ohio Adult Parole and Probation Authority, for the convenience of JPSO investigators, again incarcerated Defendant. The Task Force conducted a second round of interviews with Defendant in Ohio. Ron Camden, a 27 year veteran of the Cincinnati Police Department Homicide Squad, and someone whom Defendant referred to as an "associate advisor of mine," was also present. Camden agreed to be present, not as a police officer, but as Ellwood's friend. On the first day of the interview, November 25, 1997, Camden confronted Defendant with a transcribed statement of Stan Hill, an inmate previously incarcerated with the Defendant. Defendant denied having ever made a statement to Hill. Ultimately, JPSO St. Susan Rushing read a portion of Stan Hill's transcribed statement to Defendant. As Lt. Rushing read what Stan Hill alleged, that Ellwood told him stating, "He put a body in water," Ellwood exclaimed in question and inquiry, "I put a body in water?" (Exhibit Q -- Motion to Suppress the Evidence and Alleged "Inculpatory" Statements in which Defendant avers that he never made such statements, but that he was merely repeating what one of the law enforcement officers was saying, as said officer read for a transcript of a tape made

by a prison inmate). See also "My Cousin Vinnie" starring Joe Pesci. An audio tape of Stan Hill's statement was never played for the Defendant. Defendant agreed to give a taped statement at 0950 hours stating, "I discussed my case, my cases in New Orleans with Stan Hill, yes, while we were incarcerated at Highlands County Detention Facility. . . . yes, I want you to work with me. I have complete faith in you that you will find the killers or people that are guilty of these crimes and that I may be of assistance to you in this investigation."

There was a dispute between Lt. Susan Rushing and the Defendant over whether the Defendant could use the telephone to call his attorney. During the course of the interview, Defendant continuously requested use of the telephone to obtain legal counsel. In response to one request Lt. Susan Rushing informed Defendant that it was after 10:00 p.m. in New Orleans and Defendant should consider not disturbing his legal counsel who may be asleep.

Mr. Ron Camden and Lt. Susan Rushing conspired to invent a confession alleging the Defendant made the following statement:

> "Okay, okay, I'm willing to give you this. I took a black
> female. I put her in my car. I took her down the road, and
> I put her in water. That's what I'm going to give you."

(Exhibit X)
(Exhibit FF)

The first interview lasted approximately 14 hours, from 1:00 in the afternoon until three o'clock the next morning. Later in the day, throughout the second interview, Defendant continued repeatedly asking for use of the telephone to call Ross Scaccia, his attorney. As the second interview concluded, Ron Camden finally handed Defendant a piece of paper written by Lt. Susan Rushing with the name, address, and telephone number of A & P Bonding on S. White Street in New Orleans where Ross Scaccia could be contacted. Ron Camden instructed Ellwood to destroy the note and discard it.

During December, 1997, as Defendant still remained incarcerated in Canton, Ohio under the false pretense of a probation violation, but actually for the convenience of Jefferson Parish Sheriff Harry Lee, Task Force members in Louisiana located two subjects, April George and Sharon Jones, who admit knowing Ellwood.   On December 12, 1997, Lt. Susan Rushing assisted JPSO Detective Phil Ramon with a coached interview of Sharon Jones.  In the interview, Sharon Jones was coached to state that she was driven by Ellwood down Airline Highway to Prescott Road. "That girl that got burned up, he tricked us into doing more drugs and then he threw that, that stuff up on us.  Russell killed that girl.  I know he killed her.  That girl was dead. Lighter Fluid."

On December 24, 1997, Lt. Susan Rushing assisted JPSO Detective Robert H. Rotherham, Jr. with a coached identical interview of April George.  In the interview, April George was coached to say that she was driven by Ellwood down Airline Highway across a long bridge that ran over water.  He then turned onto a dirt road and drove a short distance into the woods.  Ellwood then removed the girl from the trunk and bound her hands and feet with rope.  At that point, he took this other girl a short distance from the cab and retrieved a metal gas can from his trunk.  Before dousing her with the fuel, Ellwood had removed a long gold chain with a small teddy bear pendant from around the victim's neck placing this object in his shirt pocket.  Ellwood then set fire to the victim while April George watched.  Authorities are not aware of any homicide case in Montz, Louisiana, any medical reports, or coroner reports involving a victim that was burned.  Because April George is considered to have a learning disability, Sharon Jones was chosen to be developed as the State's main lay witness.

On Saturday, December 13, 1997, Lt. Susan Rushing received a tape-recorded telephone call from Defendant at the Stark County Correctional Center.  Ellwood said,

"you found out very differently that I do have an attorney." Ellwood complains to Lt. Susan Rushing that she violated his constitutional rights during the interrogation on November 25 and 26, 1997. Ellwood complains to Lt. Susan Rushing that she took all of his telephone numbers and prohibited him from counsel, legal counsel. Ellwood stated, "What about 21 hours?"

On Monday, December 15, 1997, Lt. Susan Rushing received another tape-recorded telephone call from Defendant at the Stark County Correctional Center. A portion of the taped conversation twenty days after the alleged confession contains: Exhibit N. Page 4 of 16 (emphasis added):

> Rushing: Okay, on the 22nd, do you intend <u>ever</u>, okay, coming back here, talking to your attorney, and <u>confessing</u> to <u>anything?</u>
>
> Ellwood: No.
>
> Rushing: Then why should I come pick you up?
>
> Ellwood: I cannot confess, I'm innocent. I cannot confess, to ah, ah guilt.

Exhibit N. Page 13 of 16:

> Ellwood: Well, you came on like a, you know, a cannon, you know, and I'm an innocent person, you know.
> Rushing: Well, you keep saying that, but then you, then you keep saying also that what is the charge for, for IV'ing somebody.

A false probation violation was ultimately dismissed.

On Friday, January 16, 1998, Defendant voluntarily returned to Louisiana from Ohio. Ellwood was accompanied by St. Charles Parish Sheriff Greg Champagne. Stephanie Grace, Times-Picayune reporter, noted: Champagne said, officers <u>will seek</u> a confession from Ellwood regarding the slayings, although a confession may not be necessary to gain a conviction.

> "The evidence keeps building up. . . . But this case could be made without a confession.", Champagne said.

Also on January 16, 1998, subsequent to following remarks by Ms. Jones, she was granted full use and derivative use immunity, pursuant to Article 439.1 of the Louisiana Code of Criminal Procedure.   On February 16, 1998, Ms. Jones was interviewed in the presence of her attorney.  Ms. Jones stated that Ellwood had shown her two dead bodies.  The time period for this observation is not consistent with the time period Cheryl Lewis and Delores Mack had been found.  Ellwood pointed to a body that was practically submerged in a canal that runs parallel to 3160 on this side. (This body is consistent with the case of Delores Mack).  Ellwood then pointed out a second body that was practically submerged in the canal area.  (This body is consistent with the case of Cheryl Lewis).  JPSO Lieutenant Susan Rushing and SCSO Sergeant Olga Fourroux (primarily armed with the coached statement of Stan Hill, the coached statements of Sharon Jones, and the altered date of birth of Samantha, Ms. Jones daughter) constructed a sworn affidavit and warrant of arrest for Russell Ellwood, which was presented to Emile St. Pierre, Judge of the 29th Judicial District Court on March 2, 1999.  (Exhibit O).

The first warrant cited a coroner's report that said Cheryl Lewis had been dead for no longer than 24 hours when her body was found.  The second warrant said the woman's body had been in the area longer than a day.  Both warrants were signed by Lieutenant Susan Rushing.

Judge St. Pierre, convinced of the "facts and circumstances" in support of the affidavit, affixed his signature authorizing the arrest of Russell Ellwood for LSA-R.S. 14:30.1, homicide in the second degree (two counts).

A portion of Ms. Jones testimony during Defendant's trial contains:

Q.    I believe I have various medical records regarding you, Ms. Jones.
       Did you have a baby in 1994?

A.    Yes.

Q.    And the little baby's name is what?

A.   It's Samantha.

Q.   And while you were going with Russell Ellwood, weren't you pregnant with her?

A.   Yeah.

Q.   And you were like three or four months pregnant then; is that correct?

A.   Yeah.

Q.   Your baby was born in what month?

A.   December the first.

Q.   Of 1994?

A.   Yeah.

(Exhibit VV, pp. 102, 103)

Subsequently, in violation of Louisiana Constitution of 1974, Article 1, § 15, on March 4, 1998, Defendant was arraigned on two counts of second degree murder in violation of LSA-R.S. 14:30.1, Delores Mack and Cheryl Lewis.

In response to defense counsel's objection, a grand jury convened.  On March 23, 1998, Defendant was charged by indictment with two counts of second degree murder in violation of LSA-R.S. 14:30.1, Delores Mack and Cheryl Lewis.

On April 9, 1998, Defendant was again arraigned on the same two counts, the indictment was read, and the Defendant entered a plea of not guilty.  Sometime between February and March, 1998, Maria Chaisson, Defendant's indigent defense counsel, initiated a telephone conversation with Ron R. Camden.  In the interview, Mr. Camden is noted as stating:

> "Ellwood didn't really confess.  He said anything in an attempt to return to New Orleans and Ross Scaccia, his attorney."

Subsequently, beginning with Phil Ramon and the F.B.I. investigation which culminated with the termination of both JPSO Phil Ramon and JPSO Susan Rushing, Attorney General Richard P. Ieyoub issued a statement on February 22, 1999.

State of Louisiana v. Russell Ellwood

"As a result of subsequent investigation initiated by members of the Task Force along with the Louisiana Department of Justice, as best as it can be determined, it appears that it was physically impossible for Russell Ellwood to have murdered Delores Mack. The State will delete one count of the indictment on March 1."

"The State will continue its murder prosecution against Ellwood for the death of Cheryl Lewis."

On March 2, 1999, the State entered a nolle prosequi as to count one of the indictment, Delores Mack. The indictment was also amended to allege that Cheryl Lewis was murdered "on or between January 31, 1993 and February 9, 1993," effectively removing Defendant out of his alibi. With his attorney present, Defendant was arraigned on the amended indictment, not charged by the grand jury on June 7, 1999. At that time, Defendant pled not guilty to the charge of second degree murder of Cheryl Lewis.

Because of extensive pre-trial publicity, the trial court granted Defendant's Motion for a Change of Venue from St. Charles Parish to Lafayette Parish. A three day trial began on June 8, 1999, which concluded in a unanimous jury finding that the Defendant was guilty as charged. On August 17, 1999, Defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant filed a timely motion for appeal, which was granted by the trial court.

Now, Russell Ellwood, Petitioner herein, respectfully presents his claims for relief in supplement amended:

### INTRODUCTION TO THE CLAIMS

In the instant case, the Petitioner will present claims of ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and other violations of his rights to the due process of law.

It should be noted that there was insufficient evidence to support all of the charges. This case is a clear example of what can happen when the prosecutor loses

sight of the fact they are to seek justice and not merely convictions. In the instant case there was no justice.

Petitioner submits the following amendments to claims 1-3 and supplementation of claims 4-11.

CLAIM I

THE ADMISSION OF PREJUDICIAL "OTHER CRIMES WITNESSES" TESTIMONY ABSENT CONTRADICTORY HEARINGS WAS IN CONTRAVENTION OF LA.C.CR.P. ART. 404(B) AND DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.

The contention of the Petitioner is that the verdict of the jury was based solely on "other crimes" evidence. The defense moved, prior to trial, for a contradictory hearing on the proposed crimes evidence, but was denied same. The trial court allowed only a written notice of what the other crimes evidence would show, and an argument about same, but did not require the other crimes witnesses to appear in court, prior to trial for a contradictory hearing. The prosecutor was permitted to introduce "other crimes" evidence of several incarcerated women, who testified that they had all been attacked or abused by the defendant. Their testimony was allowed over the repeated objections of the defense, prior to and during trial. At least two that testified could not identify the Defendant. Seven prostitutes testified that the defendant beat them or sexually assaulted them or dumped them in a "pool of blood." Their testimony was allowed to show system, pattern, motive, and intent. However, there is no evidence in the instant case that the victim died in that manner. The manner of her death was unclassified, accident cannot be ruled out. There were no signs of assault (trauma). Her cause of death was classified as "asphyxia due to drowning."

There is no physical evidence that she was killed or was the victim of second degree murder. She could have overdosed on drugs, wandering along Highway 3160, then simply drowned in the adjoining water. It is obvious that the jury found the defendant

guilty, not because there is any valid evidence to that effect, but because of the "other crimes" evidence solely. See also *Michelson v. United States*, 335 U.S. 469, 475-476 (1948). See also R. Lempert & S. Saltzburg, A Modern Approach to Evidence, 221-24 (2d Ed. 1982), for a discussion of the effect of Fed. R.Evid. 404 on the proof necessary for introduction of prior crimes evidence. See also the majority and dissenting opinions in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), *cert.denied*, 440 U.S. 920 (1979). See also Kuhns, The Propensity to Misunderstand the Character of Specific Acts Evidence, 66 Iowa L.Rev. 777 (1981).

In *State v. Code*, 627 So.2d 1373 at 1381 (La. 1993), the court wrote: **La. Code of Evid. Art. 1103** provides that the notice requirements and evidence standards of *Prieur* and its progeny have *not* been overruled by the new Code of Evidence. Under *Prieur*, the state is required to give a defendant notice that evidence of other crimes will be offered and which exception to the general exclusionary rule the state is relying upon. *Prieur*, 277 So.2d at 130. In addition, the state must prove by clear and convincing evidence that the defendant committed the other crimes. *Prieur*, 277 So.2d at 129.

Several statutory and jurisprudential rules play a role in determining the admissibility of other crimes evidence. The Louisiana Supreme Court set forth the following factors which must be met for other crimes evidence to be admissible under the system or modus operandi exception:

> (1) there must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith; (2) the modus operandi employed by the defendant in both the charged and uncharged offenses must be so peculiarly distinctive that one must logically say they are the work of the same person; (3) the other crimes evidence must be substantially relevant for some other purpose than to show a probability that the defendant committed the crime on trial because he is a man of criminal character; (4) the other crimes evidence must tend to prove a material fact genuinely at issue; and (5) the probative

value of the extraneous crimes evidence must outweigh its prejudicial effect.

In the instant case, other crimes evidence failed to meet factors: (1), (3), (4), and (5). Evidence is admissible under Art. 404(B) only if it is relevant. "Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case."

The State is required to prove that defendant committed the other crimes by a preponderance of the evidence. *State v. Guidroz*, 98-377 (La.App. 5 Cir. 10/14/98), 721 So.2d 480, 486, *writ denied*, 98-2874 (La. 2/26/99), 738 So.2d 1061.

Defense counsel, Scaccia, repeatedly moved for *Prieur* hearings during pre-trial and trial. (Exhibits W, RR, UU, and VV). Moves for mistrial were denied four times. (Exhibits UU and VV).

Prejudice to the defendant occurred as it served no other purpose than to paint petitioner as a "bad character." This issue was preserved for appeal under the contemporaneous objection rule but was not assigned as error by appellate counsel to the prejudice of Petitioner. *State v. Bernard*, 665 So.2d 106, 108 (La.App. 4 Cir. 1995).

## CLAIM II

**EVIDENCE WAS INSUFFICIENT TO OBTAIN A CONVICTION, TO THE PREJUDICE OF PETITIONER, IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.**

In the light most favorable to the prosecution, evidence presented to the trier of fact is insufficient. The *Jackson* standard is not applicable. Had the jury known that the other crimes witnesses were coached to lie, that the expert witness testimony is a lie, and that the defendant was in Ohio when Cheryl A. Lewis died in Louisiana, the jury would have found it impossible to convict.

Insufficiency of evidence unexhausted claim in violation of the 14th

Amendment of the United States Constitution.  See *Miller-El v. Cockrell*, 537 U.S. 322 (2003), 327; *Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001).  *See also*, *State ex rel. Ferrand v. Blackburn*, 414 So.2d 1207, 1209 (La. 1983).  Defendant did not raise this assignment of error in the Louisiana Supreme Court.  However, since a conviction based upon insufficient evidence is a violation of constitutionally guaranteed due process, such an assignment may be raised in a post-conviction proceeding.   LSA-C.Cr.P. Art. 930.3(1); *State ex rel. Womack v. Blackburn*, 393 So.2d 1216 (La. 1981).

The contention of the State is that the victim in the instant case is a drowning victim.  The official <u>cause</u> of death is "asphyxia due to drowning" but no medical records exist in support of the official <u>manner</u> of death.  Accident cannot be ruled out. The State has never proven that the victim <u>died</u> of second degree murder or manslaughter.  The State must first prove what, where, when, how, why, who; no testimony of any kind has proven any of this.  No medical records were presented during trial to support "asphyxia due to drowning."  The State has failed to show beyond a reasonable doubt that Defendant <u>committed</u> second degree murder or manslaughter.  1) Lt. Susan Rushing testified that Defendant told her, "I put a body in water."   2) Mr. Ron Camden testified that he heard Defendant tell Lt. Susan Rushing that "I put a body in water." 3) Sharon Jones testified that Defendant showed her two bodies in water. The State contends that one of the bodies is the body of the victim in the instant case and the body of another victim that was found on the day after the body in the instant case was found.  However, police reports clearly indicate that the two bodies were not there in the same time frame.  (Exhibit MM, pp.34-35). The sworn affidavit for Defendant's arrest does not prove that a crime was committed. Taken together, the statement by Sharon Jones alleging that Defendant simply showed her two bodies and Lt. Rushing's statement that alleges Defendant said that "I put a

body in water," has no factual basis.  Sharon Jones could not have referred to the victims Cheryl Lewis and Delores Mack.  It is true that their bodies were discovered within 70 yards of each other, but police reports confirm that both bodies were not there at the same time.

William Marvin Bass, a Ph.D. in Forensic Anthropology, testified that the deceased had been killed "18 to 21 days" prior to the time her body was discovered on February 21, 1993.  With all due respect the expert, this was a "suspect" conclusion.

The police "reinvestigation" team of Dep. Chief Richard Rodrigue and Col. John Thevinot, of the Jefferson Parish Sheriff's Office, had established that the defendant had been in Canton, Ohio from on or about 2/10/93 to 2/23/93, thereby giving him a police alibi for those dates.  (Exhibit A).  Defendant could not have killed the deceased if she had been killed between the dates 2/10/93 and 2/21/93.

The police reports clearly states:  body had not been in area more than twenty-four hours prior to discovery.  See St. Charles Parish Sheriff's Department Serial Murder Task Force Report.  (Exhibit D & E).

Under oath, Dr. Susan Garcia, who performed the autopsy testified (in cross-examination by Mr. McPherson) (Exhibit TT):

Page 82, lines 26-32:

Q.    Are you able to estimate the date of her death?

A.    Not precisely.

Q.    Within how close could you estimate the date of her death?

A.    It's my opinion that she had been in the water for at least a week, if not longer, and more likely than not longer.

Page 83, lines 8-13

Q.    But it could have been as little as seven days?

A.    Under certain circumstances, yes.  Under these circumstances, I don't

think so.

Q.    But I guess it would be fair to say that you could not estimate the time of her death?

A.    I would defer to another opinion.

Thus, the autopsy report failed to show a time of death and coroner's testimony gave an estimated time of death of at least one week.

If the time of death was within a 11-day period, the defendant had an alibi that was confirmed by the police, and therefore, could not have killed the deceased.

The determination of the time of death of Cheryl Lewis by William Marvin Bass is inadequate, insufficient, and not based upon any scientific forensic evidence.

The autopsy report clearly reflects decomposition in the early second stage of decomposition referred to as "bloating," a period of decomposition 7 to 9 days after death.[1]

In testimony, under oath, Mr. Bass stated that he used only high and low temperatures taken at Moisant Airport approximately 40 miles from the crime scene. (Exhibit S).  He did not refer to the toxicology reports in his assessment.

"Drainage canal" in the instant case means a vast body of water (swamp) draining into Lake Des Allemands, which in turn, enters the Gulf of Mexico.

Mr. Bass testified that there is no tide in this waterway where the body was discovered but the tide tables are available for Hahnville, Louisiana from the U.S. Geological Survey.  (Exhibit B).  Tides were at their lowest levels for the month during the week preceding the discovery of the victim on February 21, 1993.  There is concern as to what percent of the body was in the water and what percent of the body was in the air which would split the equation.  Mr. Bass used the standard equation, twice as long in the water and three times as long if the victim is buried.  The

---

[1] Edward J. Imwinkelried, Scientific Evidence, Pathology § 19-8 (B) page 137 (Formation of gas (gastrointestinal tract and tissues) 7 to 9 days).  (See Appendix A).

standard equation, one day on land, two days in the water and six to eight days buried in the ground is used to determine the extent of decomposition. Two days in the water means completely submerged in water. However, this is not the case of the decedent. The victim was found face down, stationary in the water. A percentage of the body was in the air. Therefore, the equation must be split.

The body was not free floating. Specifically, the left thigh was secure and stationary, possibly wedged upon a submerged stump or blade grass. Only the trunk (torso) and head were free floating, depending upon the stage of rigor mortis, i.e., accelerated rigor mortis due to cocaine abuse. (See crime scene photographs -- water line evidence of tide levels).

The left ear is above the water level. Scratches, abrasions, and cuts are clearly evident upon the buttocks and back of the decedent attributed to raccoon bites. Any and every entomologist will agree that flies lay eggs in the ear canals and in the open cuts in the flesh.[2] In the instant case, there is absolutely no maggot activity.

Soft tissue of the face was removed. Lividity of body fluids indicates that the body was leaning in the water from the left to the right. (See autopsy report). The torso and trunk were free floating in the water; the soft tissue of the [entire front of the body] was eaten by crawfish and blue-point crabs.

Mr. Bass did not consider the crawfish and the blue-point crabs that inhabit this exact waterway. Crawfishermen, setting traps, discovered the body. The peculiar phenomenon of crawfish migration must be fully explained to further support a point of fact in the instant case.[3] A mass migration begins as the crawfish seek oxygenated

---

[2] Payne, J.A. and King, E.W., "Insect Succession and Decomposition of Pig Carcasses in Water," Journal of the Georgia Entomological Society, Vol. 7, 1972, pp. 154-55
  at 154: The distended abdomen was usually the first pig part to project above water. It was immediately covered with blow fly eggs.
  at 155: see text photos
(See Appendix B).

[3] De-oxygenated water natural habitat - Thousands upon thousands of crawfish de-oxygenate the water of their natural habitat.

water that is suitable for their survival.  Mass migration of crawfish has occurred and will occur again in the immediate area of Hwy. 3160.  During migration, crawfish cover the roadway (Hwy. 3160) by the millions in a sea of orange.

The Department of Highways has erected signs in this area, "Danger, slippery when wet," because autos crush the crawfish.  Motorists use burlap sacks and literally fill the bags with crawfish covering the roadway.  Crawfish are scavengers and eat decayed meat.  Absence of soft skin tissue is evident upon the entire front portion of the body, submerged face down in the water.  Certainly, when myriads upon myriads of crawfish discovered the decedent, she would have easily been devoured within days.

The determination of the time of death of Cheryl Lewis is very "suspect."  The procedure used by Mr. Bass, failure to utilize obvious additional data, and especially to ignore the presence of marine animal activity, *i.e.*, crawfish and blue-point crabs that inhabit the waterways, is not scientific and is unprofessional.  Mr. Bass was a prosecution expert witness and simply testified as to what the prosecutor wanted him to say.

One count of second degree murder of Delores Mack was dropped because it was impossible for Mr. Russell Ellwood to have killed her.  If it is impossible that Mr. Ellwood killed Delores Mack, who died an estimated 12 - 18 hours after the body of Cheryl Lewis was discovered in the same area, it is even less likely that Mr. Ellwood could have killed Cheryl Lewis, based on the marine animal activity.  See *State v. Matthews*, 450 So.2d 644 (La. 1984), 645-646 [PMI - 24 hours]; *State v. McKnight*, 739 So.2d 343 (La.App. 1 Cir. 1999), 346-347 [PMI - 6 days].

The conclusion of Dr. Susan Garcia of the cause of death of Cheryl Lewis as "asphyxia due to drowning" is highly suspect and is not supported by any medical evidence.  Dr. Garcia, in her report, notes hemorrhage or blue discoloration of the

petrous ridges of the skull.  There is no doubt that the decedent did asphyxiate.

Hemorrhage of the petrous region of the temporal bones is quite common in each type of asphyxia.  *State v. Cruz*, 455 So.2d 1351 (La. 1984), 1354.

Dr. Garcia only notes the weight of each lung, atelectatic property, and decompositional changes present but fails to note dilated alveoli or edema fluid in the alveolar.  No glass slides of the lung tissue exist.  No x-rays of the lung tissue exist to show presence of water in the lungs.  Water in the lungs is essential, combined with hemorrhage of the petrous ridges of the skull in order to rule "asphyxia due to drowning."  See *Rector v. Johnson*, 120 F.3d 551, 555-556 (5th Cir. 1997).  Without the presence of water in the lungs and only hemorrhage of the petrous ridges of the skull, the decedent did not "asphyxiate due to drowning" and in all probability, did asphyxiate elsewhere, and the dead body was placed in the water. See Autopsy report of Cheryl Lewis (The circumstances of this death considering the location where the body was found . . . make the manner of death highly suspicious for homicide. Accident cannot be completely ruled out, therefore manner is best left unclassified at this time).  With all due respect to Dr. Garcia, it is obvious that the cause of death was not determined aside from "asphyxia," accidental or intentional.  Dr. Garcia simply concluded "asphyxia due to drowning" because the body was discovered in water but no water was found in Cheryl Lewis.  Only an eyewitness or eyewitness testimony can determine that the decedent was "unconscious but still alive" when the body hit the water.  (Exhibits CC & DD and Appendix C).

Dr. Garcia notes, "There is no remaining evidence of fracture or injury" because "soft tissue of the face is not present."  Therefore, Dr. Garcia is unable to indicate any "intent to inflict great bodily harm," an essential factor of homicide.

Both Mr. Bass and Dr. Garcia ignored the presence, effect, and continuous

eating habits of marine animal activity, i.e., crawfish and blue-point crabs,[4] that inhabit this area where the body was discovered. In doing so, each prosecution "expert witness" is guilty of gross neglect in determining the true time of death of the decedent.

Based upon floating (usually within 2 to 3 days), absence of maggot activity and the overall obvious 'bloating' state of decomposition, the time of death is more closely pinpointed to the time period well within Petitioner's alibi, February 10-23, 1993.

Dr. Garcia concluded that the death was caused by asphyxia of undetermined causation. Further hampering her determination was the absence of evidence of trauma. Circumstances which could bring about asphyxia are too many, too vague, and are not supported by any facts in this case. Although the body location might suggest foul play, there is no evidence supporting such suggestion. Without any supporting facts, intent, which predicates the charge of murder, is merely speculation — or more specifically — fabrication. Without intent to "inflict great bodily harm," there is no murder.

*State v. LaBorde*, 11 So.2d 404 at 404, 405 (La. 1942). This Court has held that where the evidence of the prosecution is accepted as true and it does not prove the crime charged, we can consider the legal issue presented, even though no bill of exception was taken, because it is an error patent on the face of the record. Even in a case where it is admitted by the State or declared by the judge in his per curium that there is no proof of some essential element of the crime charged, the question of the validity of the conviction becomes a question of law, which this court will review.

---

[4] Crawfish and blue-point crabs begin eating about the eyes, nose, and mouth of a body and will continue to devour the body until it becomes skeletonized. However, discovery of the body, by crawfishermen, interrupted this process. Prolonged exposure to the crawfish resulted in additional portions of the body being devoured. See distinction in *State v. McKnight*, 739 So.2d 343 (La.App. 1 Cir. 1999) at 351.

*State v. Raymo*, 419 So.2d 858 at 861 (La. 1982). Because the State's case was devoid of evidence of an essential element of the charged offense, . . . defendant's conviction and sentence must be set aside, *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970; *State v. Peoples*, 383 So.2d 1006 (La. 1980), regardless of how the error is brought to the attention of the reviewing court. State ex rel. *Womack v. Blackburn*, 393 So.2d 1216 (La. 1981). . . . Moreover, since the double jeopardy clause prevents retrial when a reversal is based on insufficiency of evidence due to the state's failure to prove an essential element of the offense, a judgment of acquittal must be entered. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *State v. Nguyen*, 367 So.2d 342 (La. 1972).

*State ex rel. Graffagnino v. King*, 436 So.2d 559 at 563 (La. 1983). It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and this court will not second-guess the credibility determinations of the trier of fact beyond our sufficiency evaluations under the Jackson Standard of Review. See *State v. Richardson*, 425 So.2d 1228 (La. 1983).

*State v. Mussall*, 523 So.2d 1305 at 1306 and 1309 (La. 1988). Having considered all the evidence from the perspective of a rational trier of fact who interprets that evidence as favorable to the prosecution as any rational fact finder can, petitioner argues that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. At 1309 . . . Additionally, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319.

While Mr. Ellwood was in Ohio, Cheryl Lewis died in Louisiana. Journalistic hacks fueled the false portrait and misconceptions of Russell Ellwood, fabrication of

a murder charge and the circumstantial 'selection' of a suspect spawned by the prosecutor to appease the public.  The trial court became nothing more than a circus side-show for the media at the expense of petitioner and is a gross violation of Petitioner's rights by police and prosecutors who are 'under the gun' to solve a high publicity case.

### CLAIM III

**THE TRIAL COURT ERRED, TO THE PREJUDICE OF PETITIONER, IN 1) FAILING TO INSTRUCT THE JURY ON A) IMPEACHMENT AND B) REASONABLE DOUBT, AND 2) CHARGING THE JURY ON A RESPONSIVE VERDICT OF MISDEMEANOR MANSLAUGHTER, THEREBY DEPRIVING PETITIONER OF HIS RIGHT TO AN IMPARTIAL JURY AND A FAIR TRIAL, IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND LSA-CONST. ART. I, §§ 2, 3, 13, 16, & 22.**

## 1)A)  IMPEACHMENT

The jury charge on impeachment was incomplete because the jury was only charged at the end of trial.  (Exhibit RR, p.23).

See *State v. Ray*, 249 So.2d 540 (La. 1971), 543; *State v. Kaufman*, 304 So.2d 300 (La. 1974), 305-306; and *State v. Camp*, 571 So.2d 195 (La.App. 4 Cir. 1990), 199.

It is reversible error for the trial court not to caution the jury at the time of introduction as to the limited purpose of the inconsistent statement (for impeachment, not as substantive proof of guilt).  In the instant case, trial court expressed its intent to caution the jury but failed to do so.

## 1)B)  REASONABLE DOUBT

The jury charge on reasonable doubt was incomplete because during trial when objected to, trial court failed to instruct jury on reasonable doubt during testimony of expert witness.  (Exhibit TT, pp. 81, 82).

See *State v. Bernard*, *supra*, *State v. Ray*, *supra*; *State v. Kaufman*, *supra*; and

*State v. Camp, supra.*

## 2)   RESPONSIVE VERDICT OF MISDEMEANOR MANSLAUGHTER

A charge on the responsive verdict of misdemeanor manslaughter constitutes

error because:  the jury may not consider evidence which was not introduced at trial

in violation of the 6th and 14th Amendments to the United States Constitution and the

LSA-Const. Art. I, §§ 2, 13, and 16.

The judge erroneously charged the jury on the responsive verdict of

manslaughter granting the state special instruction on "misdemeanor manslaughter"

unsupported by any interpretation of the evidence presented.

That is not to suggest that Beck would be satisfied by instructing the jury on just

any lesser included offense, even one without any supporting evidence, *Cf. Roberts*

*v. Louisiana*, 428 U.S. 325, 334-335, 96 S.Ct. 3001, 3006-3007, 49 L.Ed.2d 974

(1976). *Schad v. Arizona*, 111 S.Ct. 2491 at 2505 (1991).

In *State v. Vergo*, 594 So.2d 1360 at 1363-1364 (La.App. 2 Cir. 1992), the

court wrote:

> The language of LSA 14:31(2)(A) [Felony or
> Misdemeanor manslaughter], which is an unintentional
> homicide, requires the state to prove beyond a reasonable
> doubt that defendant was engaged in the underlying offense
> when the homicide was committed. LRS 15:271.
> C.Cr.P. art. 802 requires the court to charge the jury
> as to the law applicable to the case.  The trial court is
> required to charge the jury, when properly requested as to
> the law applicable to any lessor theory of defense the jurors
> reasonably could infer from the evidence. *State v. Johnson*,
> 438 So.2d 1091 (La. 1983).

Thus, the effect of the presence of an objection to the trial court's instruction is

critical to the resolution of Petitioner's complaint that the instruction prejudicially

presented to the jury, the option of returning the responsive verdict of misdemeanor

manslaughter when no evidence of this was ever presented. *State v. Mart*, 419 So.2d

1216 at 1218 (La. 1982).

(Exhibit PP: page 91, lines 12-32; page 92, lines 1-32; page 93, lines 1-8; page 94, lines 28-32).  No evidence of misdemeanor manslaughter.

## CLAIM IV

DEFENSE COUNSEL FAILED TO MOVE FOR MISTRIAL UNDER LA. C.CR.P. ART. 487(A), TO THE PREJUDICE OF PETITIONER, REQUIRING PETITIONER TO STAND TRIAL ON AN INDICTMENT "DEFECT OF SUBSTANCE," IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3,13, 15, 16, & 22.

In violation of the **5th, 6th and 14th Amendments** of the United States Constitution and Article I, §§ 2, 3, 13, 15, 16, & 22 of the Louisiana Constitution, Defense counsel failed to move for a mistrial, under **LSA-C.Cr.P. Art. 487(A)**, which trial court denied, when an attempt was made by defense counsel to introduce into evidence the original indictment for comparison to the amended indictment as rebuttal to prosecution expert witness testimony.  (See Exhibits T & U).

The accused had a crucial interest in submitting the original indictment into evidence to the trier of fact.  After *Crane v. Kentucky*, it is clear that the accused's right attaches to evidence which is logically only to rebutting incriminating expert witness testimony.  Defense was denied defense funds by the trial court.  Defense was without expert witness testimony to rebut the post-mortem interval of the decedent.  Defense counsel's attempt to introduce the original indictment into evidence as rebuttal to the prosecution expert witness testimony relating to the post-mortem interval of the decedent was denied.  The judge only permitted a reading of the prosecution's amended indictment.  When the prosecutor objected to defense counsel's attempt to introduce the original indictment into evidence as rebuttal to the prosecution expert witness testimony relating to post-mortem interval of the decedent, the prosecutor was seeking "the perpetuation of an unfair advantage."  In our adversary system of criminal justice, that type of advantage is both intolerable and unconstitutional.  See

Imwinkelried and Scofield, <u>The Recognition of an Accused's Constitutional Right to</u> <u>Expert Witness Testimony Attacking the Weight of Prosecution Science Evidence:</u> <u>The Antidote for the Supreme Court's Mistaken Assumption in California v.</u> <u>Trombetta, 33 Ariz.L.Rev. 59 (1991)</u>. The trial court unconstitutionally excluded relevant rebuttal evidence proffered by defendant.

**Federal Rule 104(E)** provides that a judge's ruling on admissibility does not limit the "right of a party to introduce before the jury evidence to weight or credibility." In ***Crane v. Kentucky***, 476 U.S. 683 (1986), the U.S. Supreme Court cited **Rule 104(E)** in holding that a trial judge's decision to admit a confession does not deprive an accused of the right to contest the reliability of the confession before the jury.

According to the Court, a contrary rule deprives the accused of a fair trial: "Whether rooted directly in the due process clause . . . or in the compulsory process or confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defence.'"

Certainly the <u>date</u> of <u>this</u> crime is an essential element of the crime and must be charged in the indictment because defendant <u>had an alibi</u>. The date is essential to the offense, taking defendant out of his alibi, as amended, not charged by the grand jury, and introducing expert witness testimony relating to post-mortem interval, "making" the defendant fit the crime. (See **La.C.Cr.P. art. 468** -- The date or time of the commission of the offense need not be alleged in the indictment, unless the date or time is essential to the offense. Petitioner argues the date or time is an essential element to the offense in the instant case.)

Leading Law Review commentators and treatise writers have concluded that a judge may not consider the credibility of the source of the evidence in gauging probative value under Rule 403. Likewise, the overwhelming majority of courts

assess that a judge cannot pass on credibility in assessing probative value. See *United States v. Castello*, 830 F.2d 99 (7th Cir. 1987); *United States v. Gardea Carasco*, 830 F.2d 41, 44 (5th Cir. 1987) (stating that "[i]t is the sole province of the jury . . . to assess the weight of the evidence and the credibility of witnesses . . [w]e cannot declare testimony incredible as a matter of law unless it is 'so unbelievable on its face that it defies physical laws'"); *United States v. Welsh*, 774 F.2d 670, 672 (4th Cir. 1985) (stating that "as a general rule, credibility of a witness has nothing to do with whether or not his testimony is probative . . . the law does not consider credibility of a component" of probative value).

As a result of trial court's action, defense counsel should have moved to declare a mistrial under **LSA-C.Cr.P. Article 487(A)**.

The amended indictment is substantially defective. A "defect of substance" in information, which, under **LSA - C.Cr.P. Art. 487**, cannot be amended after trial begins, is a defect which will work to the prejudice of the party accused.

"A 'defect of substance' as contemplated by **Article 487** of the Code of Criminal Procedure is intended to mean a defect which will work to the prejudice of the party accused. City of *Baton Rouge v. Norman*, 290 So.2d 865 (La. 1974). In the instant case, the trial court denied a pre-trial motion to pay for expert witness fees, leaving defendant without rebuttal. In an attempt to prove prejudice flowing from the defect in the amended indictment, as the only course of rebuttal, in absence of defense expert witness testimony, defense counsel attempted to introduce the original indictment into evidence for comparison to the amended indictment, clear and convincing proof of prejudice. The prosecution objected. Defense counsel's attempt which would have proved prejudice was thwarted by the trial court's denial to permit introduction of the original indictment as evidence, thereby preventing defendant to present a defense. See *State v. Harris*, 478 So.2d 229 at 229 and 231 (La. App. 3 Cir.

1985).

In *State v. Offord*, 663 So.2d 296 at 299 (La. App. 3 Cir. 10/4/95), the court pronounced:

> Defendant argues that the amended indictment constitutes a defect of substance, and therefore that the court should have granted him a mistrial pursuant to La. Code Crim. P. Article 487(A). A "defect of substance" is a defect that prejudices the defendant. State v. Harris, 478 So.2d 229 (La. App. 3 Cir. 1985), writ denied, 481 So.2d 1331 (La. 1986).

During the trial, the defense sought to introduce the original indictment. The prosecution objected. The court only permitted a reading of the "amended" indictment to the jury — the original indictment was not available to the court or to counsel.

The defense was deprived of its right to argue that there was a discrepancy between the original indictment and the amended indictment and that such discrepancy was crucial to defendant's case, in that the defendant had a "police alibi" for those dates. The defense was prohibited from arguing that the prosecution "made" the amended dates fit its evidence, because of the police developed alibi for the defendant. The time of death of the victim, Cheryl Lewis, was crucial to the defense. Evidence that she died, or was killed, when the defendant was out of town was vital. The original indictment, though substituted by an amended indictment, would have been evidence to this allegation of the defendant. It was not permitted.

In *California v. Trombetta*, 467 U.S. 479 (1984), the justice, however, reasoned that the accused had "alternative means" of attacking the prosecution's evidence. *Trombetta*, 467 U.S. at 490. The justice acknowledged that there must be a fair adversary balance at trial. However, given these alternatives, that balance could be maintained even though the accused had been deprived of potentially exculpatory evidence.

Four years later in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102

L.Ed.2d 281 (Ariz. App. 1988), the Supreme Court revisited the ***Trombetta*** issue. As in ***Trombetta***, the court added that while the accused may not have had the ideal evidence of a retest, the accused had "alternative means" of proof available. 488 U.S. at 56. In the last sentence of his opinion, the Chief justice asserted that "the defendant is free to argue to the finder of fact that a . . . test would have been exculpatory, . . . . 488 U.S. at 59.

In both ***Trombetta*** and ***Youngblood***, the court assumed that defense evidence attacking the weight of the prosecution scientific testimony would generally be admissible. According to the court's assumption, however, the accused can resort to other effective kinds of rebuttal testimony to attack the weight of the prosecution's expert witness testimony.

In the instant case, the trial court follows the court's assumption in ***Trombetta*** and ***Youngblood*** that the defense rebuttal evidence will be admissible as a matter of course but falls short. Therefore, defense counsel failed to move for a mistrial.

See ***State v. Bernard***, *supra*.

## CLAIM V

COUNSEL COMMITTED ERRORS WHICH FELL OUTSIDE THE WIDE RANGE OF ACCEPTABLE PROFESSIONAL ASSISTANCE, TO THE PREJUDICE OF PETITIONER, AND COUNSEL'S ERRORS RENDERED THE RESULTS OF TRIAL AND APPEAL UNRELIABLE BECAUSE:

1)     DEFENSE COUNSEL FAILURES SURROUNDING ISSUES OF EXPERT WITNESS TESTIMONY.
1)A)   FAILURE TO DEMAND "DAUBERT" HEARINGS AND FAILURE TO OBJECT WHEN NOT HELD; PREJUDICE TO PETITIONER; PREVENTION OF REVIEW IN HIGHER COURTS; CONSTITUTIONAL VIOLATION OF FULL AND COMPLETE JUDICIAL REVIEW.
1)B)   FAILURE TO DEMAND "CERTIFICATE OF ANALYSIS" UNDER LA.C.CR.P.--R.S. 15:499, 15:500, AND 15:501(A); FAILURE TO OBJECT WHEN NOT PROVIDED; PREJUDICE TO PETITIONER; PREVENTION OF REVIEW IN HIGHER COURTS; CONSTITUTIONAL VIOLATION OF FULL AND COMPLETE JUDICIAL REVIEW.
1)C)   FAILURE TO SUBPOENA DECLARANT FOR CROSS-EXAMINATION UNDER LA.C.CR.P.--R.S. 15:499, 15:500, AND 15:501(B)(1) & (2).
1)D)   FAILURE TO OBJECT BEFORE AND AFTER DIRECT

EXAMINATION BASED UPON DISCOVERY AND NOTICE OF EXPERT WITNESS TESTIMONY (JENCK'S ACT); PREJUDICE TO PETITIONER; PREVENTION OF REVIEW IN HIGHER COURTS; CONSTITUTIONAL VIOLATION OF FULL AND COMPLETE JUDICIAL REVIEW.

1)E)  FAILURE TO PROPERLY CROSS-EXAMINE DR. SUSAN GARCIA, EXPERT WITNESS, TO REVEAL LABORATORY EVALUATIVE REPORTS OF DIATOMS AND GLASS SLIDES OF LUNG TISSUE, AND DECLARANT.

2)    DEFENSE COUNSEL FAILED TO EXAMINE MARY DUNN, DEFENSE WITNESS, IN REFERENCE TO THE ALTERED DATE WITHIN THE ANNETTE PHOENIX INTERVIEW.  PHOENIX'S STATEMENT INDICATES THE ACTUAL POST-MORTEM INTERVAL OF CHERYL LEWIS.

3)    DEFENSE COUNSEL FAILED TO SUBPOENA EXCULPATORY WITNESSES;

4)    DEFENSE COUNSEL FAILED TO MOVE FOR MISTRIAL UNDER LA. C.CR.P. ART. 487(A), REQUIRING PETITIONER TO STAND TRIAL ON AN INDICTMENT "DEFECT OF SUBSTANCE"; AND

5)    APPELLATE COUNSEL FAILED TO BRIEF CONTEMPORANEOUS OBJECTIONS OF DEFENSE COUNSEL

IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.

The Petitioner was convicted and sentenced in violation of the Louisiana Constitution of 1974 and the United States Constitution, in that his attorney did not render reasonably effective assistance of counsel before, during, and after trial.

The origin of the right to effective assistance of counsel stems from the due process of the Fourteenth Amendment which entitles any defendant to a trial free from fundamental unfairness, including any unfairness which would stem from blatantly incompetent counsel. *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1974). Any person charged with a criminal offense is also entitled by the right to counsel provision of the Sixth Amendment to reasonably effective assistance of counsel. The corresponding article in our Louisiana Constitution of 1974 is Article I, Section 13.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) the court established a two-prong test for reviewing a defendant's claim, as his counsel's performance was so defective that a reversal of his conviction was required. In *Strickland*, the Court held:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel guaranteed by the Sixth Amendment.' Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* 466 U.S. at 687, 104 S.CT. At 2064.

However, the essence of the inquiry is whether the constitutional error caused the verdict to be unreliable or the proceedings unfair rather than a "mere outcome determination." ***Lockhart v. Fretwell***, 113 S.Ct. 838 (1993). Thus, a Petitioner must show that the reliability and integrity of the verdict is questionable. A reviewing court is required to assess the possibility that the constitutional violation had an "adverse effect" on the defendant's ability to subject the state's case to meaningful adversarial testing and to present evidence in his favor.

The question of ineffective assistance of counsel is a cumulative one. It is not proper to divide each issue up on an effort to "conquer" it; rather, this court must review the totality of the circumstances and the cumulative effect of counsel's lapses. See ***Strickland v. Washington***, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (when reviewing counsel's effectiveness, court must look to "all the circumstances" of the trial). Therefore, the claims submitted below must be viewed in their cumulative context, rather than in isolation. The Petitioner presents the following instances of counsel's cumulative ineffectiveness.

The cumulative effect of defense counsel's failures prevented Defendant the right to present a defense and the right to a fair trial. See ***Bradford v. State***, 278 So.2d 624, 625 (La. 1973); ***Wilson v. State***, 220 So.2d 426, 427 (1969). Where failure to give pre-trial notice is the result of defense counsel's lack of diligence or ignorance, contempt or discipline by the bar are far more appropriate sanctions than punishing the accused for the errors of his counsel. *Cf.* ABA Code of Professional

Responsibility.  Disciplinary Rules 6-101, 7-101(A)(3).  See also *People v. Ibarra*, 60 Cal.2d 460, 386 P.2d 487, 34 Cal.Rptr. 863(1963) (suggesting the loss of a substantive defense as a criterion for finding ineffective assistance of counsel). See generally Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv.L.Rev. 1434 (1965).

1)   **DEFENSE COUNSEL FAILURES SURROUNDING ISSUES OF EXPERT WITNESS TESTIMONY.**
1)A)   **FAILURE TO DEMAND "DAUBERT" HEARINGS AND FAILURE TO OBJECT WHEN NOT HELD.**

The court has ruled in Frye, which was overruled by *Daubert*, that before an expert witness can testify, the court must first determine if the scientific proof is accepted by the community for which the expert witness is about to testify.  The Louisiana State Supreme Court has also recognized exceptions to the rule's seemingly inflexible assertion that trial error, unless contemporaneously objected to, cannot be asserted to on appeal.  In *State v. Williamson*, 389 So.2d 1328 (La. 1980), fundamentally erroneous mistreatments of the trial court's failure to conduct fundamentally fair *Daubert* hearings, should be found by this court to require reversal, despite the Petitioner's failure to raise an objection in the trial court.

The court has apparently adopted a view, not totally unlike the federal "plain error" approach, that such constitutional violations as stated above so effect the fairness and the accuracy of the fact finding process that due process of law requires reversal, even in the absence of compliance with legislative procedural mandates.

When counsel for petitioner fails to comply with the contemporaneous objection rule, it is not the petitioner who caused the error to not hold *Daubert* hearings but trial counsel who caused prejudice to petitioner by trial counsel's failure to raise the complaint timely and properly before the trial court.  Therefore, this procedural default of trial counsel (that is, the failure to raise the complaint properly) is excusable and is not the result of trial strategy.  See *Henry v. Mississippi*, 379 U.S. 443, 13 L.Ed.2d

408, 85 S.Ct. 564 (1965); *Estelle v. Williams*, 425 U.S. 501, 48 L.Ed.2d 126, 96

S.Ct. 1691 (1976); *Wainwright v. Sykes*, 433 U.S. 72, 53 L.Ed.2d 594, 97 S.Ct. 2497

(1977).

See Exhibit RR, p.40, pre-trial hearing.

### 1)B)   FAILURE TO DEMAND "CERTIFICATE OF ANALYSIS" UNDER LA.C.CR.P.--R.S. 15:499, 15:500, AND 15:501(A); FAILURE TO OBJECT WHEN NOT PROVIDED.

*State v. McGee*, 757 So.2d 50 at 60 (La.App. 4 Cir. 2000): [Defendant] further

suggests that his trial counsel was ineffective for failing to object to provide notice as

required by La.R.S. 15:499.  Defendant's argument is without merit as the state

provided notice under La.R.S. 15:499 concerning its intention to use the crime lab

report.

In the instant case, defense counsel failed to object prior to or during trial.  (See

*State v. Lee*, 2000-2429 (La.App. 4 Cir. 01/04/01) , 778 So.2d 656, 666).

### 1)C)   FAILURE TO SUBPOENA DECLARANT FOR CROSS-EXAMINATION UNDER LA.C.CR.P.--R.S. 15:499, 15:500, AND 15:501(B)(1) & (2).

*Harris v. Spears*, 606 F.2d 639 at 642.  The district court incorrectly failed to

determine that a failure to object during cross examination would be a trial type

procedural default involving "trial judgment of [the] lawyer" triggering review under

the "cause and prejudice" standard of *Wainwright v. Sykes*, 433 U.S. at 91 n. 14, 97

S.Ct. 2497, 53 L.Ed.2d 594 citing *Henry v. Mississippi*, 379 U.S. 443, 451, 85 S.Ct.

564, 13 L.Ed.2d 408 (1965).  The court held that there was cause and prejudice under

that standard.

The crux of the prejudice suffered by petitioner was the counsel's failure to

expose the declarant to provide appropriate evidentiary foundation for the cross

examination, and to afford the defendant an opportunity to confront the "accuser."

The constitutional error occurred, however, not when the expert witness was cross

examined, but failure to subject the declarant to the test of cross examination as required by the **Sixth Amendment**.

     See LSA-R.S. 15:499, 500, & 501.

1)D)  **FAILURE TO OBJECT BEFORE AND AFTER DIRECT EXAMINATION BASED UPON DISCOVERY AND NOTICE OF EXPERT WITNESS TESTIMONY (JENCK'S ACT).**

     *U.S. v. Martinez*, 87 F.3d 731 (5th Cir. 1996):

at 733:

> About what happened incorporated into a document . . . and the government has relied upon them just as they would a witness statement, then I think it's covered by the Jencks Act . . . .

at 734:

> In criminal cases prosecuted by the United States: "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as herein defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified . . ." 18 U.S.C.A. 3500 (B).

at 738-739:

> Lastly, it must be noted that our present decision in no way impinges upon any of the rights or protections established in ***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny or under the general Federal Rules of Evidence as applied in federal criminal cases. The Supreme Court's decision in ***Brady***, released subsequent to its decision in ***Jencks v. United States***, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), recognized the government's general obligation to provide evidence that is both material and favorable to an accused. 373 U.S. at 85, 89, 83 S.Ct. At 1196-97. This includes evidence that would materially impeach a prosecution witness. See ***United States v. Bagley***, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

     Petitioner contends issue indeed falls under ***Brady*** and ***Bagley***.

     In *U.S. v. Ramirez*, 174 F.3d 584 (5th Cir. 1999):

at 587:

> Ramirez argues the district court erred in not declaring a mistrial or striking the testimony of Secrease and Blount as a sanction for non-disclosure under the **Jencks Act**.
>     The Jencks Act requires the United States to disclose a prior statement of a witness in its possession relating to the subject matter of that witness' testimony. *See* **18**

U.S.C.A. § 3500 (West 1985). The definition of "statement" includes "a . . . recording . . . which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." *Id*. The United States must disclose the information after the witness' direct examination testimony. Id. If the United States fails to disclose, the court must either strike the testimony of the witness or declare a mistrial. *Id*.

at 588-589:

See *Johnston v. Pittman*, 731 F.2d 1231, 1234 (5th Cir.

1984).

Finding no cases directly on point, in which the requested evidence is no longer useful for the purpose for which the defendant wants it, we agree that cases determining when the state may be excused from its obligation because it lost or destroyed the requested evidence provide an important analysis for this case. In *Armstrong v. Collier*, a case in which the state misplaced the requested evidence, this court enumerated three factors to consider in determining whether to excuse the state: the state's bad faith or negligence, the importance of the evidence, and the other evidence of guilt adduced at trial. 536 F.2d at 78.

## 1)E) FAILURE TO PROPERLY CROSS-EXAMINE DR. SUSAN GARCIA, EXPERT WITNESS, TO REVEAL LABORATORY EVALUATIVE REPORTS OF DIATOMS AND GLASS SLIDES OF LUNG TISSUE, AND DECLARANT.

Prejudice to Petitioner resulted because defense counsel failed to elicit, on cross-examination of Dr. Susan Garcia, expert witness, the identity of declarant of laboratory evaluative reports of diatoms and collection of glass slides of lung tissue (alveoli), thereby allowing the hearsay testimony of said witness as admissible.

"An expert witness may base an opinion of assumed facts in a hypothetical question only where there is admissible evidence of the truth of the assumptions."

See *People v. Sundlee*, 70 Cal.App.3rd 477, 484, 138 Cal.Rptr. 834, 837

(1977). See *In Re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1255-56

(E.D.N.Y. 1985) (contending that, on its face, the proposed expert testimony was

speculative); *United States v. Addison*, 498 F.2d 741, 744 (D.C. Cir. 1974) (noting

that jurors sometimes attribute a "mystic infallibility" to scientific testimony).

On cross-examination by Mr. McPherson:

Q.    But I guess it would be fair to say that you could not estimate the time of death?

A.    I would defer to another opinion.

(Exhibit TT, p.83)

**Article 705(B)**; Criminal Cases, La. Code of Criminal Procedure specifically states: In a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that the respect to evidence which would otherwise be inadmissible such basis shall only be elicited on cross-examination.

Defense counsel's failure to elicit testimony revealing the declarant of laboratory evaluative reports of diatoms and collection of glass slides of lung tissue (alveoli) used to support the expert witness' opinion of "asphyxia due to drowning" constitutes ineffective assistance of counsel.

Therefore, because the expert witness was not cross-examined as to laboratory evaluative reports and accompanying reports or the declarant, defense was never provided an opportunity to attack inclusion or exclusion of laboratory evaluative reports, abuse of discretion, probative value with respect to material evidence, credibility, adequate chain of custody going to the weight rather than admissibility of the evidence.

As a matter of law, the potential for unfair prejudice of declarant's testimony and evaluative reports as the bases for the expert witness pathologist's testimony would not substantially outweigh its probative value since the evaluative reports of diatoms and glass slides of lung tissue are unquestionably a legitimate ground for a finding of homicide. See *Davidson Oil Country Supply Co. v. Klockner*, 908 F.2d 1238 citing *Ballou v. Henri Studios*, 626 F.2d 1147.

See Exhibit PP, 3-05-99, pre-trial hearing, p. 94.  No confirmation of second method.

Page 38

2)   DEFENSE COUNSEL FAILED TO EXAMINE MARY DUNN, DEFENSE WITNESS, IN REFERENCE TO THE ALTERED DATE WITHIN THE ANNETTE PHOENIX INTERVIEW.  PHOENIX'S STATEMENT INDICATES THE ACTUAL POST-MORTEM INTERVAL OF CHERYL LEWIS.

Phoenix's unaltered interview statement corroborates the statement of Marie Dupre.  Phoenix's statement indicates the actual post-mortem interval of Cheryl Lewis, well within the "window of time" when Defendant was <u>not</u> in Louisiana.

See Exhibit NN, 1-15-99, pre-trial hearing, p. 10.

3)   DEFENSE COUNSEL FAILED TO SUBPOENA EXCULPATORY WITNESSES.

Mary Manheim, potential witness, reviewed police reports, autopsy report, and crime scene photographs stating her expert opinion in favor of the defendant; the post-mortem interval of Cheryl Lewis well within the "window of time" when defendant was <u>not</u> in Louisiana.  Ms. Manheim, knowing that her testimony contradicted a nationally renowned prosecution expert witness, would only offer testimony as a hostile witness and this would result in her contempt of court if placed in this position. Ms. Manheim requested that Ross Scaccia not subpoena her.  (Exhibit RR, p.41 - Scaccia intends to call expert witness Mary Manheim.)

Testimony of Maria M. Chaisson, defendant's former indigent defense counsel, is necessary to impeach the testimony of witness Ron Camden, or as an admission of said witness, regarding the "alleged confession" of the defendant.  (See Exhibit X, Motion in Limine, Exibit OO, 3-02-99, p.7, Exhibit FF, letter from Maria Chaisson).

Times-Picayune Reporter Matt Scallan quoted SCSO Major Sam Zinna on February 26, 1993 and March 9, 1993.  Major Sam Zinna's quotes are necessary to impeach Sharon Jones, the state's main lay witness. (Exhibits O and VV)

Testimony of A.D. Clouate (JPSO Corporal, Missing Persons Section) is necessary in reference to missing persons report interview of Marie Dupre.  The interview was conducted on 2/11/93.  His testimony is necessary to prove the

amended indictment is defective of substance.  Marie Dupre's testimony is necessary to confirm these statements.  (Exhibit C).

Times-Picayune reporter Stephanie Grace quoted St. Charles Parish Sheriff Greg Champagne on January 16, as stating officers will seek a confession in the slayings (of Delores Mack and Cheryl Lewis) but a confession isn't necessary.

St. Charles Parish Sheriff Greg Champagne's testimony is necessary to prove the alleged confession is nothing more than alleged.  A confession was still being sought two months after the alleged confession was alleged to have been obtained on November 25, 1997.

April George's (D.O.C.# 269654) testimony is necessary to confirm her coached statement is identical to Ms. Sharon Jones' coached statement.  In this interview, April George is coached to state that Ellwood set a petite female with black hair on fire.  In a letter to Petitioner postmarked August 3, 2000, Ms. George states, ". . . they want me to lie on you an say you do crude things to my body. I was going to get on the stand and tell them I lied on you.  I had one of the women in the room with me and she said she lied on you because you was white.  She didn't even know who you are until somebody told her. . . . she gone home now."  Ms. George stated in another letter that the burn on her breast is the result of a marijuana cigarette, not the coached statement that Ellwood burned her breast.  This witness is necessary to elicit testimony as proof that Denise "Cookie" Sanders lied about defendant in trial testimony.

Testimony of JPSO Detective Richard H. Rotherham, Jr. is necessary to prove the statement of April George is coached.

Mervin Spencer's testimony is needed as he was identified by four eye-witnesses as responsible for the homicide of Cheryl Lewis.

St. Charles Parish Sheriff's Office Captain Jules Turullo is necessary to testify

in reference to exculpatory "Brady material." Captain Jules Turullo was informed of an identified black/male suspect, Mervin Spencer, responsible for the homicide of Cheryl Lewis. Investigative reports and interviews conducted in his investigation of Spencer were suppressed by the prosecutor. (Exhibit I & J).

Milo Lewis' testimony is necessary as he is the one who identified Mervin Spencer as the assailant of Cheryl Lewis. Milo Lewis gave exculpatory statements about defendant. Milo Lewis identified black/male suspect as "light complected, scar on right cheek, not driving a taxicab, and not Russell Ellwood." (Exhibit L & M).

Orison Smith saw Cheryl Lewis approach a small red Toyota occupied by two white males, so, her testimony is necessary. Ms. Smith stated the two white males are friends of Mervin Spencer and that Spencer does not own a vehicle suggesting that Mervin Spencer borrowed the red Toyota and Mervin Spencer is responsible for the homicide of Cheryl Lewis.

Annette Phoenix's statement corroborates the statement given by Milo Lewis. Ms. Phoenix identifies subject as a black/male, scar on right cheek, thin mustache, A.K.A. Poo-Nanny and indicates the actual PMI of the decedent. (Exhibit K).

Lawrence Lewis' testimony is necessary as he gave a statement to JPSO John Thevinot and JPSO Bruce Harrison. Mr. Lewis confronted black/male suspect he believed responsible for the homicide of Cheryl Lewis, his sister. Mr. Lewis' friend copied the license plate number of a brown or red Toyota driven by suspect and Lawrence Lewis gave the license plate number to Lillian Lewis, his mother.

JPSO Detective Bruce Harrison is necessary as he gathered several exculpatory statements about Russell Ellwood, including statements by Milo Lewis, Lawrence Lewis, and coached statements of Nawassa Richmond, "other crimes witness." In an anonymous letter to James A McPherson, JPSO Bruce Harrison is noted as coaching Nawassa Richmond "beyond belief." As the exculpatory evidence in favor of

Ellwood mounted, Jefferson Parish Sheriff Harry Lee gave the order to "convict Ellwood." Consequently, JPSO Bruce Harrison was removed from the case and JPSO John Thevinot continued to coach the seven "other crimes evidence" witnesses. (Exhibit Z).

In violation of the 5th, 6th, and 14th Amendments to the United States Constitution and the Louisiana Constitution of 1974, Article I, Sections 2, 3, 13, 15, 16 & 22, the cumulative effect of all errors denies the accused due process, compulsory process, the fundamental fairness and the right to a fair trial.

The prejudicial effect of the exclusion of this contingent of witnesses has prevented defendant the right to present a defense and the right to a fair trial. Request is hereby made for subpoena of the following individuals for an evidentiary hearing regarding the above claims:

Defense counsel failed to subpoena:

> Dr. Cyril H. Wecht
> Steven Lintlop - Centre of Forensic Science, Toronto, Ontario, Canada
> Mary Manheim
> Maria M. Chaisson
> Matt Scallan
> SCSO Major Sam Zinna
> Sharon Jones
> JPSO Corporal A.D. Clouate
> Marie Dupre
> Stephanie Grace
> SCSO Sheriff Greg Champagne
> April George, D.O.C. # 269654
> Denise "Cookie" Sanders
> JPSO Detective Richard H. Rotherham, Jr.
> Susan D. Rushing
> Mervin Spencer
> SCSO Jules Turullo
> Milo Lewis
> Orison Smith
> Annette Phoenix
> Lawrence Lewis
> JPSO Bruce Harrison
> JPSO John Thevinot
> Charles LaHaye #459879
> Daniel Dickerson # 87172

4)   DEFENSE COUNSEL FAILED TO MOVE FOR MISTRIAL UNDER
LA. C.CR.P. ART. 487(A), REQUIRING PETITIONER TO STAND
TRIAL ON AN INDICTMENT "DEFECT OF SUBSTANCE"

In violation of the **5th, 6th and 14th Amendments** of the United States

Constitution and Article I, §§ 2, 3, 13, 15, 16, & 22 of the Louisiana Constitution,

Defense counsel failed to move for a mistrial, under **LSA-C.Cr.P. Art. 487(A)**, when

an attempt was made by defense counsel to introduce into evidence the original

indictment for comparison to the amended indictment as rebuttal to prosecution expert

witness testimony. (Exhibits T, U, & VV, p.125-6).

The accused had a crucial interest in submitting the original indictment into

evidence to the trier of fact. After ***Crane v. Kentucky***, 476 U.S. 683, 90 L.Ed.2d 636

(1986) it is clear that the accused's right attaches to evidence which is logically only

to rebutting incriminating expert witness testimony.   Defense was denied defense

funds by the trial court. Defense was without expert witness testimony to rebut the

post-mortem interval of the decedent.  Defense counsel's attempt to introduce the

original indictment into evidence as rebuttal to the prosecution expert witness

testimony relating to the post-mortem interval of the decedent was denied.  The judge

only permitted a reading of the prosecution's amended indictment.   When the

prosecutor objected to defense counsel's attempt to introduce the original indictment

into evidence as rebuttal to the prosecution expert witness testimony relating to post-

mortem interval of the decedent, the prosecutor was seeking "the perpetuation of an

unfair advantage." (Exhibit VV, p.126-7).  In our adversary system of criminal justice,

that type of advantage is both intolerable and unconstitutional.  See Imwinkelried and

Scofield, The Recognition of an Accused's Constitutional Right to Expert Witness

Testimony Attacking the Weight of Prosecution Science Evidence: The Antidote for

the Supreme Court's Mistaken Assumption in California v. Trombetta, 33 Ariz.L.Rev.

59 (1991).  The trial court unconstitutionally excluded relevant rebuttal evidence

proffered by defendant.

In *State v. Offord*, 663 So.2d 296 at 299 (La. App. 3 Cir. 10/4/95), the court pronounced:

> Defendant argues that the amended indictment constitutes a defect of substance, and therefore that the court should have granted him a mistrial pursuant to La. Code Crim. P. Article 487(A). A "defect of substance" is a defect that prejudices the defendant. State v. Harris, 478 So.2d 229 (La. App. 3 Cir. 1985), writ denied, 481 So.2d 1331 (La. 1986).

During the trial, the defense sought to introduce the original indictment. The prosecution objected. The court only permitted a reading of the "amended" indictment to the jury — the original indictment was not available to the court or to counsel. (Exhibit VV, p.127).

Scaccia refused to stipulate to a reading of the amended indictment. Claims IV and VII were not assigned as error by appellate counsel. Trial court erred by permitting prosecution under a fatally defective indictment.

In the instant case, the trial court follows the court's assumption in *Trombetta* and *Youngblood* that the defense rebuttal evidence will be admissible as a matter of course but <u>falls short</u>. The defense counsel should have immediately moved for mistrial.

5)   APPELLATE COUNSEL FAILED TO BRIEF CONTEMPORANEOUS OBJECTIONS OF DEFENSE COUNSEL

    A)   Claims I          other crimes witness

    B)   Claims III(1)(B)     reasonable doubt

    C)   Claims IV, VII
            IV    defective indictment constructively amended, broadened by date and theory
            VII   defense counsel failure to move for mistrial under La.C.Cr.P.art. 487(A)

    D)   Claims X         denial of testimony of Shara Kohrs

Ineffective assistance of appellate counsel resulted in a miscarriage of justice,

was prejudicial to the substantial rights of the accused, constitutes a substantial violation of statutory rights and cannot be denied, by passed, or annulled by jurisdictional or procedural default.

Additional subpoenas need to be issued for:

> Jon Ballay, D.O.C.# 126099
> Paul Petta, D.O.C.# 87208
> Charles Unger, D.O.C.# 87945
> Garnet Marshall, D.O.C.# 110335
> Diane Gilliam, D.O.C.# 215093
> Shara Kohrs, D.O.C.# 119059

## SUMMARY OF INEFFECTIVE ASSISTANCE CLAIM

The Louisiana Constitution of 1974, Article I, Section 2 guarantees every person the due process of law, and Section 16 guarantees a fair trial. These protections are also found in the United States Constitution's Due Process Clause of the Fourteenth Amendment.

Petitioner never had a chance at getting a fair trial with this counsel. Counsel has a duty to be an advocate for their client, and in the instant case, the counsel was clearly ineffective in all areas of the defense. Counsel failed to offer even the most basic of representation when there was no investigation conducted. At the heart of effective representation, is the independent duty to investigate and prepare. *Goodwin v. Balkcom*, 684 F.2d F.2d 794, 805 (11th Cir. 1982); accord *Porter v. Wainwright*, 805 F.2d 930, 933 (11th Cir. 1986); *Tyler v. Kemp*, 755 F.2d 741 (11th Cir. 1985); *Douglas v. Wainwright*, 714 F.2d 1532 (11th Cir. 1983, vacated, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), adhered to, 739 F.2d 531 (1984).

As the court held in *Wade v. Armontrout*, 798 F.2d 304 (8th Cir. 1986):

> investigation is an essential component of the adversary process. "Because [the adversarial] testing process generally will not function properly unless counsel has done some investigation into the prosecutions case and into various defense strategies . . . ." counsel has a duty to make reasonable investigations" Id at 307 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2589, 91 L.Ed.2d 305 (1986) (quoting *Strickland v. Washington*, 466 U.S. 668,

691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

This is particularly critical where it relates to the failure to investigate and present an effective defense. *Jones v. Cunningham*, 313 F.2d 347, 353 (4th Cir.), *cert.denied*, 375 U.S. 832 (1963) (counsel has affirmative obligation to seek out possible defenses); *Cf. State v. Wood*, 648 P.2d 71 (Utah 1982) (ineffective counsel found if attorney refuses to present the defendant's basic defense).

It is clear that counsel was ineffective for failing to investigate and present a defense. Petitioner was denied his constitutional right to the effective assistance of counsel and this denial mandates a reversal of the conviction and that the matter be remanded back to the district court where a new and constitutional trial can be held.

## CLAIM VI

THE PROSECUTOR SUPPRESSED EXCULPATORY EVIDENCE, A BRADY VIOLATON, TO THE PREJUDICE OF PETITIONER BECAUSE:

1) EVIDENCE SURROUNDING THE ISSUE OF EXPERT WITNESS TESTIMONY:
   A) FAILURE TO HOLD "DAUBERT" HEARINGS DENIED PETITIONER MATERIALLY SUPPORTING EVIDENCE OF EXPERT WITNESS.;
   B) SUPPRESSION OF EVALUATIVE LABORATORY REPORTS OF DIATOMS, GLASS SLIDES OF LUNG TISSUE, AND DECLARANT UNDER LA.C.CR.P. ART. 729.3, LA.R.S. 15:499, 15:500, AND 15:501(A) IN SUPPORT OF EXPERT WITNESS TESTIMONY; AND
   C) BEFORE DIRECT EXAMINATION OF EXPERT WITNESS UNDER THE JENCKS ACT.
2) PROSECUTOR SUPPRESSED AUTOPSY PHOTOGRAPHS;
3) DAILY INVESTIGATIVE REPORTS — OF DR. GARCIA'S NOTES;
4) INVESTIGATIVE REPORTS, INTERVIEWS AND INTERROGATION OF MERVIN SPENCER; AND
5) DESTRUCTION OF BUS TICKETS, EXPLOITATION AS ONION-SKIN GAS RECEIPT, AND FAILURE TO REVEAL THE ACTUAL EXCULPATORY EVIDENCE IN ITS TRUE LIGHT,
IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. See *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1964); *Kyles v. Whitley*, 514 U.S. 149, 115 S.Ct. 1555 (1995).

*Brady* provides a broad constitutional right of the accused to discover upon request any evidence in the prosecutor's possession useful to the accused's presentation of a defense. *Brady*'s holding emerged from the court's precedents finding the prosecution's knowing solicitation , use or failure to correct false testimony to be a violation of due process, see e.g., *Wilde v. Wyoming*, 362 U.S. 607 (1960); *Napue v. Illinois*, 360 U.S. 264 (1959); *Alcorta v. Texas*, 355 U.S. 28 (1957), *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holihan*, 294 U.S. 103 (1935). These decisions, unlike *Brady*, were designed to prevent various types of prosecutorial misconduct, rather than to further the accused's effort to defend.

The United States Supreme Courts's pretrial discovery decision in *Brady v. Maryland, supra*, while formally predicated on a single fairness requirement under the due process clause of the Fourteenth Amendment, presented but one aspect of the right to present a defense.

Specifically, *Brady* held that "suppression by the prosecution of favorable evidence to an accused upon request violates due process where the evidence is material either to guilt or punishment irrespective of the good faith or bad faith of the prosecution." *See, e.g., Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Keogh*, 391 F.2d 275 (5th Cir. 1961); *United States v. Leichtfuss*, 331 F.Supp. 723, 735-36 (N.D. Ill. 1971); *cf. Jencks v. United States*, 353 U.S. 657 (1957); **18 U.S.C. § 3500 (1970)** (The "Jencks Act").

1)   **EVIDENCE SURROUNDING THE ISSUE OF EXPERT WITNESS TESTIMONY:**

A)   **FAILURE TO HOLD "DAUBERT" HEARINGS DENIED PETITIONER MATERIALLY SUPPORTING EVIDENCE OF EXPERT WITNESS.**

Failure to hold ***Daubert*** hearings deprived Petitioner to be provided proof of materially supporting evidence of expert witness testimony.    The reasonable probability exists that admission of this testimony, without materially supporting evidence, rendered a different result of the proceeding depriving petitioner the right to a fair trial.

1)   **EVIDENCE SURROUNDING THE ISSUE OF EXPERT WITNESS TESTIMONY:**

B)   **SUPPRESSION OF EVALUATIVE LABORATORY REPORTS OF DIATOMS, GLASS SLIDES OF LUNG TISSUE,   AND DECLARANT UNDER LA.C.CR.P. ART. 729.3, LA.R.S. 15:499, 15:500, AND 15:501(A) IN SUPPORT OF EXPERT WITNESS TESTIMONY.**

In the instant case, the prosecutor failed to provide reports, as mandated under La.C.Cr.P. Art. 729.3 and La. R.S. 15:499, 15:500, and 15:501(A), prior to or during trial.   Continuous suppression or non-existence of any/all medical evidence material to the issue of homicide, prevented Petitioner the right to a fair trial and would have resulted in his acquittal.

"When confronted with an informal request for ***Brady*** discovery the government must respond whether it possesses the information requested and whether such information, construed broadly, is 'arguably favorable' to defendant's case; and in those circumstances in which the government possesses helpful information but does not believe that it is discoverable because it is not materially favorable, defendant can then move the court to inspect the material in camera, and it is the court which then must decide the question of disclosure."   ***United States v. Quinn***, 364 F.Supp. 432 at 443 (N.Ga. 1973).

Motions for Discovery and Inspection:

April 09, 1998      Scaccia files Application for Bill of Particulars and Motion for in camera inspection, Items 9), 10), and 11).  Exhibit P.

| | |
|---|---|
| Jan. 11, 1999 | Answer to Application for Bill of Particulars and Motion for Discovery and Inspection. Exhibit R, with cover letter. |
| Jan. 15, 1999 | Exhibit NN. P.35, Discovery issue - open discovery. P. 37 Discovery to be complete by March 15, 1999. |
| Mar. 5, 1999 | Exhibit PP.  P.124, lines 29-32 discovery issue. P. 125, Freese promises to complete discovery by March 15, 1999 deadline. P.126,, materials need in-camera inspection P.126, Freese advises full open file discovery ended on Dec. 10, 1998. P.128, Freese agrees to provide additional discovery material of Delores Mack. |
| May 20, 1999 | Scaccia files second motion for discovery and inspection, motion to disallow other crimes evidence, and motion to suppress. Exhibit W. |
| May 20, 1999 | Names of expert witnesses and their reports.  Exhibit W, Item 14). |
| June 1, 1999 | Prosecutor Freese provides names of expert witnesses only, but not expert witness reports. Suppresses diatoms and glass slides. Exhibit RR, pp.39-40. Freese advises no need for *Daubert* hearings, Scaccia fails to object.  Scaccia fails to demand "certificate of analysis." Exhibit RR, p.40. |

1)   **EVIDENCE SURROUNDING THE ISSUE OF EXPERT WITNESS TESTIMONY:**
     C)   **BEFORE DIRECT EXAMINATION OF EXPERT WITNESS UNDER THE JENCKS ACT.**

Suppression of the declarant of medical reports, material and favorable to the accused, necessitated the trial court's striking the expert witness testimony or sanctioning the prosecutor, depriving Petitioner the right to a fair trial and would have rendered a different outcome of the trial.

In *State v. Conley*, 32 Ohio App.2d 54 at 59-60, 288 N.E.2d 296 at 300 (1971), the court wrote:

> To identify a particular item . . . as being part of a pertinent incident in the past usually requires a showing of a continuous chain of custodians up to the material moment. When a chemical analysis is involved . . . the material moment is the moment of analysis, since this provides the basis for the expert testimony and makes the testimony

relevant to the case. In the case of many others, the material moment occurs at trial.

See **Harmon v. Anderson**, 495 F.Supp. 341, 343 (E.D.Mich. 1980) (chain of custody of slides from examining physician to pathologist unclear).

Far more important is the developing case law recognizing a defendant's constitutional right to re-test real evidence and the concomitant of the prosecution to preserve that evidence for re-examination. **Warren v. State**, 292 Ala. 71, 75, 288 So.2d 826, 830 (1973) (criminal defendant's due process right of cross-examination violated if defendant not given opportunity to have own expert examine incriminating evidence). (Exhibit PP, p.94).

Defendants have successfully argued that the due process, confrontation, and compulsory process clauses mandate this right to preservation. The leading case is **United States v. Bryant**, 439 F.2d 642 (D.C.Cir.), *aff'd after remand*, 488 F.2d 1182 (D.C.Cir. 1971). At 651 the D.C. court wrote:

> It is most consistent with the purposes of [**Brady v. Maryland**, **Rule 16** and the **Jencks Act**] safeguards to hold that the duty of disclosure attaches in some form once the government has first gathered and taken possession of the evidence in question. Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its evidence. Hence we hold that before a request for discovery is made, the duty of disclosure is operative as a duty of preservation. Only if evidence is preserved during the early stages of investigation will disclosure be possible later.

The court in **Bryant** relied on **United States v. Augenblick**, 393 U.S. 348 (1969), in which the Supreme Court stated that "the Government bore the burden of producing [Jencks Act Material] or explaining why it could not do so." *Id.* at 355-56.

**United States v. Franklin**, 747 F.2d 497, 498 (8th Cir. 1984) (chemists refreshed recollection prior to trial by reviewing reports prepared at the time cocaine tested). In this situation, however, the analyst's in-court testimony and not the laboratory report is the evidence. The report may be introduced in evidence only by

the adverse party and then only for impeachment. See **Fed.R.Evid. 612 (B), (C), &**

**(D).**

    See **Fed.R.Evid. 902**; *United States v. Davis*, 14 M.J. 847, 848 n.2 (A.C.M.R.

1982) ("A laboratory report may also be admitted as an official record when it is

accompanied by an authenticating certificate.").

    See generally Imwinkelried, The Constitutionality of Introducing Evaluative

Laboratory Reports Against Criminal Defendants, 30 Hastings L.J. 621 (1979).

    See *State v. Reese*, 56 Ohio App. 2d 278, 382 N.E.2d 1193 (1978) (failure to

serve copy of lab report on defendant renders report inadmissible).

    In *State of Louisiana v. Leon Simmons*, 845 So.2d 1249 at 1261-62 (La.App.

5 Cir. 04/29/03), the court pronounced:

> The state has a continuing duty of disclosure and if the state,
> subsequent to ordered disclosure, discovers additional evidence or
> decides to use a particular item as evidence at trial, the state has a
> continuing duty to notify the defendant of the evidence and its intended
> use at trial. **La.C.Cr.P. art. 729.3.** *State v. Williams*, 448 So.2d 659,
> 664 (La. 1984).

[Black] contends the photograph's late disclosure warranted sanctions, such as

suppression, and absent that remedy, a mistrial should have been granted. The trial

court has wide discretion in fashioning a remedy for what it perceives to be a

discovery violation. *State v. Black*, 34,688 p.22 (La.App. 2 Cir. 5/9/01), 786 So.2d

289, 298. See also *State v. Lee*, 778 So.2d 656, 666 2000-2429 (La.App. 4 Cir.

01/04/01).

    A related problem is posed in the so-called "lost evidence" cases. These cases

involve situations in which the government has been in the possession of physical

evidence, such as bullets, weapons, drugs, blood samples, or written statements, which

are arguably material to the defense and is unwilling or unable to produce the evidence

at trial. This problem has arisen often in connection with statements required to be

produced under the Jencks Act, and the courts have held that failure to produce the

evidence requires dismissal of the prosecution in order to protect the accused's right to defend. In other contexts the courts have also dismissed prosecutions or reversed convictions because of the prosecution's failure or inability to supply arguably exculpatory evidence previously in its possession. *Pointer v. Texas*, 380 U.S. 400, 404 (1965) quoting *Turner v. Louisiana*, 379 U.S. 466; See also *Mattox v. United States*, 156 U.S. 237, 242 (1895). To say that a defendant has a right to cross-examine witnesses implies that the state must endeavor to elicit their evidence in the form of direct testimony, which may have been impossible for the prosecutor to do, before resorting to their out-of-court statements. See *State v. Fisher*, 222 Kan. 76, 563 P.2d 1012 (1977).

> [T]o ensure the right to confrontation is not abridged, we hold that in a criminal proceeding the defendant must testify at trial before hearsay evidence may be admitted . . . .

Upon direct examination of prosecution's expert witness, the evaluative laboratory reports of diatoms, glass slides of lung tissue, and identification of declarant is mandatory. If non-existent, prosecutor continued to suppress this fact.

For the purposes of accuracy, brevity and clarity, the Petitioner adopts his previous argument as sufficient regarding this Claim VI (1)(A,B,C). Accordingly, your Petitioner asks this Honorable Court to review the entire record, the law and memoranda submitted, and allow the Petitioner by reference to adopt the particular legal argument pled in Claim V (1)(A-E), *infra*, and permit the same to be incorporated to support this Claim.

**2)    PROSECUTOR SUPPRESSED AUTOPSY PHOTOGRAPHS**

Failure to disclose the autopsy photographs, evidence favorable to the Petitioner, deprived the accused the right to present a defense and the right to a fair trial which would have rendered a different outcome of the trial.

Exhibit P    4-09-98, Items 6) and 7)
Exhibit W    5-20-99, Item 4) autopsy photographs
Exhibit RR    6-01-99
            A)    page 28,  Autopsy reports are grossly incomplete,

|   |   | never received supplemental reports. |
|---|---|---|
|   | B) | page 29, Freese states autopsy discovery is complete |
|   | C) | page 30, Freese states there are no autopsy photos |
| Exhibit S | Report from William Marvin Bass | |
| 1-26-99 | | Lt. Steve Buras provided William Bass with one color photograph of the face taken at autopsy. |

**3)   DAILY INVESTIGATIVE REPORTS — DR. GARCIA'S NOTES**

Failure to disclose the autopsy photographs, evidence favorable to the Petitioner, deprived the accused the right to present a defense and the right to a fair trial which would have rendered a different outcome of the trial.

In reference to the Crime Scene Investigation Daily Report, Location of Occurrence: Jefferson Parish Morgue, Jefferson, La.; Briefing Officer: Dr. Susan Garcia, M.D.; Time Notified: 6:50 a.m.; Arrived at Scene: 7:20 a.m.; Departed Scene: 12:02 p.m.; Mission Performed: yes x ; Comments on Back: X , page 1.  (Exhibit F, St. Charles Sheriff's Department Crime Scene Investigation Daily Report of Cheryl Lewis by Dr. Susan Garcia "Comments on Back X" page 1.).

**4)   INVESTIGATIVE REPORTS, INTERVIEWS AND INTERROGATION OF MERVIN SPENCER**

New developments in the case revealed that homicide victim Cheryl Lewis was last seen in the company of a black male who was well built and clean shaven.  Two different witnesses gave information that the male subject was driving a white over black Ford LTD or a 1986 Toyota 4-door brown.  Mervin Spencer was seen frequently driving a Toyota black pickup.

(Exhibits I, J, K, L, & M).

**5)   DESTRUCTION OF EVIDENCE**

Destruction of an envelope (ticket pamphlet) containing defendant's Greyhound computer-print and onion-skin bus tickets, dated February 22, 1993 and February 23, 1993, respectively, admittedly found by another Task Force member (SCSO Sgt. Olga Fourroux).  The onion-skin bus ticket was exploited as an onion-skin "gas receipt" by

the prosecution.  Destruction of this exculpatory evidence in support of an alibi prevented defendant the right to present a defense and the right to a fair trial. Suppression of the actual Greyhound computer-printed and onion-skin bus tickets prevented defendant the right to present a defense and the right to a fair trial.  See F.B.I. 302 Form - Field Report of Howat Peters dated 10-5-98. (SCSO Sgt. Olga Fourroux informs Peters of discovery of receipt(s)).

Prosecutor's action not only deprived defendant of due process in violation of U.S.C.A. Const. Amends. 5 and 14, but also deprived the Defendant the right to present a defense in violation of U.S.C.A. Const. Amend. 6.

| Exhibit G | 2-22-93 | Purchase of bus tickets |
| Exhibit H | 2-01-94 | Altered police time line to suppress alibi |

### CLAIM VII

**THE TRIAL COURT ERRED, TO THE PREJUDICE OF PETITIONER, REQUIRING PETITIONER TO STAND TRIAL ON A DEFECTIVE INDICTMENT CONSTRUCTIVELY AMENDED, BROADENED BY DATE AND THEORY, IN VIOLATION OF THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.**

The amended indictment is broadened by "date and theory" not charged in the original indictment, taking defendant out of his alibi and presenting false expert witness testimony to "make" the defendant fit the amended indictment.

The amended indictment is broadened by date and theory charged in the original indictment, taking Defendant out of his alibi.  The prosecutor's expert witness testimony "made" the Defendant fit the amended indictment.

In ***Stirone v. United States***, 361 U.S. 212, 216-217 (1960), the court pronounced:

> "Ever since ***Ex Parte Bain***, 121 U.S. 1 was decided in 1887 it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."
> "[] . . . that after the indictment was changed it was no longer the indictment of the grand jury who presented it."

In the instant case, on March 23, 1998, the grand jury returned a true bill alleging the Petitioner in a two count indictment for second degree murder "on or about February, 1993" the same man committed two homicides. On March 2, 1999, the prosecutor in open court entered a nolle prosequi as to count one and amended the date "on or about February, 1993" to "on or between January 31, 1993 and February 9, 1993" the same man committed one homicide "on or between" dates convenient to fit the crime, beyond the defendant's alibi.

Ms. Marie Dupre reported seeing Cheryl Lewis at 2:00 a.m. on February 1, 1993. Annette Phoenix's interview corroborates this statement of Marie Dupre. Milo Lewis stated to police that he was with Cheryl Lewis on a <u>Wednesday evening</u>. The state's answer to application for a bill of particulars states "between February 7 and February 21, 1993" as the time of death of Cheryl Lewis. (Exhibit R).

"No showing is made that the defendant . . . was prejudiced in presenting any defense." See ***State v. Royal***, 232 So.2d 292, 293. In the instant case, Defendant was prejudiced by the compulsory and confrontation clause of the U.S.C.A. Const. Amend. 6 and the due process clause of U.S.C.A. Const. Amend 14. The indictment charged by the grand jury shows that "<u>on or about</u>" a certain month (February), the Defendant allegedly killed <u>both</u> Delores Mack <u>and</u> Cheryl Lewis. (See Exibit U). This indictment also shows that the prosecution dismissed its case against Delores Mack by amending the indictment to "<u>on or between January 31 and February 9, 1993</u>" as to count two, Cheryl Lewis, when the re-investigation team proved that the Defendant could not have killed Delores Mack. The Defendant, by police admission, was in Canton, Ohio when Delores Mack was killed. (Exhibit A). The grand jury charged and the prosecution claimed that the Defendant <u>on or about</u> a certain month killed <u>both</u> Delores Mack <u>and</u> Cheryl Lewis. The failure of the trial court to allow <u>this</u> indictment into evidence seriously effected the defense's position that <u>both</u> victims

were killed at approximately the same time. (Exhibit VV, pp. 126-127).

Where an indictment alleges that an offense allegedly occurred "on or about" a certain date, the defendant is deemed to be on notice that the charge is not limited to a specific date . . . The courts agree that when the indictment uses the "on or about" designation, proof of a date reasonably near to the specified date is sufficient. *U.S. v. Leibowitz*, 857 F.2d 373 at 379 (7th Cir. 1988) emphasis added.

"On or between January 31 and February 9, 1993" is specific and not charged by the grand jury. There was prejudicial variance between the amended indictment which alleged that an offense occurred "on or between January 31, 1993 and February 9, 1993," effectively taking Petitioner out of his alibi.

Further, "original" police reports indicated that the victims were killed at approximately the same time, thereby making it impossible for the Defendant to have killed Cheryl Lewis, if he did not kill Delores Mack. (Exhibits D and E). Furthermore, the prosecutor "made" the amended dates fit its evidence, taking the Defendant out of his alibi, February 10 through February 23, 1993, backwards into the month of January, not charged by the grand jury. If no alibi had been discovered by the police investigation, the prosecutor was prepared to proceed to trial on two counts of murder and present evidence, *i.e.*, expert witness testimony; to support the police reports and sworn affidavit and warrant for arrest.

However, upon discovery of Petitioner's alibi, the only possible avenue to continue with prosecution forced the prosecutor to amend the indictment and present different expert witness testimony to support his amendment. (Exhibit A).

The government's change in position before the trial can be sufficient to work a constructive amendment of the indictment involving an alibi even where the court does not formally alter the elements of the offense in the jury charge..

Only the grand jury can broaden an indictment through amendment. *United*

*States v. Salvatore*, 110 F.3d 1131, 1145 (5th Cir. 1997). A constructive amendment

occurs when the government is allowed to prove "an essential element of the crime on

an alternative basis permitted by the statute but not charged in the indictment." *Id.*

(quoting *United States v. Slovachek*, 867 F.2d 842, 847 (5th Cir. 1989)). [ ] . . .

illustrate that the government may not obtain an indictment alleging certain material

elements or facts of the crime, then seek a conviction on the basis of a different set of

elements or facts. *U.S. v. Robles-Vertiz*, 155 F.3d 725 at 727-728 (5th Cir. 1998)

emphasis added.

In the instant case, although not during trial, but with permission given by the

trial judge for a formal amendment, the government changed its theory so as to urge

a jury to convict on a basis broader than that charged in the indictment.

The State formally amended the indictment. The trial court's charge also

broadened the possible basis of conviction beyond that originally charged by the

grand jury over defense counsel objections. (See *State v. Johnson*, 637 So.2d 1033,

1036 (La. 6/3/94).

See *State v. Bernard, supr*a.

## CLAIM VIII

**THE TRIAL COURT ERRED, TO THE PREJUDICE OF
PETITIONER, PERMITTING EXPERT WITNESS TESTIMONY
NOT BASED UPON MATERIALLY SUPPORTING EVIDENCE
IN VIOLATION TO THE 5TH, 6TH, AND 14TH AMENDMENTS
TO THE UNITED STATES CONSTITUTION AND THE LSA-
CONST. ART. I, §§ 2, 3, 13, 15, 16, & 22.**

The due process of law contained in the 5th and 14th Amendments, the

compulsory process of the 6th Amendment, the right to present a defense contained

in the 6th Amendment, and the right to a fair trial contained in the 14th Amendment

and the correlations in the Louisiana Constitution of 1974, Article I, §§ 2, 3, 13, 15,

16, and 22 were abridged or violated because expert witness testimony is not based

upon materially supporting evidence. Laboratory evaluative reports of the presence

of diatoms and a collection of glass slides of lung tissue were suppressed under discovery or are non-existent. The government must disclose impeachment evidence that is favorable to the defendant and material to guilt or punishment.

Expert witness testimony must be based upon materially supporting evidence was denied because: the pathologist's expert witness testimony as to the cause of death, "asphyxia due to drowning," was not supported by laboratory evaluative reports or declarant's testimony during trial, laboratory evaluative reports were suppressed under discovery or are non-existent in violation of the 5th, 6th, and 14th amendments of the united states constitution and the LSA-Const. Art. I, §§ 2, 3, 13, 15, 16, & 22. (Exibit RR, pp. 28-29).

An expert may base an opinion on assumed facts in a hypothetical question <u>only</u> when there is admissible evidence of the truth of the assumptions. See *People v. Sundlee*, 70 Cal.App.3rd 477, 484, 138 Cal.Rptr. 834, 837 (1977). When a declarant makes a statement out of court, the parties cannot immediately subject the statement to cross-examination. The common law ascribed great value to cross-examination as ensuring the reliability of testimony. Dean Wigmore characterized cross-examination as the "greatest legal engine ever invented for the discovery of truth." Wigmore, Evidence § 1367 (3rd Ed. 1940).

The most trenchant analysis appears in the cases which excludes evaluative reports. In *Commonwealth v. McCloud*, 457 Pa. 310, 22 A.2d 653 (1974), the Supreme Court of Pennsylvania excluded an autopsy report stating an opinion about the legal cause of death. The Court wrote that an opinion on that subject is "at best a conclusion based on the interpretation of often conflicting medical opinion." In *Phillips v. Neil*, 452 F.2d 337 (6th Cir. 1971), *cert.denied*, 409 U.S. 884 (1972), the Court of Appeals for the Sixth Circuit rejected psychiatric reports. One commentator endorsed the result in *Phillips*, recognizing that the soundness of the <u>declarant's</u>

opinions "could not be adequately tested without cross-examination of the declarant."

Rule 703 of the Federal Rules of Evidence attempts to delimit the bases upon which an expert witness may rely in testifying to those "reasonably relied" upon "by experts in the field." It provides: the facts or data in the particular case upon which an expert bases an opinion or inference may be those "perceived by" or "made known" to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. *In Re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223 (1985) at 1243. See also *U.S. v. Bowers*, 660 F.2d 527 (5th Cir. 1981) (testimony was irrelevant and speculative at best and therefore properly excluded).

Even though laboratory reports were understood by the prosecutor and expert witness to be referred to under the hearsay exception, the confrontation clause requires exclusion. A hearsay declarant is, in effect, a "witness against" the accused. In *Bourjaily v. United States*, 107 S.Ct. 2775 (1987), the court referred to a two-pronged test, albeit in qualified terms: "[t]he court has, as a general matter only, required the prosecution to demonstrate both the unavailability of the declarant and the "indicia of reliability" surrounding the out-of-court declaration.

Although business and public records generally may bear adequate indicia of reliability, laboratory reports may not. Simply stated, not all business and public records are alike. The drafters of the Federal Rules recognized this by identifying three different categories of public records and placing different limitations on their admissibility. For example, although public records are generally admissible under **Rule 803(8)**, investigative reports are not when offered by the prosecution because "of the almost certain collision with confrontation rights which would result from their use against the accused in a criminal case." Similarly, the inclusion of the

trustworthiness clauses in both the public and business records exceptions supports the proposition that some of these records pose serious reliability risks. Reliability issues involve two different but related problems — the first concerns the reliability of the scientific test itself; the second involves the way in which the test results are reported. See also *Crawford v. Washington*, 124 S.Ct. 1354 (2004).

Moreover, in other contexts, the Supreme Court has repeatedly emphasized the importance of trial confrontation of scientific proof. For example, in *United States v. Wade*, 388 U.S. 218 (1976), the court extended the right to pretrial identification procedures, in part, because the presence of counsel will "assure a meaningful confrontation at trial . . ." The Court, however went on to distinguish identification procedures from scientific analyses:

> The Government characterizes the lineup as a mere preparatory step in the gathering of the prosecutor's evidence, not different for Sixth Amendment purposes — from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood samples, clothing, hair, and the like. We think there are differences which preclude such steps from being characterized as critical stages at which the accused has the right to presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witness . . ..

In *Delaware v. Fensterer*, 474 U.S. 15 (1985) the court stated (emphasis added), "[t]he Confrontation Clause is generally satisfied when the defense is given full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the fact-finder the reasons for giving scant weight to the expert's testimony." Had the expert's findings been introduced through a laboratory report, however, as it should have been in the instant case, there would have been an "opportunity to probe these infirmities," suppressed or non-

existent.  Petitioner argues that the expert's findings could only be properly introduced

through evaluative laboratory reports of diatoms and glass slides of lung tissue, in the

instant case presenting "opportunity to probe these infirmities."  (Exhibit RR, p.40).

    *Gregory v. State*, 40 Md.App. 297, 328 N. 28, 391 A.2d 437, 455 N. 28

(1978) ("It [is] the state's burden — not that of the appellant — to produce the witness

against him."). (Emphasis added).  In addition, in the instant case, given the adequacy

of pre-trial discovery, placing the burden on the defendant to call the analyst is unfair.

Furthermore, Petitioner argues, in the instant case, that his discovery rights would

have been adequate notice of the analyst's testimony but laboratory evaluative reports

have been suppressed or are non-existent.

    In the instant case, discovery depositions were unavailable and thus necessary

information was not obtained through that device.  Consequently, Petitioner had no

way of knowing what tests were suppressed or never existed, who the declarant was,

whether the declarant was qualified, and so forth.  Issuing a subpoena for the analyst

under these circumstances was impossible.  Even if reports were unreliable, there was

no meaningful opportunity to test these.  (Exhibit PP, p. 94 - no confirmation of

second testing method).

    Paul C. Giannelli, The Admissibility of Laboratory Reports in Criminal Trials:

The reliability of Scientific Proof, 49 Ohio St.L.J. 671 (1988-1989).

    Excerpt from State v. McCoy, 457 So.2d 887 (La.App. 3 Cir. 1984) at 390:

> . . . witnesses are allowed to draw reasonable inferences
> from personal observations, *State v. Prestridge*, 399 So.2d
> 564 (La. 1981).  Intoxication is an observable condition
> about which a witness may testify.  *State v. Neal*, 321
> So.2d 497 (La. 1975).

    *See LSA-R.S. 15:499, LSA-R.S. 15:500, LSA-R.S. 15:501 (A) & (B)(1).*

    No certificate of analysis was provided to the court.  If Cheryl Lewis drowned,

samples of fluid, if present, would have been collected as samples from the lung tissue

and submitted to a laboratory for examination. Ultimately, the results of that examination would show the presence of micro-organisms (diatoms) in the lungs. These organisms only live in water, never in lungs. This finding would be significant because it would mean that Cheryl Lewis was still alive when she hit the water and was capable of swallowing and aspirating drainage canal water down into her stomach and lungs. The stomach was empty. See *State v. McKnight*, 739 So.2d 343, 352 (98-1790 La.App. 1st Cir. 6/25/99) (unconscious child thrown into Tickfaw River).

If this evaluative laboratory report never existed, because diatoms are micro-organisms and cannot be "observed" with the naked eye, Dr. Garcia's testimony as to opinions "perceived by" means that the pathologist claims to have observed something that it is impossible for her to have "observed" nor could facts or data be "made known" to her to determine the cause of death as "asphyxia due to drowning." In a case of "asphyxia due to drowning," positive determination by "observation" alone is impossible. Therefore, Dr. Susan Garcia's testimony is irrelevant.

If this evaluative laboratory report existed, due process, compulsory process, and confrontation clause issues arise.

If Cheryl Lewis drowned, a collection of glass slides of lung tissue would indicate dilated alveoli. Edema fluid would be present in the alveolar with disproportionate autolytic changes in the respiratory epithelium. In other words, if her lungs had been contaminated by drainage canal water, they should have been decomposing more rapidly than other tissues.

If a collection of glass slides of lung tissue and accompanying evaluative reports are non-existent, because cell walls of the alveoli are microscopic and cannot be "observed" with the naked eye, Dr. Garcia's testimony as to opinions "perceived by" means that the pathologist claims to have "observed" something that it is impossible for her to have "observed," nor could facts or data be "made known" to her to

determine the cause of death as "asphyxia due to drowning." In a case of "asphyxia due to drowning," positive determination by "observation" alone is impossible. Therefore, Dr. Susan Garcia's testimony is irrelevant.   If a collection of glass slides of lung tissue and accompanying evaluative reports existed, due process, compulsory process, and confrontation clause issues arise.   The St. Charles Parish Coroner's Office and the Jefferson Parish Coroner's Office deny custodianship of the complete autopsy files of Cheryl Lewis.   (Exhibit RR, p.40)  Freese states Jefferson Parish Coroner is under contract in St. Charles).

Direct examination of Dr. Susan Garcia (Exhibit TT):

By Douglas Freese:

P.80, lines 31-32:
Q.    And you indicated that a toxicological report was performed; is that correct?
P.81, lines 1-9, 14-32, p.82, lines 1-2, 26-32:
A.    Yes. That's a standard procedure in any forensic examination.

P.82, lines 26-27:
Cross by James McPherson:

Q.    Are you able to estimate the date of her death?

A.    Not precisely.
P.83, lines 14-17:

Q.    And I believe you said that you think she was alive at the time of her death but may not be conscious?

A.    I think I testified that I think she was alive at the time she hit the water and was not conscious.

The Petitioner has corresponded with Steven P. Lintlop, MSc., Head of Research and Development at the Centre of Forensic Sciences in an effort to obtain expert opinion and information on this matter.  In an April 8, 2005 letter (Exhibit CC), he states:

**There is no test or method available to a toxicologist to allow them to determine whether any individual is conscious or unconscious at the time of death.**

Further, in a March 6, 2006 letter (Exhibit DD), he states:

> **The prosecutor, Mr. Freese, asked Dr. Garcia whether the death could have been due to a cocaine overdose. Dr. Garcia replied "No". This response is not supported by the information available to me. As I have stated in previous letters, given that "purge fluid" and not blood was analyzed it is not possible to interpret the effect of cocaine on the deceased.**

Assisted by defense counsel's neglect to object to direct testimony or to elicit on cross-examination from Dr. Susan Garcia's evaluative reports and the declarant, the prosecutor successfully sidestepped due process, compulsory process, and confrontation process clauses with prepared, rehearsed, suggestive testimony elicited from the expert witness pathologist; slightly referring to a laboratory report of toxicological analysis of purge fluid, eluding any reference to evaluative reports absolutely mandatory to determine the cause of death, in the instant case , as "asphyxia due to drowning" to "make" the case, a case of homicide.

## CLAIM IX

**THE TRIAL COURT ERRED, TO THE PREJUDICE OF PETITIONER, DENYING THE USE OF TWO VIDEO TAPES OF STATE WITNESS, STAN HILL, AS PART OF ITS CROSS-EXAMINATION AND IMPEACHMENT OF THIS WITNESS IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 13, & 16.**

The defense was denied the use of two video tapes of the state witness, Stan Hill, as part of its cross-examination and as part of its impeachment of this witness. These video tapes had been taken prior to trial, at the request of state, to "preserve" Stan Hill's testimony, for it was alleged by the state that the witness was ill and may not be available for trial. (Exhibits X, LL, & SS, p.6).

Petitioner contends the "basis" of the case against the Petitioner is the testimony of a Prison inmate, who alleged that Petitioner confessed to him.

It is worth noting here, how important the state regarded the testimony of this

felon, who has been convicted of at least 15 serious felonies. His testimony was so important that the state insisted his testimony should be preserved, and so it was. However, the court denied the use of the videos as part of the defense cross-examination and impeachment.

In *Carver v. United States*, 164 U.S. 694 (1897), the court reversed a murder conviction because two important portions of the defense case had been excluded at trial . . . since the prosecution had been allowed to present portions of these conversations under a dying declaration theory. The court in *Carver* also held that the defendant had been improperly prevented from introducing evidence . . . statements inconsistent with her dying declarations which were introduced by the prosecution. Probably the strongest early statement by the court regarding the exclusion of portions of the defense's evidence came in *Crawford v. United States*, 212 U.S. 183 (1909). This evidence was excluded by the trial court. . . . with little attention to its impact on the ability of the defendant to present his theory of defense.

*Donnelly v. United States*, 228 U.S. 243 (1913), presented similar issues:

> [N]o other statement is so much against interest as a confession of murder, it is far more calculated than dying declarations, which would be let in to hang a man . . . and when we surround the accused with so many safeguards . . . I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight.

The two leading Supreme Court precedents are *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).

The role played by the right to defend as reflected in *Chambers* and *Green* is to assure that trial and appellate courts do not lose sight of the accused's significant interest in presenting the excluded evidence and to assure that the accused is not unfairly precluded from meeting the charges brought against him by a mechanistic application of the evidentiary rules. Specifically relying on *Chambers*, the court must

assess the importance of the excluded evidence to the accused's defense and, finding

the evidence critical, hold that the due process clause of the **Fourteenth Amendment**

compels the admission of evidence.

> "[A]s the United States Supreme Court has recently observed: few rights are more fundamental than that of an accused to present witnesses in his own defense." ***Chambers v. Mississippi***, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297, 312.

***Kittleson v. Dretke***, 2005 WL 2278097 (Sept. 20, 2005):

> The Fifth Circuit looked to precedent to weigh whether Kittleson's confrontation claim was "rooted deeply in the due process clause of the 14th Amendment or in the compulsory process clauses of the 6th Amendment, guaranteeing criminal defendants a meaningful opportunity to present a complete defense. See ***United States v. Scheffer***, 118 S.Ct. 1261 (1998).

> It is effectively denied when a defendant is prohibited from "exposing to the jury the facts from which jurors, as the sole trier of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. See ***Davis v. U.S.***, 94 S.Ct. 1105 and ***Chambers v. Mississippi***, 93 S.Ct. 1038 (1973).

See also ***State v. Smith***, 594, So.2d 467 at 474-475 (La.App. 4 Cir. 1981).

The right to defend requires a constitutional analysis of any problem involving

the application of a procedural or evidentiary rule in such a manner as to hinder,

obstruct, or prevent the accused from presenting defense evidence relation to the

issues of guilt or affirmative defenses. The constitutional level of analysis provided

by the right to defend requires trial courts in analyzing such problems to consider the

fairness to the accused of applying the procedural rule in question, while still

permitting an accommodation of the procedural and evidentiary interests furthered by

the rule at issue. In short, the right to present a defense seeks to guarantee, consistent

with the adversary system, the accused's opportunity to fully participate in the search

for truth at the criminal trial.

Petitioner was denied the use of two videos of the perpetuated testimony to

display to the jury the "demeanor" of witness Stan Hill as part of its cross-examination and impeachment of said witness. Thus, Petitioner's right to present a defense and the right to a fair trial was thwarted.

### CLAIM X

**THE TRIAL COURT ERRED, TO THE PREJUDICE OF PETITIONER, DENYING A PRISON INMATE DEFENSE WITNESS AN OPPORTUNITY TO GIVE TESTIMONY IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16 & 22.**

A prison inmate witness for the defense was not permitted to give testimony that:

A) she knew the defendant;

B) she knew the defendant, and was "good friends with" on e of the victims who died, and for which the defendant was a suspect;

C) that her friend's jewelry, a ring, was seen by her in the possession of several people she knew as "drug dealers," after her death;

D) she gave the names of these "drug dealers" to the police;

E) she knew the people were drug dealers because she had purchased drugs from them;

F) she knew other women who made their living as prostitutes, who knew the defendant;

G) other prostitutes shared information with her regarding their safety, as they "worked;" and

H) there was never any concern by her or her fellow workers that defendant was any danger to any of them.

After considering the above information provided by this potential witness, the trial court refused to allow her to testify, because the court felt her testimony was irrelevant. A proffer was then made by the defense, which included the above statements. This witness was present in court, and gave this testimony to the judge, out of the presence of the jury. The court again denied her testimony as being "irrelevant," but did say that the court would allow the witness to say only the following: "I know Russell Ellwood and he has a reputation for non-violence."

This limited ruling by the trial court so restricted defense that they elected not to use her, reasoning that to use her as a witness in this manner would be worse than using her at all.

Because the defense alleged that the main investigatory officer was guilty of police misconduct, the defense attempted to show that the officer coaxed witnesses against the defendant, deserted evidence in his favor, and portrayed him as a "serial killer." This defense was thwarted by the trial court. The officer had "made" the defendant "a suspect in 15 to 26 murders." The victim in one of those murders was the same person for which the defendant was a suspect. The defense was that the over-zealous and fame seeking police officer portrayed the defendant as a "serial killer" and that this was an exaggeration on her part. The death of one of those victims "attributed" to him by that officer was relevant to the entire case. Testimony that the witness saw the victim's jewelry, a ring, in the possession of other people she personally knew as "drug dealers," after this victim's death would be relevant, at least to show that other persons could have committed the offenses. The court did not allow the defense witness' testimony on the grounds of relevancy. See **Fed. Rules of Evid. 501.** See also Weinberg, The Judicial Discretion to Exclude Relevant Evidence, 21 McGill L.J. 1, 25-26 (1975) and Trautman, Logical or Legal Relevancy - A Conflict in Theory, 5 Van. L.Rev. 385, 388 (1952). See also sworn affidavit of Shara Kohrs, D.O.C.# 119059, 7/2/99. (Exhibit Y).

The trier of facts makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988). See also *U.S. v. Soape*, 169 F.3d 257 at 268 (5th Cir. 1999).

See *State v. Bernard*, *supra*.

In the instant case, a rational trier of fact was not given the opportunity to make

credible determinations, to accept or reject the testimony of this defense witness.

## CLAIM XI
## CUMULATIVE EFFECT OF ALL ERRORS

**THE CUMULATIVE EFFECT DENIES THE PETITIONER DUE PROCESS, COMPULSORY PROCESS, THE FUNDAMENTAL FAIRNESS, AND THE RIGHT TO A FAIR TRIAL BECAUSE OF ALL ERRORS IN VIOLATION OF THE 1ST, 4TH, 5TH, 6TH, 7TH, 8TH, 9TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE LSA-CONST. ART. I, §§ 2, 3, 13, 15, 16, 17, 19, & 22.**

Petitioner's application clearly alleges the cumulative effect of multiplicity of errors, that if proven would entitle him to constitutional relief. *Rickman v. Dutton*, 864 F.Supp. 686 (M.D. Tenn. 1994) and *United States ex rel. Williams v. Washington*, 863 F.Supp. 697 (N.D. Ill. 1994).

## CONCLUSION

In violation of the 5th, 6th, and 14th Amendments of the United States Constitution and the Louisiana Constitution of 1974, Article I, §§ 2, 3, 13, 15, 16, & 22, Petitioner claims that new evidence makes it likely that a new jury, hearing the evidence, would have a reasonable doubt as to the Petitioner's guilt. Through coached and fabricated evidence, altered exculpatory evidence, destroyed exculpatory evidence, and suppressed exculpatory evidence, Defendant was falsely convicted of a crime in which he is absent of guilt. The fact remains conclusively, when Defendant was in Ohio, Cheryl Lewis died in Louisiana.

WHEREFORE, Russell Ellwood, Petitioner, prays that the court GRANT Petitioner relief to which he may be entitled.

Respectfully submitted,

*Russell Ellwood* 09/11/07
Russell Ellwood
D.O.C.# 413920, ~~Spruce 4~~ CYPRESS-3
Louisiana State Penitentiary
Angola, Louisiana 70712

IN THE
TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES
STATE OF LOUISIANA

RUSSELL ELLWOOD,
Versus
N. BURL CAIN, Warden,
STATE OF LOUISIANA,

---

## EXHIBITS & APPENDICES

---

| | | |
|---|---|---|
| Exhibit A | 1/93 | Calendar of February 1993 - police time line with alibi dates |
| Exhibit B | for 2/93 | Tide Tables, weather data for time period in question from David Walters, U.S. Geological Survey for February 1993 |
| Exhibit C | 2-02-93 | Missing person report - Signal 22 |
| Exhibit D | 2-21-93 | St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Cheryl A. Lewis |
| Exhibit E | 2-22-93 | St.Charles Parish Sheriff's Dept., Serial Murder Task Force police report, Delores Mack |
| Exhibit F | 2-22-93 | St.Charles Parish Sheriff's Dept., Crime Scene Investigation Daily Report of Cheryl Lewis by Dr. Susan Garcia |
| Exhibit G | 2-22-93 | Bank statement - purchase of Greyhound Bus ticket from Canton, Ohio |
| Exhibit H | 2-01-94 | Police time line p. 86 - Ellwood visited Ohio, Entry for 2-01-94 |
| Exhibit I | 5-01-96 | JPSO Special Investigations Division Vice Squad 187808, 187809 |
| Exhibit J | 5-02-96 | JPSO Narcotics Division - Report of Investigation 187810 |
| Exhibit K | 6-25-96 | Interview of Annette Phoenix, one week before her sister's death, listed as Sunday, 2:00 A.M., (actually Monday, February 1, 1993 2:00 A.M.), Going to Circle K |
| Exhibit L | 7-12-96 | JPSO audio tape transcription of Milo Lewis (item # 04-3203-95) |
| Exhibit M | 2-10-99 | State of Louisiana Dept. of Justice Interview Report of Milo Lewis (file # 36-373) with Cheryl Lewis on Wednesday evening |
| Exhibit N | 12-15-97 | Audio tape transcription from Stark County Jail, pp. 1, 4, 12, 13 |
| Exhibit O | 3-02-98 | Warrant for Arrest of Russell Ellwood and Affidavit (1993 time period not consistent with pregnancy of Samantha) |
| Exhibit P | 4-09-98 | Application for Bill of Particulars and Motion for Discovery and Inspection |
| Exhibit Q | 5-26-98 | Motion to suppress the evidence and alleged "inculpatory" statements |

## EXHIBITS & APPENDICES (continued)

| | | |
|---|---|---|
| Exhibit R | 1-11-99 | Answer to Application for Bill of Particulars and Motion for Discovery and Inspection and cover letter |
| Exhibit S | 1-26-99 | Report from William Bass (University of Tennessee, Knoxville) to JPSO Steve Buras (officer provided autopsy photos) |
| Exhibit T | 3-23-98 | Indictment |
| Exhibit U | 3-02-99 | Amended Indictment |
| Exhibit V | 4-19-99 | Motion To Dismiss Remaining Count of the Indictment & Motion To Adopt All Previous Motions Filed |
| Exhibit W | 5-20-99 | Motion for Discovery and Inspection, Motion to Disallow Other Crimes Evidence, and Motion to Suppress |
| Exhibit X | 6-04-99 | Motion in Limine |
| Exhibit Y | 7-02-99 | Affidavit of Shara Kohrs - two inmates that testified could not identify Ellwood, but were urged by police to testify |
| Exhibit Z | 6-21-00 | Anonymous letter to James A. McPherson (witness coaching of St. Gabriel inmates - deposition of Bruce Harrison requested) |
| Exhibit AA | 2-26-03 | Original Post Conviction Application and cover letter |
| Exhibit BB | 2-27-03 | Indigent mail request, Clerk of Court - District Attorney - St. Charles withdrawal slip $2.58 |
| Exhibit CC | 4-08-05 | Letter from Steven Lintlop |
| Exhibit DD | 3-06-06 | Letter from Steven Lintlop |
| Exhibit EE | 9-26-05 | Letter to Ross T. Scaccia from C.David James - material in my possession has been sent to Mr. Scaccia |
| Exhibit FF | 1-17-06 | Letter from Maria Chaisson (RE: Ron Camden telephone conversation) |
| Exhibit GG | 3-30-06 | Letter to Clerk of Court, 29th Judicial District Court |
| Exhibit II | 7-2000... | Correspondence to Ellwood from McPherson, dated 7-10-00, 3-11-03, 3-18-03, 3-26-03, 5-02-03, 4-05-05, 5-24-05, 6-10-05, 7-18-05 |
| Exhibit JJ | 2-2003... | Correspondence to Practice Assistance Council from Ellwood, dated 2-14-03, 2-17-05, 3-01-05, 4-13-05, 5-16-05, 5-16-05, 6-14-05, 6-15-05, 7-05-05, 7-12-05 |
| Exhibit KK | 3-2005... | Correspondence to Practice Assistance Council from McPherson, dated 3-10-05, 4-06-05, 4-18-05, 6-30-05 |

EXHIBITS & APPENDICES (continued)

TRANSCRIPTS

**Exhibit LL**     Transcript of perpetuated testimony of Stan Hill
5-26-98

|  |  |
|---|---|
| p.57 lines 25-32 | Ellwood allegedly dumped bodies in alleyways |
| p.58 lines 1-5 | Ellwood allegedly dumped bodies "behind dumpsters or aside the river" |
| P.60 lines 7-23 | victims were "tied up" and "strangled" |

**Exhibit MM**     Transcript of Testimony of Lt. Susan Rushing
12-09-98

|  |  |
|---|---|
| p.34 lines 30-32 | Bodies not in same vicinity at same time |
| p.35 lines 1-6 |  |
| p. 40 lines 30-31 | Date of Samantha's birth in 1994 altered |
| p.41 lines 12-17 | Birthdate of child is very important |

**Exhibit NN**     Transcript of Hearing on Motion to Suppress
1-15-99

|  |  |
|---|---|
| p.10 lines 8-9 | Changed dates on things |
| p.10 line 24 | Witness interviews altered (Annette Phoenix interview) |
| p.35 lines 6-31 | Discovery issue - open discovery |
| p.37 line 8 | Discovery to be complete by March 15, 1999 |
| p.40 lines 1-5 | Jefferson Parish Coroner is under sub-contract in St.Charles |

**Exhibit OO**     Transcript of Pre-trial Motion to Amend Bill of Information
3-02-99

|  |  |
|---|---|
| p.7 lines 1-12 | Maria Chaisson spoke with Ron Camden. Ellwood did not confess during interrogation. |

**Exhibit PP**     Transcript of Hearing on Pre-trial Motions
3-05-99

|  |  |
|---|---|
| p.91 lines 12-32 |  |
| p.92 lines 1-32 | No evidence of misdemeanor manslaughter |
| p.93 lines 1-8 |  |
| p.94 lines 18-24 |  |
| p.94 lines 18-24 | No confirmation of second testing method |
| p.124 lines 28-32 | Discovery issue |
| p.125 lines 6-29 | Freese promises to complete discovery by March 15, 1999 |
| p.126 lines 23-26 | Full open discovery ended on December 10, 1998 |
| p.128 lines 2-9 | Freese agrees to provide additional discovery material of Delores Mack |

**Exhibit QQ**     Transcript of Hearing on Motions
5-10-99

|  |  |
|---|---|
| p.19 lines 3-32 | Discussion related to actual grounds as basis of defective indictment |
| p.21 lines 7-16 | Freese continues to suppress bus tickets dated 2/22/93 and 2/23/93 |
| p.23 lines 19-22 | Motion to dismiss denied |
| p.23 lines 23-29 | Scaccia objects for the record |

EXHIBITS & APPENDICES (continued)

**Exhibit RR**
6-01-99

Transcript of Hearing on Motions

| | |
|---|---|
| p.22 lines 26-32 | \\__ Motion to suppress the evidence of other crimes |
| p.23 line 1 | / |
| p.23 lines 2-15 | The court will give cautionary instructions to the jury regarding four incidents |
| p.23 lines 16-26 | Scaccia objects to ruling denial |
| p.23 lines 27-32 | \\__ Freese believes we have had evidentiary hearing |
| p.24 lines 1-13 | / |
| p.26 lines 19-32 | Discovery motion heard |
| p.28 lines 17-32 | Autopsy reports grossly incomplete; never received supplemental reports. |
| p.29 lines 1-8 | Freese states autopsy discovery is complete |
| p.30 lines 1-8 | Freese states there are no autopsy photographs |
| p.39 lines 24-32 | \\___ Only names of expert witnesses provided |
| p.40 lines 1-20 | / |
| p.40 lines 21-28 | Freese states no need for *Daubert* hearings; Scaccia fails to object |
| p.41 lines 11-22 | Scaccia intends to subpoena Mary Manheim as expert witness |

**Exhibit SS**
6-07-06

Transcript of Trial - Day 1 - Motion in Limine Ruling

| | |
|---|---|
| p.6 lines 18-28 | Denied use of Stan Hill videos - no objection |
| p.7 line 1 | Maria Chaisson testimony to impeach Ron Camden |
| p.7 line 17 | Denied reconsideration of court's ruling on other crimes evidence |
| p.7 lines 18-24 | Denied Shara Kohr's testimony |
| p.7 lines 25-27 | Scaccia preserves objection |

**Exhibit TT**
6-08-06

Transcript of Trial - Day 2 (record erroneous marked Day 1)

| | |
|---|---|
| p.80 lines 31-32 | Toxicological report was performed |
| p.81 lines 22-32 | \\___ Objection to "certain beyond a reasonable doubt" |
| p.82 lines 1-2 | / Trial court fails to charge jury on reasonable doubt during testimony of said witness |
| p.82 lines 26-32 | \\__ Unable to estimate the time of death |
| p.83 lines 8-13 | / |
| p.83 lines 14-17 | Alive but unconscious |

**Exhibit UU**
6-09-99

Transcript of Trial - Day 3

| | |
|---|---|
| p.5 lines 15-32 | Motion to protect record in reference to other crimes witnesses |
| p.6 lines 4-15 | Scaccia moves for mistrial based on denial of other crimes witnesses |
| p.7 lines 12-19 | Move for mistrial |
| p.7 lines 24-27 | Move for mistrial denied |
| p.25 lines 24-27 | Scaccia objects again and moves again for mistrial |
| p.25 lines 28-30 | Trial court notes objection |
| p.26 lines 26-30 | Third objection to other crimes witnesses and third motion to move for mistrial |
| p.27 lines 21-22 | Trial court denies motion |
| p.28 lines 25-32 | \\___ Denise Sanders testified Lewis and Ellwood seen |
| p.29 lines 1-8 | / together in summer of 1993 |
| p.209 lines 17-29 | Ellwood feels comfortable with State's discovery |

### EXHIBITS & APPENDICES (continued)

Exhibit VV          Transcript of Trial - Day 4
6-10-99

Sharon Jones testimony
                    p.102 lines 29-32        \\_____    Medical reports of birthdate of
                    p.103 lines 1-13         /          Samantha as December 1, 1994

p.125 lines 7-13          Scaccia expresses desire to introduce original indictment
                          into evidence
p.126 lines 13-32         Discussion of original indictment as evidence
p.126 lines 27-32         \\__ Freese objects
p.127 lines 1-5           /
p.127 lines 6-8           Trial court offers stipulation if agreeable to Scaccia
p.127 lines 9-17          Scaccia refuses to agree to stipulation
p.127 lines 20-27         State's objection is sustained trial court's stipulation
                          enforced
p.144 lines 18-32         \\_____ Court entertains objection by McPherson
p.145 lines 1-31          /       on disallowing other crimes testimony
p.146 lines 19-28         Delete other crimes jury charge and testimony
p.146 lines 29-32         Trial court denies fourth motion
p.190-200                 Jury Charges

Exhibit WW   Petition to rule on pending Motion for Production of Documents with cover
             letter filed April 14, 2005, Clerk of Court, St. Charles Parish

Exhibit XX   Letter to Honorable Kirk R. Granier requesting to rule on motion for
             production of documents which was never ruled upon, with proof of mailing.

## APPENDICES

Appendix A          Scientific Evidence (1986) - Pathology § 19-8(B) page 137, by P.
                    Giannelli and E. Imwinkelried

Appendix B          Insect Succession and Decomposition of Pig Carcasses in Water,
                    by Jerry A. Payne and Edwin King, Journal of Entomological
                    Science, pp. 154-155

Appendix C          State v. Matthews, testimony of Dr. Patrick Besant-Matthews,
                    cover page & pp. 123 & 131

IN THE

TWENTY-NINTH JUDICIAL DISTRICT COURT

PARISH OF ST. CHARLES

STATE OF LOUISIANA


RUSSELL ELLWOOD,
                                                     *Petitioner*,

Versus

STATE OF LOUISIANA,
                                                     *Respondent*

---

**SUPPLEMENT AND MEMORANDUM TO REMANDED
APPLICATION FOR POST CONVICTION RELIEF
Case No. 98-109 Division "D"**

---

MAY IT PLEASE THE COURT:

NOW COMES Russell Ellwood, *pro se*, and in proper person, who presents to this Honorable Court a Supplemental Claim and Memorandum of Actual Innocence supported by newly discovered evidence. Your Petitioner avers the following facts in support of this motion:

Jurisdiction is properly vested in this Honorable Court under the provisions of the Louisiana Constitution of 1974, Article I, § 22, Article V, § 16(A) and Louisiana

1

APPENDIX

DD

C.Cr.P. Art. 924, et seq.   Now, Russell Ellwood, Petitioner herein, respectfully presents his claim for relief in supplement:

## CLAIM XII

**A Fundamental miscarriage of justice occurred, to the prejudice of Petitioner, resulting in the conviction of one who is actually innocent, in violation of Amendments 5, 6, and 14 of the United States Constitution and LSA-Constitution Article I, §§ 2, 3, 13, 15, 16, and 22.**

The arrest on December 5, 2006 of Ronald J. Dominique, the "Bayou Serial Killer" and his numerous confessions serves as the base of the foundation in firm support of Petitioner's claim of actual innocence.

According to police records, Mr. Dominique was active before and during 1993, the time period consistent with the deaths of Cheryl Lewis and Delores Mack. Mr. Dominique was arrested on August 25, 1985 on an obscenity charge in Lafouche Parish. Dominique's first recorded brush with a rape accusation involved a Houma man his same age who said Dominique picked him up, took him back to Thibodaux and bound and raped him at gunpoint. This first alleged victim said he met Dominique in 1993. The second incident occurred three years later. The victim said he met Dominique and allegedly agreed to help him buy drugs. The two men rode to Dominique's house and went inside, where Dominique grabbed a gun and tied him up, police reports say. Dominique brutally raped him with a knife to the victim's throat. Dominique was jailed on August 15, 1996. After three months, the charges were dropped. He was released November 7, 1996.

Petitioner contends that the aforementioned time line is inaccurate. An accurate time line includes Cheryl Lewis, February 21, 1993, discovered 70 yards from Delores Mack, February 22, 1993, discovered in the pumping station canal; the rape of a Houma man at Dominique's house in Thibodaux in 1993, month unknown,; John Wooters, June 18, 1993, discovered on Hwy. 3127 very near the discovery site of Lewis, Mack, Mitchell, and Ranson. John Wooters was a florist in New Orleans.

2

Ronald J. Dominique worked for a florist in Houma as a delivery man.

Vincent Symanski, discovered in a drainage canal on Hwy. 61 in Sorrento, Louisiana on February 17, 1994; David Mitchell, discovered in the same pumping station canal in July 1997 where Delores Mack was discovered; and Larry Ranson, discovered in the same pumping station canal on Hwy. 3160 where Mack and Mitchell were discovered which is 70 yards from the discovery site of Cheryl Lewis. Three victims were discovered literally on top of one another, 70 yards from a fourth victim; all four in the very near [close proximity] to the discovery site of John Wooters.

The state contends that all of Dominique's victims are male and generally homosexual. Delores Mack was legally a woman. Mr. Dominique is an admitted homosexual and drug user. However, several recently discovered facts dispute the state's contention. A trail of evidence links the death of Cheryl Lewis with the deaths of three drug dealers of Boutte; Angel Mejia (June 20, 1997), Joseph Brown (October 20, 1997), and Gary Pierre (December 14, 1997). Pierre knew both Brown and Mejia, lived one block from Mejia and was arrested with him on drug-distribution charges in 1997. Joseph Brown was also a drug dealer and the illegitimate son of Cheryl Lewis. Mervin Spencer knew Joseph Brown, Cheryl Lewis, Brown's mother, and Annette Phoenix, sister of Cheryl Lewis. Mervin Spencer, it is alleged, was intimate with both sisters. Cheryl Lewis was last seen getting into a vehicle with a black man identified as Mervin Spencer. Mr. Spencer was frequently seen driving a black Toyota pickup truck as was Ronald J. Dominique.

Milo Lewis, boyfriend of Cheryl Lewis, stated to JPSO Bruce Harrison that he and Cheryl Lewis were together until late evening on a Wednesday in February, 1993. Lewis never saw Cheryl Lewis again.

The unaltered statement of Annette Phoenix indicates the actual post-mortem interval of Cheryl Lewis (Exhibit K) and corroborates the statement of Marie Dupre

(Exhibit C). These two statements combined with the statements of Milo Lewis

(Exhibits L and M) fully support Petitioner's claim of actual innocence.

Unaltered statement of Annette Phoenix by Lieutenant Rushing (Exhibit K):

> "Annette reported that, one week before her sister's death, she was
> on the street in the West Bank Traffic Circle on a Sunday at 2:00 am
> [actually Monday morning], she was using crack cocaine and was
> engaged in prostitution. She was on foot, intending to go to the Circle
> K in the traffic circle, . . ."

Missing person report concerning statement of Marie Dupre (Exhibit C):

> "Ms. Dupre went on to state that Cheryl came to her residence at
> about 2:00 am on Monday, the 1st of February to get a few dollars to go
> to the Circle K food store. . ."

Based upon these three statements and based upon Petitioner's police initiated

alibi, Wednesday, February 3, 1993 is not applicable. The PMI is well within

Petitioner's alibi. On Wednesday evening, February 10, 1993, Petitioner was asleep

at the Salvation Army Men's Lodge in Hattiesburg, Mississippi. On Wednesday

evening, February 17, 1993, Petitioner was in Canton, Ohio.

Through coached and fabricated evidence; altered, destroyed, and suppressed

exculpatory evidence, Defendant was falsely convicted of a crime in which he is

actually innocent. The fact remains conclusively, when Defendant was in Ohio,

Cheryl Lewis died in Louisiana.

In July of 2005, Paul Petta explained to defendant a connection between inmate

Jon Ballay, D.O.C.# 126099, attorney Jim Williams, and himself, in the development

of Diane Gilliam as an "other crimes evidence" witness. This conversation brings to

light the fabrication and probable coaching of Diane Gilliam as a witness. Request is

hereby made for subpoena of Paul Petta, D.O.C. # 87208, regarding this claim.

On July 22, 2006, Charles Unger (D.O.C. # 87945) spoke with Russell

Ellwood expressing his desire to testify in the defense of Russell Ellwood.

(Exhibit HH).

4

Garnet Marshall, D.O.C.# 110335, has provided information to Petitioner that his coached statement was obtained through the effort of Lt. Susan Rushing during visits to Angola. During each visit she was accompanied by two different male detectives and SCSO Sgt. Olga Fourroux. During one of Lt. Rushing's visits, she purchased a carton of Camel cigarettes for Mr. Marshall and promised to assist with his early release in exchange for his coached statement against Petitioner. Additionally, Mr. Marshall provided information in reference to Mervin Spencer, Cheryl Lewis, Joe Brown, and the crucial link to Ronald J. Dominique. Request is hereby made for subpoena of Garnet Marshall, D.O.C. # 110335. (Exhibit HHH).

On May 27, 2007, Petitioner spoke with inmate Daniel Dickerson, # 87172. He worked as a paralegal for Jim Williams, attorney, and prepared documents in reference to Jon Ballay as intermediary for Diane Gilliam and Nawassa Richmond in preparation of their false testimony against me.

On June 4, 2007 3:00 pm, Jon Ballay revealed to Petitioner that, "of course Diane Gilliam made a deal with the prosecutor, but didn't get it."

On June 13, 2007, Petitioner spoke with Daniel Dickerson, #87172, during lunch. He said that he came to prison in February of 1999. He worked for Jim Williams up to that time. All documents he prepared pertaining to Diane Gilliam, Nawassa Richmond, and Jon Ballay would be before that date. (Exhibit EEE).

Request is hereby made for subpoena of these additional witnesses:

| | |
|---|---|
| Jon Ballay, D.O.C.# 126099 | Exhibit EEE |
| Diane Gilliam, D.O.C.# 215093 | |
| Shara Kohrs, D.O.C. # 119059 | Exhibits AAA, BBB |
| Gayle Niedhart, D.O.C. # 211283 | Exhibit CCC |
| Sandra Cordero, D.O.C. # 396759 | Exhibit DDD |
| April George, D.O.C.# 269654 | Exhibit FFF |
| Russell Kirkland, D.O.C. # 417899 | Exhibit GGG |
| Daniel Dickerson, D.O.C. # 87172 | |
| Charles LaHaye, D.O.C. # 459879 | |

*House v. Bell*, 2006 WL 1584475 (U.S.) 2006 held:

5

1.   Because House has made the stringent showing required by the actual innocence exception, his Federal Habeas action may proceed. Pp. ___16___34.

(A)   To implement the general principle that "comity and finality 'must yield to the imperative of correcting a fundamentally unjust incarceration,'" *Murray v. Carrier*, 477 U.S. 478, 495, 106 S.Ct. 2639, 91 L.Ed.2d 397, this Court has ruled that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327, 115 S.Ct. 851. Several features of *Schlup*'s standard bear emphasis here. First, while the gateway claim requires "new reliable evidence . . . not presented at trial," *id.*, at 324, 115 S.Ct. 851, the habeas court must assess the likely impact of 'all the evidence' on reasonable jurors, *id.*, at 329, 115 S.Ct. 851. Second, rather than requiring absolute certainty about guilt or innocence, a petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt. Finally, this standard is "by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, "which governs insufficient evidence claims, *id.*, at 330, 99 S.Ct. 2781.

Rather, because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. See *ibid*. In addition, because the standard does not address a "district court's independent judgment as to whether reasonable doubt exists," *Schlup*, supra, at 329, 115 S.Ct. 851, a ruling in House's favor does not require the showing of clear error as to the District Court's specific findings. It is with these principles in mind that the evidence developed in *House*'s federal habeas proceedings should be evaluated. Pp. ____16-20.

*Borrego v. U.S.*, 975 F.Supp. 520 at 523, 524 (1997):

. . ., even if a petitioner cannot demonstrate cause, courts may still consider newly raised claims where "failure to consider the claims will result in a fundamental miscarriage of justice." *Sawyer v. Whitley*, 505 U.S. 333, 339, 120 L.Ed.2d 269, 112 S.Ct. 2514 (1992). A fundamental miscarriage of justice occurs in those "extraordinary circumstances" when a constitutional violation probably has caused the conviction of one who is "actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 91 L.Ed.2d 397, 106 S.Ct. 2639 (1986).

At 524:

In addition, the Supreme Court consistently has held that the death penalty does not mandate a higher standard of review on federal habeas corpus appeal. *Herrera v. Collins*, 506 S.Ct. 390, 405 L.Ed.2d 203, 113 S.Ct. 853 (1993). Thus, it follows that the court overcame the barrier to extending the "actual innocence" standard of review to non-capital cases when it extended the exception to capital sentences because capital and non-capital cases are treated alike on federal habeas review. See *United*

*States v. Maybeck*, 23 F.3d 888, 893 (4th Cir. 1994).

*Ritchie v. Eberhart*, 11 F.3d 587 at 591, 593 (6th Cir. 1993):

At 591:

> What is demanded of a habeas petitioner at the federal court stage, *McCleskey* held, is indistinguishable from what is demanded of him at the state court stage.

At 593:

> We have no doubt that habeas corpus is general, . . ., are governed by principles of equity.  Because this is so, the federal courts would undoubtedly entertain a second or successive petitioner from Mr. Richie if he could point to a constitutional violation that probably resulted in the conviction of one who was actually innocent.  See *McCleskey v. Zant*, 111 S.Ct. at 1470; *Murray v. Carrier*, 477 U.S. at 496.

*Dean v. U.S.*, 788 F.Supp. 306 at 311, 312 (E.D. Tex 1992):

At 311:

> Since the same standard of performance that is expected of attorneys cannot reasonably be expected of a pro se applicant, a more lenient standard for pro se applications is appropriate and consistent with *McCleskey*.

At 312:

> Even if the cause and prejudice standard applied in *McCleskey* were applicable here, review of applicant's claims would be appropriate under the "fundamental miscarriage of justice" exception.  *McCleskey*, 111 S.Ct. at 1470.  Under this exception, an applicant is entitled to review of a new claim, despite the failure to demonstrate cause for failing to raise it in the first application, if the "constitutional violation has probably resulted in the conviction of someone who is actually innocent." *Murray*, 477 U.S. at 496; *McCleskey*, 111 S.Ct. at 1470.

*Jones v. Estelle*, 722 F.2d 159 at 173 (5th Cir. 1983).  But there is no statute of limitations on the serious constitutional claims of prisoners.

Cause to not raise claim in original application had no reason to investigate *Brady* claim.  Government's suppression of *Brady* material and lying during pre-trial "[cause] . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. at 492, 91 L.Ed.2d 397, 106 S.Ct. 2639.

7

1)   Petitioner alleges the state asserted that it would disclose all *Brady* material. (Exhibit NN, pp.35, 37, 40) (Exhibit PP, pp.125-126, 128) (Exhibit RR, p. 29).

Petitioner further alleges that the prosecutor knowingly failed to turn over myriads of exculpatory evidence involving every allegation in violation of Petitioner's due process rights. All the while, the prosecution maintained an open file policy.

2)   Petitioner alleges that defense counsel confirmed for the state Petitioner's reliance on the prosecution's representation that it had disclosed all *Brady* material. (Exhibit RR, p.29) (Exhibit UU, p. 209).

3)   Petitioner alleges the state suppressed exculpatory medical evidence or suppressed its knowledge of the non-existence of inculpatory medical evidence material to the issue, "the cause of death as asphyxia due to drowning," making the manner of death a homicide (Exhibit RR, pp. 28-30, 40).   Petitioner alleges the contention of the state is that Russell Ellwood intentionally drowned Cheryl Lewis but evaluative laboratory reports of diatoms and glass slides of lung tissue (proof of asphyxia due to drowning) have been suppressed or are non-existent.   Petitioner further alleges that only a gross examination of the lungs of the decedent was conducted.

Petitioner alleges that prejudice ensued, prejudice within the compass of the "cause and prejudice" requirement because the suppressed or non-existent medical evidence is "material" for *Brady* purposes.

Under *Strickler*, supra, three inquiries underlie the "cause" determination: (1) whether the prosecution withheld exculpatory evidence; (2) whether the petitioner reasonably relied upon the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (3) whether the state confirmed the petitioner's reliance on that policy by asserting during the state Habeas proceedings that the

petitioner had already received everything known to the government. *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 at 1177, 1178 (2004).

Petitioner shows cause when the reason for his failure to develop facts was the continued suppression of the evidence. (Exhibit PP, pp. 124-126, 128) (Exhibit NN, p. 35) (Exhibit RR, p. 29) (Exhibit UU, p. 209). See *Strickler v. Greene*, 527 U.S. 263 at 276, N.14, 144 L.Ed.2d 286, 119 S.Ct. 1936 (1999).

In light of this, the excluded medical evidence, material to the issue of homicide, leaves us with a definite conviction that the inclusion of the medical evidence withheld from Ellwood reasonably could undermine the confidence of any reasonable jurist in the conviction. *Dilosa v. Cain*, 279 F.3d 259 (5th Cir.Court of App. 2002).

Petitioner alleges that he is entitled to an evidentiary hearing. The evidence at issue has either been suppressed or is non-existent and under *Brady* is favorable to the accused as exculpatory or impeaching. (Exhibit RR, p. 26).

Petitioner alleges that facts would have been developed sooner had James A. McPherson fulfilled his continuous promises to provide Petitioner the complete case files in a timely manner. (Exhibits II, JJ, and KK).

Petitioner alleges that procedural bars are not applicable in the instant case of actual innocence. Petitioner asserts that he has not abandoned any claims that may result in procedural bars.

Petitioner alleges he has demonstrated that the constitutional violations he alleges "ha[ve] . . . resulted in the conviction of one who is actually innocent," such that a federal court's refusal to hear the . . . claims would be a "miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 326-327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (internal quotations marks omitted). To make the requisite showing of actual innocence, petitioner must produce "new reliable evidence" and "must show that it is more likely than not that no reasonable juror would have convicted him in light of the

new evidence." *House v. Bell*, 126 S.Ct. 2064, 165 L.Ed.2d 1 (U.S. 2006).

## CONCLUSION

All issues considered, the suppression of the entire Ronald J. Dominique investigation throughout Petitioner's entire criminal proceedings, before, during and after his arrest and confessions, obviously perjured testimony of other crimes evidence witnesses, suppression or non-existence of medical evidence material to the issue of homicide, and the prosecutor's knowledgable failure to reveal said exculpatory evidence fully support Petitioner's claim of actual innocence.

This Honorable Court should vacate the conviction and sentence in the instant case and initiate investigation into the wrongdoings involved by various government agencies in the instant travesty that they created.

Respectfully submitted,

*Russell Ellwood* 10/11/07
Russell Ellwood
D.O.C. No. 413920, Cypress 3
Louisiana State Penitentiary
Angola, Louisiana 70712

TWENTY-NINTH JUDICIAL DISTRICT COURT

PARISH OF ST. CHARLES

STATE OF LOUISIANA

Docket No. __98-109__   Division "D"

RUSSELL ELLWOOD,
*Petitioner*,

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

## MOTION FOR LEAVE OF COURT TO SUPPLEMENT, AMEND, OR BOTH THE ORIGINAL APPLICATION FOR POST-CONVICTION RELIEF

**MAY IT PLEASE THE COURT:**

NOW INTO COURT, comes Petitioner, Russell Ellwood, appearing herein personally and with respect moves this Honorable Court for leave to supplement, amend, or both the original brief currently filed, in the above captioned and numbered case, and is considered under the relation back doctrine of which the Petitioner now adjoins with his original application filed on the 27th day of February, 2003.

**WHEREFORE, PETITIONER PRAYS THAT:** This Honorable Court Grant him leave to supplement, amend, or both, his original application with the trial court. *See State ex rel. Duhon v. Whitley*, No. 92-KH-1740, 94-1740 (La. 09/.02/94), 642 So.2d 1273 (1994); *State ex rel. Edge v. Whitley*, No. 92-KH-0806, 599 So.2d 1090 (1992); *State ex rel. Foy v. Whitley*, No. 92-KH-1281, 92-1281 (La. 10/06/95); 661 So.2d 455 (1995).

**PETITIONER FURTHER PRAYS THAT:** This Honorable Court order the State of Louisiana to answer through its district attorney in this affair.

Respectfully submitted this _11th_ day of _October_ , 200*6*7

_Russell Ellwood_  10/11/07
Russell Ellwood
D.O.C.# 413920, ~~Spruce 4~~ CYPRESS-3
Louisiana State Penitentiary
Angola, Louisiana 70712

IN THE
TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES
STATE OF LOUISIANA

RUSSELL ELLWOOD,
*Petitioner,*

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*

CASE NUMBER:  98-109                    DIVISION "D"

FILED: _____          _____
                                         Deputy Clerk of Court

## MOTION TO COMPEL THE DISTRICT ATTORNEY TO ANSWER

The Petitioner, RUSSELL ELLWOOD, suggests that the allegations set forth, if established, would entitle him to constitutional relief. On further suggestion your Petitioner moves this Honorable Court to Order the District Attorney Harry J. Morel, Jr. to file an answer, opposing why Your Honor should not Grant post-conviciton relief, within the specified period, under Louisiana Code of Criminal Procedure, Article 927(A).

Executed, this _11th_ day of _OctoBER_, 2006/7

Respectfully submitted

*Russell Ellwood* 10/11/07
Russell Ellwood
D.O.C.# 413920, ~~Spruce 4~~ CYPRESS-3
Louisiana State Penitentiary
Angola, Louisiana 70712

IN THE
TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES
STATE OF LOUISIANA


RUSSELL ELLWOOD,
*Petitioner*,

Versus

N. BURL CAIN, Warden,
Louisiana State Penitentiary;
STATE OF LOUISIANA,
*Respondent*


FILED: _____          _____

                                         Deputy Clerk of Court


ORDER


IT IS ORDERED that, the District Attorney in and for the Parish of St. Charles, State of Louisiana, file an "ANSWER" to the Petitioner's Application for Post-Conviction Relief with this Court on or before the _____ day of _____, 200___.

THUS ORDERED in chambers, Hahnville, Louisiana this _____ day of _____, 200___.


                                         _____
                                         Honorable Judge Presiding


**SERVICE INFORMATION**

Please Serve:

Harry J. Morel, Jr., District Attorney
P.O. Box 680
Hahnville, LA 70057-0680

Russell Ellwood (Petitioner)
D.O.C.# 413920, Spruce 4
Louisiana State Penitentiary
Angola Louisiana 70712

# VERIFICATION

STATE OF LOUISIANA

WEST FELICIANA PARISH

I, Russell Ellwood, hereby affirm and say:

1. I am the Petitioner in these proceedings and, I am solely responsible for its contents;

2. All documents annexed hereto and filed herewith are true and correct copies of the original documents filed into the record;

3. All of the allegations contained in the above foregoing supplement and memorandum to remanded application for post conviction relief are true and correct to the best of my knowledge, information and belief; and

4. I hereby certify that I have served a true copy of the foregoing supplement and memorandum to remanded application for post conviction relief upon Harry J. Morel, Jr., District Attorney, P.O. Box 680, Hahnville, LA 70057-0680, in St. Charles Parish, Louisiana, and Charles C. Foti, Attorney General, P.O. Box 94005, Baton Rouge, Louisiana 70804-9005 via the United States Postal Service, on this _11th_ day of October, 2007.


AFFIANT FURTHER SAITH NAUGHT, this _11th_ day of October, 2007.



_Russell Ellwood 10/11/07_
Russell Ellwood


_10-11-07_

Ex-Officio Notary
Dept. of Public Safety & Corrections/LSP

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a copy of the foregoing Supplement and Memorandum to Remanded Application for Post Conviction Relief has been served upon the following interested parties:

Harry J. Morel, Jr., District Attorney
P.O. Box 680
Hahnville, LA 70057-0680

Charles C. Foti, Attorney General
P.O. Box 94005
Baton Rouge, LA 70804-9005

by placing same in the prison mail depository for the United States Postal Service, with proper postage affixed thereto, on this _11th_ day of October 2006.

_Russell Ellwood_ 10/11/07
Russell Ellwood
# 413020, Cypress 3
Louisiana State Penitentiary
Angola, LA 70712